## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| **In re:** | : | **Chapter 11** |
|  | : |  |
| **EMAS CHIYODA SUBSEA LIMITED,** *et al.*, | : | **Case No. 17-31146 (MI)** |
|  | : |  |
|  | : | **(Joint Administration Pending)** |
| Debtors.[1] | : |  |

## DECLARATION OF STEPHEN H. MCGUIRE IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Stephen H. McGuire, being duly sworn, deposes, and says:

1.       I currently serve as the general counsel of EMAS CHIYODA Subsea Limited

("ECS") and certain of its affiliates, the debtors and debtors in possession in the above-captioned

cases (collectively, the "Debtors" and, together with their non-Debtor affiliates, the "Company").

I have served in that capacity since March 2011.  In that role, I advise the Company in all facets

of its business, including contract negotiation, employment matters, property management, and

corporate governance.  I am a member in good standing of the State Bar of Texas.

2.       On the date hereof (the "Petition Date"), the Debtors each commenced a case (the

"Chapter 11 Cases") by filing a petition for relief under chapter 11 of title 11 of the United States

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number and jurisdiction of formation are as follows: EMAS CHIYODA Subsea Limited (UK) (3187); EMAS Chiyoda Subsea Inc. (Delaware) (7884); EMAS CHIYODA Subsea Marine Base LLC (Texas) (5974); Lewek Falcon Shipping Pte. Ltd. (Singapore) (041E); EMAS CHIYODA Marine Base Holding Co., LLC (Texas) (7463); EMAS Chiyoda Subsea Services Pte. Ltd. (Singapore) (333Z); EMAS-AMC Pte. Ltd. (Singapore) (0442); EMAS Saudi Arabia Ltd. (Saudi Arabia) (0669); Lewek Constellation Pte. Ltd. (Singapore) (376E); EMAS CHIYODA ROV Pte. Ltd. (Singapore) (049M); EMAS CHIYODA Subsea Services B.V. (Netherlands) (4073); EMAS CHIYODA Subsea Services (UK) Limited (Scotland) (3187); EMAS CHIYODA Subsea Services LLC (Delaware) (1728); EMAS CHIYODA Subsea (Thailand) Co., Ltd. (Thailand) (1011); Gallatin Marine Management, LLC (Delaware) (8989).  The address of the Debtors' U.S. headquarters is 825 Town & Country Ln, Suite 1500, Houston, TX 77024.

Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"). The Debtors are operating their businesses and managing their properties as debtors in possession under Bankruptcy Code sections 1107(a) and 1108. To date, no creditors' committee has been appointed in the Chapter 11 Cases by the Office of the United States Trustee for the Southern District of Texas (the "United States Trustee"). No trustee or examiner has been appointed in the Chapter 11 Cases.

3.      To minimize the adverse effects of filing for chapter 11 on their business and their international operations, the Debtors have filed motions and pleadings seeking various types of "first day" relief (collectively, the "First Day Pleadings").[2] The First Day Pleadings seek relief intended to allow the Debtors to perform and meet those obligations necessary to fulfill their duties as debtors in possession.

4.      I submit this declaration (the "Declaration") to provide an overview of the Debtors, their businesses, and the Chapter 11 Cases, as well as to support the Debtors' chapter 11 petitions and certain of the First Day Pleadings.[3] I have reviewed the Debtors' chapter 11 petitions and First Day Pleadings, or have otherwise had the contents explained to me, and it is my belief that that the relief sought in each First Day Pleading: (a) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value, (b) constitutes a critical element in achieving a successful reorganization of the Debtors, and (c) best serves the Debtors' estates and their creditors' interests. The facts set forth in each First Day Pleading are incorporated herein by reference.

---

[2]     Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the relevant First Day Pleadings.

[3]     Substantially contemporaneously herewith, the Debtors have or will file additional declarations in support of certain of the First Day Pleadings to supplement this declaration.

2

5.      Except as otherwise noted, I have personal knowledge of the matters set forth herein and all facts set forth in the Declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents, or my opinion based on my experience and knowledge of the Debtors' operations and financial conditions.  In making this Declaration, I have relied in part on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and/or for my benefit in preparing the Declaration.  I am authorized to submit the Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

6.      The Declaration is divided into two parts.  Part I provides background information about the Debtors, their business operations, their corporate and capital structures, their restructuring efforts, and the events leading up to the filing of the Chapter 11 Cases.  Part II sets forth the relevant facts in support of each of the First Day Pleadings.

<div align="center">

**PART I**

</div>

**I.      BACKGROUND**

      **A.      The Debtors' and Their Business Operations**

7.      The Company is an international heavy lift subsea, offshore and onshore contractor offering engineering, procurement, construction, transportation, installation, and commissioning services at every stage of the project lifecycle to deliver complex construction projects for customers.  For example, in its subsea business, the Company's key activities include assembly of both rigid and flexible pipes, umbilical and power cable installations, heavy lift operations, and subsea structure installations.

<div align="center">

3

</div>

8.     To deliver its services in the subsea and offshore construction business, the Company has made major investments in industry leading specialized vessels and facilities.  The Company's project enabling vessels[4] helped catapult it to the top tier of deepwater subsea construction service companies.

9.     The Company's Current Fleet and Facilities.

10.     **The Vessels and Barge**:  Prior to the Petition Date, the Company provided these global services to customers through the operation of a diverse fleet of eight subsea construction and installation vessels, two of which it owns and the other six it leases.  In particular, the Debtors own the Lewek Constellation[5] (pictured below), which is the Company's flagship vessel, and the Lewek Falcon.[6]  They lease the Lewek Champion (also pictured below)[7] and the AMC Ambassador.[8]  In addition, they leased the RB1, a reel barge that partners with the Constellation to provide access to additional reels needed for construction projects.[9]  In addition, non-Debtor Emas-AMC AS ("Norway") also leases the Lewek Centurion,[10] the Lewek Express,[11] the Lewek Inspector,[12] and the Lewek Connector.[13]

---

[4]   Project enabling vessels are those vessels that are able to stay on or near field throughout the project.  For example, in the case of the Constellation, a real barge can meet the vessel in field where the Constellation will be able to off-load empty reels and re-load with fully loaded reels.  This reduces project time by, for example, removing the need to transit back to the spoolbase to pick up additional product.

[5]   The Lewek Constellation is a highly specialized, deepwater, subsea, reel lay vessel.

[6]   The Lewek Falcon is a multifunctional anchor handling tug and subsea umbilical riser and flowline construction vessel.  It is also designed and capable of tasks including subsea construction, ROV intervention, subsea maintenance and repair work.

[7]   The Lewek Champion is heavy lift and pipe lay barge equipped for pipe lay and platform operations.

[8]   The AMC Ambassador is an inspection, maintenance, and repair vessel, capable of carrying out subsea construction and field development work, deepwater intervention tasks, and installation of flying leads.

[9]   The lease for the RB1 expired in early February; however, the lease counterparties are currently negotiating a renewal.

[10]   The Lewek Centurion is a S-lay pipeline installation vessel for shallow and deep water.

4





11.    **ROVs**:  In addition, the Company owns approximately 15 remotely operated underwater vehicles (collectively, the "ROVs"), which are tethered underwater mobile devices that can be operated by a crew aboard a vessel.  The ROVs are essential for drilling support and subsea constructions services to enable deepsea exploration projects to be carried out.  Specifically, the ROVs are linked to a host ship to perform offshore work in ultra-deep water

---

11  The Lewek Express is another project enabling asset designed to undertake the SURF and rigid pipeline installation work.

12  The Lewek Inspector is a light construction vehicle used for inspection, maintenance, and repair.

13  The Lewek Connector has cable and flex lay capability.

challenging subsea environments.  Eight are owned by EMAS CHIYODA ROV Pte. Ltd., five are owned by Debtor EMAS CHIYODA Subsea Services Pte. Ltd, and two are owned by Debtor Lewek Falcon Shipping Pte. Ltd.

12.     **Spoolbases**:  Finally, the Debtors own a marine base in Ingleside, Texas (the "Ingleside Spoolbase").  Non-Debtor Norway leases a marine base in Gulen, Norway (the "Gulen Spoolbase").[14]  The Ingleside Spoolbase (pictured below) is a 120-acre, deepwater support facility as well as a pipeline fabrication base designed to serve the onshore and offshore pipelay and subsea construction needs of the Gulf of Mexico and Mexico's Bay of Campeche. The Gulen Spoolbase is used for pipe storage and handling as well as fabrication, among other things.



---

[14]    A spoolbase is a shore-based facility used for fabrication and storage of pipelines to facilitate continuous pipe laying for offshore oil and gas production.

**B.      Customers and The Debtors' Existing Projects**[15]

13.      The Company's lifeblood is its ability to win bids for contracts for projects and then to complete the work.  Contracts are typically awarded on a competitive bid basis.  Pricing is often the primary factor in determining which qualified contractor is awarded a job, although other factors, including technical capability of service and equipment, unit availability, and crew quality may be considered.

14.      The Company individually negotiates its contracts to provide services and they vary in their terms and provisions.[16]  Once a contract is won, each project undertaken by the Company is unique in geographic location, specifications, and customer needs, requiring customized design and engineering for each project and likewise necessitating customized design and engineering for the components used in each project.  As of December 31, 2016, the Company had an order backlog with potential revenue in excess of more than $1 billion stemming from 15 existing products, including the below.

15.      **The Aramco Projects**:  The Company, in consortium with Larsen & Toubro Hydrocarbon Engineering ("LTHE"), is currently engaged in a series of projects with client Saudi Arabian Oil Company ("Saudi Aramco")[17] as part of a long-term agreement for six years with options to extend.  Under the long-term agreement, LTHE and the Debtors will  provide Saudi Aramco with engineering, procurement, construction, and installation services in the

---

[15]    The following is only a summary of certain of the Company's current projects.  In addition, any description of any of the projects or agreements herein is only a summary of the project or agreement and is not meant to modify or amend any terms of the agreement.  In the event of a conflict or inconsistency between the First Day Declaration and the terms of the underlying agreements, the terms of the agreements shall control.

[16]    Notably, however, each of the existing contracts has a termination for convenience clause under which the customers are able to terminate the contracts at will, subject only to the limitations set forth in the contract.

[17]    Saudi Aramco is the state-owned oil company of the Kingdom of Saudi Arabia.

6048819v1

offshore facilities off the coast of Saudi Arabia.  In particular, in July 2016, the Company,[18] in partnership with LTHE, was awarded a contract by Saudi Aramco valued at more than $1.6 billion.[19]  The first of these projects awarded under the long-term agreement was for the development and expansion of the Hasbah Offshore Gas field situated off the cost of Saudi Arabia (the "Hasbah Project"), including building platforms and pipelines.  The onshore engineering and fabrication component of the project commenced and the offshore phase is expected to commence in the fourth quarter of this year.  The project is scheduled to be completed over a period of three and a half years.  The work relies on various suppliers of materials (e.g., clad pipes), vendors, and other service providers (e.g., welding, pipelaying, etc.).

16.     In addition, as part of the long-term agreement awarded by Saudi Aramco, the Company and LTHE are party to a contract with Saudi Aramco to upgrade 17 platforms in various offshore fields in the Arabian Sea off the coast of Saudi Arabia (the "17 Cranes Project") and a contract with Saudi Aramco for the supply and installation of four wellhead decks in the Safaniya field in the Person Gulf, the largest offshore oil field in the world (the "4 Decks Project" and together with the Hasbah Contract and the 17 Cranes Project, the "Aramco Projects").

17.     **The Chevron TVEX Project:**  The Company is party to a contract with Chevron U.S.A. Inc. ("Chevron") for engineering, procurement, construction, and installation work related to client expansion of its existing facility in the Tahiti field, located in the Gulf of Mexico.  In particular, the Company is engaged to, among other things, perform subsea

---

[18]   Specifically, Debtor EMAS-AMC Pte. Ltd. is the counterparty with LTHE (defined below) to the out of country contract with Saudi Aramco.  EMAS Saudi Arabia Ltd. is the counterparty with Larsen Toubro Arabia LLC to the in country contract with Saudi Aramco.

[19]   The Company's scope covers approximately 40 percent of the contract value.

installation work in relation to this project, including the laying of subsea manifolds, flowlines, umbilicals, and associated equipment.

18.     **Offshore Cape Three Points ("OCTP") Projects**:  The Company has also been engaged by Eni Ghana Exploration and Production Ltd for transportation, installation, and pre-commissioning of subsea equipment offshore Ghana.[20]   Specifically, there are two OCTP projects: the subsea, umbilical, riser, and flowlines ("SURF") offshore transportation and installation work and the gas export line project to install rigid offshore pipe line facilities for the purposes of gas exports ("GEL," and together with SURF, the "OCTP Projects").  Part of the Debtors responsibility for the OCTP Projects is project management, engineering, transportation, and installation for a floating producing storage offloading vessel, some of which requires the use of various vendors, suppliers, and other service providers.

19.     **Kuwait National Petroleum Project**:  The Kuwait National Petroleum Company ("KNPC") plans to build a new refinery to supply domestic and world market demand for ultra-low Sulphur petroleum products in Al Zour, Kuwait.  EMAS-AMC is subcontracted to provide transportation and installation for the export pipelines and fiber optic cables.[21]

---

[20]   The primary contract is between ENI Ghana and non-Debtor SriEmas (a Ghanaian company 49 percent owned by ECS's indirect 40 percent owner, Ezra Holdings Limited.  A back-to-back subcontract for much of the work is to be signed between SriEmas and Debtor EMAS Chiyoda Subsea Inc., although work by EMAS Chiyoda Subsea Inc. is already ongoing.

[21]   The project was subcontracted to EMAS-AMC by a joint venture between and among multinationals Hyundai Engineering & Construction Co. Ltd of Korea, Saipem S.p.A. of Italy, and SK Engineering & Construction Co. Ltd. of Korea.

C.     **The Debtors' Corporate and Capital Structure**[22]

20.     ECS, organized under the laws of the United Kingdom (the "UK"), is the ultimate parent company of multiple vessel-owning or vessel-leasing subsidiaries, in addition to other subsidiaries responsible for operations and provision of services.  The Debtors' domestic and foreign Debtor and non-Debtor subsidiaries operate throughout the world, including in the United States, Singapore, Norway, Saudi Arabia, Australia, the Netherlands, Scotland, Thailand, and Africa.  A corporate organization chart of the Debtors and certain non-Debtor affiliates, as of the Petition Date, is attached hereto as Exhibit A.

21.     As of the Petition Date, the Debtors' funded debt consists of approximately $480 million of secured debt and approximately $175 million of unsecured debt, as set forth in more detail below.  In addition, the Debtors estimates contingent debt under Bank Guarantees (defined below) of approximately $58 million, more than $150 million of remaining lease amounts under certain charters (not including those owed by non-Debtor affiliates), and $103 million in trade debt as of the Petition Date.

22.     **Lewek Constellation Pte. Ltd. Secured Loan Facility**:  On May 16, 2012, Debtor Lewek Constellation Pte. Ltd. ("Lewek Constellation") entered into that certain credit agreement among Lewek Constellation as borrower, each lender from time to time party thereto (the "Constellation Lenders"),[23] DNB Bank ASA, Singapore Branch ("DNB") as agent and security trustee, which was later amended (as amended and restated from time to time, the

---

[22]   Nothing herein constitutes a concession or acknowledgement of any amount owed or as to the validity of any debt, claim, or lien, and the descriptions herein are qualified in their entirety by reference to the documents setting for the specific terms of such obligations.  In the event of any inconsistencies between the summaries set forth herein and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents control.

[23]   Currently, DNB and DBS (defined below) each hold 34.7 of the Constellation Loan, or more than 69 percent in the aggregate.

"Constellation Credit Agreement").   Under the Constellation Credit Agreement, a syndicate of banks, with DNB as agent, extended to Lewek Constellation a secured term loan in the aggregate principal amount of $403 million ("Facility A") and an additional banker's guaranty facility credit line of $100 million ("Facility B") (Facility A and Facility B, the "Constellation Loan" ). Certain of Lewek Constellation's obligations under the Constellation Loan are guaranteed by shareholder Ezra Holdings Limited ("Ezra") and the Debtor Guarantors (the Debtor Guarantors together with Ezra, the "Prepetition Guarantors").   Lewek Constellation's obligations under Facility A are secured by, among other things, substantially all the assets of Lewek Constellation, two Panamanian naval mortgages over the vessel Lewek Constellation, a charge over the earnings account held in Lewek Constellation's name, charges over vessel-related assets owned by Lewek Constellation, and a first priority share charge granted by ECS over the shares of Lewek Constellation.   Currently, there is approximately $370 million in principal amount outstanding under Facility A of the Constellation Loan.[24]

23.   **Lewek Falcon Shipping Pte. Ltd. Secured Loan Facility**: Debtor Lewek Falcon Shipping Pte. Ltd. ("Lewek Falcon") is the borrower under that certain Third Supplemental Agreement with Overseas-Chinese Banking Corporation ("OCBC") as lender of a $95 million secured term loan facility (the "Falcon Loan") for the purpose of part-financing the acquisition of the vessel the Lewek Falcon.   The Falcon Loan is guaranteed by the Prepetition Guarantors. Lewek Falcon's obligations under the Falcon Loan are secured by, among other things, an assignment of earnings, assignment of insurances, a mortgage, an assignment over the bareboat charter proceeds, and charges over certain accounts (including the earnings account of Lewek

---

[24]   The amounts for Facility B are set forth below in the bank guarantee section.

Falcon and a retention account).   Currently, there is approximately $94 million in principal amount outstanding on the Falcon Loan.

24.     **Helix Secured Promissory Note**:   Debtor EMAS CHIYODA Subsea Marine Base LLC ("Marine Base") is the borrower under a $30 million secured promissory note (the "Helix Note") entered into with Helix Ingleside LLC, as lender.   In connection with the Helix Note, Marine Base entered into a deed of trust, security, and assignment of leases and rents to secure Marine Base's obligations under the Helix Note.   Currently, there is approximately $10 million of principal amount outstanding under the Helix Note.

25.     **ROV Secured Debt**:   Debtor EMAS CHIYODA ROV Pte. Ltd. ("ROV Pte.") is the borrower under four secured term loan facilities with DBS as lender (the "ROV Loan"). ROV Pte.'s obligations are guaranteed by Ezra.   ROV Pte.'s obligations under the ROV Loan are secured by, among other things, a deed of assignment and charge, a deed of assignment of insurances, earnings, and charter agreements, and a fixed charge over ROV Pte.'s accounts held with DBS.   Currently, there is approximately $8 million in principal amount outstanding under the ROV Loan.

26.     **ECS Unsecured Loan Facilities**:   Debtor ECS is the borrower under four separate loan agreements, as set forth in more detail below.   Currently, there is approximately $144 million in aggregate principal amount outstanding, as set forth in more detail below.

            (a)     **DBS Revolving Credit Facility**:   ECS is the borrower under a $40 million unsecured working capital revolving credit facility with DBS Bank Ltd as lender (the "Parent DBS Loan").   ECS's obligations are guaranteed by Ezra.   Currently, there is $40 million outstanding on the Parent DBS Loan.

            (b)     **Chiyoda Shareholder Loans**:   ECS is the borrower under a $40 million loan facility agreement with shareholder Chiyoda Corporation ("Chiyoda") as lender (the "Chiyoda Loan").   Currently, there is $40 million outstanding on the Chiyoda Loan.

            (c)     **Ezra Shareholder Loans**:   ECS is the borrower under a

12

shareholder loan in the principal amount of $36 million with Ezra as lender (the "Ezra Loan"). Currently, there is $36 million outstanding on the Ezra Loan.

(d)     **NYK Shareholder Loans**:  ECS is the borrower under a loan facility agreement in the principal amount of $20 million with shareholder Nippon Yusen Kabushiki Kaisha ("NYK") as lender and a separate shareholder loan in the principal amount of approximately $8 million with NYK as lender (collectively, the "NYK Loans").  Currently, there is approximately $28 million outstanding on the NYK Loans.

27.     **EMAS-AMC Pte. Ltd. Unsecured Loan Facility**:  Debtor EMAS-AMC Pte. Ltd., a Singaporean entity ("EMAS-AMC"), is the borrower under a $30 million unsecured working capital revolving credit facility with DBS as lender (the "DBS Loan").  EMAS-AMC's obligations are guaranteed by Ezra.  Currently, there is $30 million in principal amount outstanding under the DBS Loan.

28.     **Bank Guarantees**:  The Debtors, including EMAS-AMC, are party to bank guarantees required by certain of the Debtors' customers as credit support to show the Debtors' financial wherewithal to complete existing projects (the "Bank Guarantees").  The Bank Guarantees are contingent liabilities that are part of the Company's off-balance sheet financing arrangement.  As of the Petition Date, there are approximately $58.5 million of contingent liabilities on account of the Bank Guarantees, including approximately $29.3 million on account of Facility B of the Constellation Loan.  Approximately $8 million of the Bank Guarantees are cash collateralized, the remainder are fully unsecured.

29.     **Charter Agreements**:  In addition, the Debtors are party to a number of vessel lease agreements, under which the charterers are liable for the costs of crew, fuel, insurance, dockage, and other maintenance expenses.  Specifically, certain of the Debtors lease vessels from the owner under various bareboat charters, under which the Debtors must provide crew, fuel, insurance, dockage, and routine repair and maintenance.  Under many of the Debtors' charters,

the Debtors are permitted to purchase the vessel for some additional amount at the end of the charter.  If the Debtors default, the owner of the vessel is able to reclaim the vessel.

30.     The Debtors currently lease the Lewek Champion and the AMC Ambassador. There are remaining lease amounts of approximately $178 million under the Lewek Champion (approximately $161 million) and the AMC Ambassador (approximately $17 million).  The Debtors' estimate that as of the Petition Date, they have remaining performance and payment obligations on account of the bareboat charters for the Lewek Champion and the AMC Ambassador of approximately $2.85 million.  Debtor EMAS-AMC Pte. Ltd., as sub-lessee, guarantees payment obligations in respect of the Lewek Champion and provided a general assignment in favor of the owner of the vessel.[25]  The Debtors' performance and payment obligations in favor of the particular vessel owner are guaranteed by shareholder Ezra Holdings Limited on the AMC Ambassador.

31.     **Trade Debt**:  Based on their books and records, the Debtors estimate that they have outstanding trade payables totaling approximately $103 million as of the Petition Date.

32.     **Equity Interests**:  ECS is a privately held company with Ezra holding 40 percent of its shares, Chiyoda 35 percent, and NYK 25 percent.  As set forth above and in the corporate organization chart, ECS is the ultimate parent of the other Debtors.

---

[25]   In addition, non-Debtor Norway leases the Lewek Centurion, the Lewek Connector, the Lewek Express, and the Lewek Inspector.  Norway's performance and payment obligations on the Lewek Connector, the Lewek Express, and the Lewek Inspector  are also guaranteed by Ezra Holdings Limited.

**D.     Events Leading to the Debtors' Chapter 11 Filing**

33.     The Company's revenue and cash flows have come under significant strain due to, among other things, failing demand for the Company's services as a result of the depressed market conditions in the offshore and subsea construction market it serves; significant vessel operating costs; and a tightening of credit conditions, which ultimately led to the Company's banks freezing various credit lines.

34.     **Deteriorating Market Conditions and Intense Competition**.  The Company provides services for subsea inspection, maintenance and repair, well intervention, drilling, and decommission work.  In other words, the Company primarily serves the oil and gas sector.  As a result of the global slowdown in the oil and gas industry, there has been low growth and limited new deep water exploration and production leading to low vessel utilization, which has had a negative impact on the Company's financial situation.  Despite the challenges in the subsea market and decreasing revenue, many of the Debtors' charter agreements were entered into at a time when charter rates were considerably higher than they are today, which has kept the overall expenses high despite the challenging market conditions.  Moreover, the deepsea offshore markets in which the Company operates are highly competitive.  Certain competitors in the deepsea construction business may have greater financial and other resources than the Company.  As a result, certain competitors may have a better ability to withstand periods of low utilization and/or compete more effectively on price.

35.     **The Debtors' Cost-Reduction Initiatives**.  The Company has taken numerous actions to mitigate the effects of the decline in activity levels, especially given the substantial fixed cost pressure.  In particular, management has made steady efforts to reduce operating costs, including the vessel operating costs, by, among other things, attempting to renegotiate vessel repayments, reducing fixed costs (e.g., cold stacking half of the fleet for 2017), and reducing

15

variable costs via staff reductions and relocations.  However, these cost saving maneuvers have had mixed success.

36.     **Tightening Credit Conditions and Constrained Liquidity**.  As a result of the deteriorating market conditions in the oil and gas sector coupled with the Company's financial difficulties, the Company's lenders have frozen borrowing availability under the Company's prepetition facilities, limiting the cash available to meet its operating needs.

37.     **Development of New Business Plan**. Together the above factors have left the Company without adequate cash to meet its day-to-day operating needs.  As a result, the Company and its financial advisors set out to develop a revised business plan (as may be amended, modified, or supplemented from time to time the "Business Plan").  The Business Plan, which showed a need for substantial additional funding, was shown to the Company's shareholders, along with a request for additional funding to support the Business Plan.  To implement the Business Plan, the Company considered both out-of-court and in-court options in various jurisdictions.  The Debtors and their boards carefully considered and weighed each option.

38.     **DIP Financing**.  After engaging certain parties, including some of their existing prepetition lenders, in discussions to provide potential financing, it became evident to the Debtors that Subsea 7 S.A. ("Subsea") and equityholder Chiyoda Corporation ("Chiyoda," and together with Subsea and Chiyoda, the "DIP Lenders") were the only viable candidates to provide DIP financing on a non-priming, consensual basis and on the timeframe necessary to alleviate their liquidity demands.  As a result, the Debtors engaged in earnest in extensive arm's-length negotiation spanning several weeks.  Days prior to the Petition Date, the Debtors and the

DIP Lenders agreed to the definitive terms of the financing package, and the Debtors determined it was then in their best interest to commence the Chapter 11 Cases.

<div align="center">

**PART II**

</div>

**I.    FIRST DAY PLEADINGS**

39.    In furtherance of these objectives, the Debtors expect to file, and respectfully request that this Court approve, the First Day Pleadings.  I have reviewed each of the First Day Pleadings and proposed orders (including the exhibits thereto) and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.  Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with minimum interruption or disruption to their businesses or loss of productivity or value, and (b) constitutes a critical element in maximizing value during the Chapter 11 Cases.  The Debtors' attorneys have explained to me the customary practices with regard to the requested relief in chapter 11 business reorganization cases and the rationale for these pleadings.

**A.    Administrative and Procedural First Day Pleadings**

40.    **Joint Administration Motion**.    The Debtors request entry of an order consolidating the Chapter 11 Cases for procedural purposes only.  Many, if not most, of the motions, applications, and other pleadings filed in these Chapter 11 Cases will relate to relief sought jointly by all of the Debtors.  For example, virtually all of the relief sought by the Debtors in the First Day Pleadings is sought on behalf of all of the Debtors.  Joint administration of the Chapter 11 Cases, for procedural purposes only, under a single docket entry, will also ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding instead of several independent chapter 11 cases.  In addition, the Debtors have requested that any future filing of any affiliate of the Debtors also be jointly administered

<div align="center">

17

</div>

(for procedural purposes only) with these Chapter 11 Cases, <u>provided</u>, <u>however</u>, the Debtors will file notice with the Court identifying the cases of such affiliates that are to be jointly administered with these Chapter 11 Cases.

41.     **Complex Case Designation Notice**.  As set forth above, the Debtors have total debt of more than $10 million and there are more than 50 parties in in interest in this case. Indeed, the Debtors have more than $550 million of debt and more than 1,000 creditors alone. Therefore, the Debtors believe that the Chapter 11 Cases qualify as complex chapter 11 cases.

42.     **Consolidated List of Creditors Motion**.  The Debtors request authority to file a consolidated list of creditors, in lieu of filing a separate creditor matrix for each Debtor. Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and result in duplicate mailings.

43.     Moreover, the Debtors request authority to file a single consolidated list of their top 30 creditors (the "Consolidated Top 30 List"). Federal Rule of Bankruptcy Procedure 1007(d) requires a debtor to file a list containing information on its twenty largest unsecured creditors, excluding insiders (a "Top 20 List").  The Top 20 List is intended to facilitate the appointment of a creditors' committee by the United States Trustee.  If a creditors' committee is appointed, the Consolidated Top 30 List will be sufficient to aid in the United States Trustee's appointment of a creditors' committee.  In this context, requiring each Debtor to file a Top 20 List would impose an unnecessary administrative burden on the Debtors, without conferring any benefit upon the Debtors' estates or the United States Trustee.

44.     The Debtors also request authority to establish certain procedures for providing notice to parties of the commencement of the Chapter 11 Cases and of the meeting of creditors pursuant to Bankruptcy Code section 341 (the "Notice of Commencement").

45.     In particular, the Debtors request authority for their proposed claims and noticing agent to serve by regular mail the Notice of Commencement to creditors and shareholders in accordance with Bankruptcy Rule 2002.   This will ensure that the Debtors' creditors and shareholders receive prompt notice of the commencement of the Chapter 11 Cases and of the meeting of creditors.

46.     **Schedules Extension Motion.**  The Debtors seek entry of an order (i) granting the Debtors (a) an additional thirty (30) days to file their schedules of assets and liabilities, schedules of current income and current expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") and (b) additional time to file financial information reports under Bankruptcy Rule 2015.3(a) and (ii) authorizing the Debtors to file their required monthly operating reports by consolidating the information required for each Debtor in one report.

47.     Due to the number of the Debtors' creditors, the geographic scope of the Debtors' operations, the size and complexity of the Debtors' business, the limited staffing available to gather, process, and complete the Schedules and Statements, and the substantial burdens already imposed on the Debtors' management by the commencement of the Chapter 11 Cases, the Debtors will likely be unable to complete their Schedules and Statements by the current deadline that I have been told is imposed by the Bankruptcy Rules.

48.     Consequently, the Debtors submit that "cause" exists to extend the current deadline by thirty (30) days, until forty-four (44) days after the Petition Date (the "Extended

Filing Deadline"). The requested extension should enhance the accuracy of the Statements and Schedules when filed and may help avoid the potential necessity of substantial subsequent amendments. No party in interest will be prejudiced by the requested extension of time to file the Schedules and Statements. Moreover, the Debtors request such an extension without prejudice to their rights to seek further extensions or waivers from this Court.

49.     Further, the Debtors have certain foreign subsidiaries and affiliates that did not file for relief under chapter 11 of the Bankruptcy Code (the "Non-Debtor Affiliates"). To prepare the Rule 2015.3 Reports, the Debtors must compile information from books, records, and documents relating to a multitude of transactions at numerous locations around the world. Assembling and compiling the financial reports of the value, operations, and profitability of the Non-Debtor Affiliates in the very brief time mandated by Rule 2015.3 would pose significant challenges and require the Debtors' employees and advisors to expend considerable resources and time. Furthermore, the Company does not currently prepare and maintain financial reports in the form required by Bankruptcy Rule 2015.3 for each of the Non-Debtor Affiliates. To create de novo reports would be unduly costly and burdensome to the Debtors. In addition, the Debtors' employees and advisors are already engaged in numerous other tasks necessary to facilitate these Chapter 11 Cases, including the preparation of various other schedules, reports, and other papers required by the Bankruptcy Code and the Bankruptcy Rules. The combination of these tasks have imposed substantial burdens on the Debtors' management, personnel, and advisors, in addition to the day-to-day operations of the Debtors' businesses.

50.     I also believe that permitting the Debtors to file their monthly operating reports by consolidating the information required for each Debtor in one report that tracks and breaks out all of the specific information (e.g., receipts, disbursements, etc.) on a debtor-by-debtor basis

will further administrative economy and efficiency in the Chapter 11 Cases, while not prejudicing any party in interest. Accordingly, I believe that the relief requested is in the best interests of the Debtors, their estates, creditors, stakeholders, and other parties in interest.

51. **Epiq Retention as Claims and Noticing Agent**. The Debtors seek authority to employ and retain Epiq Bankruptcy Solutions, LLC ("Epiq") as claims and noticing agent in the Chapter 11 Cases. I believe that such relief is prudent in light of the thousands of creditors, potential creditors, and parties in interest to whom certain notices will be sent. Accordingly, I believe that the most effective and efficient manner by which to give notice and process claims in the Chapter 11 Cases is to engage Epiq, an independent third party with significant experience in this role to act as an agent of the Court.

52. The Debtors and their advisors obtained and reviewed engagement proposals from two other claims and noticing agents to ensure selection through a competitive process. I have been advised that Epiq is one of the country's leading chapter 11 administrators, with significant experience in noticing, claims administration, solicitation, balloting, and facilitating other administrative aspects of chapter 11 cases. I understand that Epiq has substantial experience providing services, including claims and noticing services, in matters comparable in size and complexity to this matter.

53. I believe that Epiq's rates are competitive and reasonable given Epiq's quality of services and expertise. Appointing Epiq as the Debtors' Claims and Noticing Agent will maximize the efficiency of the distribution of notices and the processing of claims, as well as relieve the Office of the Clerk of the Bankruptcy Court of the administrative burden of processing an overwhelming number of claims.

54.     Prior to the Petition Date, the Debtors provided Epiq a retainer in the amount of $25,000, which Epiq applied to all prepetition invoices.   Epiq seeks to have the retainer replenished to the original amount, and thereafter, to hold the retainer under the Epiq Agreement during the Chapter 11 Cases as security for the payment of fees and expenses incurred in rendering the Epiq Services hereunder, with any remainder to be held as security for the payment of other approved fees and expenses incurred in rendering other services under the Epiq Agreement.

55.     As part of the overall compensation payable to Epiq under the terms of the Epiq Agreement, the Debtors have agreed to certain indemnification obligations as specifically enumerated in the Epiq Agreement.   The Debtors and Epiq believe that the indemnification provisions contained in the Epiq Agreement are customary and reasonable for Epiq and comparable firms providing claims, noticing, solicitation and related administrative services.

**B.     Operational First Day Pleadings**

56.     **Employee Wages Motion**.  As of the Petition Date, the Debtors employ approximately 495 employees (the "Employees") around the world as part of their international operations.  Some of the Employees provide local support in the Debtors' U.S. or foreign offices, while other Employees are currently deployed on offshore projects.  The Employees provide a variety of services to support the Debtors' operations, including engineering, procurement, project development, human resources, research and development, sales, marketing, and administration.

57.     In addition to the Employees, the Debtors directly hire certain skilled individuals to work on their vessels and provide offshore execution services related to their offshore projects (the "Offshore Crews").  As of the Petition Date, there are approximately 600 Offshore Crews.

58.     In addition to the Offshore Crews that are directly retained by Singapore, the Debtors also work with a variety of staffing agencies (the "Offshore Crew Providers") that provide additional offshore crews (the "Supplemental Offshore Crews").  Given the volatilities of the offshore project market, the Offshore Crew Providers help the Debtors effectively manage their projects.  In addition, there may be laws requiring a certain percentage of local crew onboard the Company's vessels in certain jurisdictions in which the Company operates.  To supplement its workforce, the Company engages the assistance of approximately 20 temporary workers.  In addition, Singapore retains a consultant.

59.     I believe that, to minimize the personal hardship that the Debtors' workforce will suffer if prepetition obligations are not honored, as well as the harm which would result to the Debtors if employees morale is not maintained, it is of critical importance that the Debtors pay prepetition wages, compensation, and amounts associated with employee benefit programs and, in the Debtors discretion, have the ability to continue such programs in the ordinary course.

60.     **Wages and Salary Claims**.  On average, the Debtors' global annual Employee payroll is approximately $59,000,000, not including the Norwegian Employees or the Australian Employees.[26]  In the ordinary course of business, the Debtors pay the U.S. Employees on a biweekly basis and the Non-U.S. Employees on a monthly basis.  The U.S. payroll is processed through third-party payroll processor, Automatic Data Processing, Inc. ("ADP").[27]  All U.S.

---

[26]   In addition to the Employee payroll number, the Offshore Crews are also under the Debtors' payroll as set forth in more detail below.

[27]   Specifically, each payroll period, the Debtors wire ADP the amounts necessary to satisfy the Debtors' payroll obligations.  ADP then initiates direct deposit transfers or administers payroll checks to the Employees, as well as processes tax deposits.  ADP's services are crucial to the smooth functioning of the Debtors' payroll system because they ensure that (a) the Workforce (to the extent paid through the ADP) are paid on time, (b) source deductions are appropriately determined, (c) payroll reporting is accurate, and (d) appropriate amounts are remitted to taxing authorities and other payees.  The Debtors pay ADP approximately $20,000 per month for their payroll services.  As of Petition Date, the Debtors estimate they owe approximately $20,000 to ADP.

Employees are paid every other Friday for the two weeks prior to the week of payment. The current aggregate gross amount for the U.S. Employees is approximately $1,200,000 per pay period.

61.     The Non-U.S. Employees payroll is processed through a number of third-party payroll processors. A majority of the Non-U.S. Employees are paid on the 27th day of the month other than the Netherlands Employees who are paid on the last working day of each month. The current aggregate gross amount for the Non-U.S. Employees is approximately $2,500,000 per month (not including the Norwegian Employees or the Australian Employees).

62.     The Debtors have made their most recent biweekly payroll on February 24, 2017 for the period February 5, 2017 through February 18, 2017, for all the U.S. Employees and for the period through February 2017 for all the Non-U.S. Employees. The Debtors estimate that as of the Petition Date, approximately $750,000 is owed on account of accrued and unpaid wages and salaries for the Employees (the "Employee Wages and Salary Claims") and that substantially all the amounts owed per Employee are less than the priority cap.

63.     In addition to the wages and salaries paid to the Employees, the Debtors also directly pay the wages and salaries of the Offshore Crews. Of the 600 Offshore Crews, five are paid on a salaried basis for a fixed number of days worked per year, with the rest paid a day rate. The Debtors estimate that as of the Petition Date, approximately $950,000 is owed on account of accrued and unpaid wages and salaries for the Offshore Crews.

64.     Moreover, as of the Petition Date, the Debtors owe the Offshore Crew Providers approximately $3,500,000 (approximately $1,100,000 of which is owed by a U.S. entity and approximately $2,400,000 of which is owed by a Singapore entity) (the "Offshore Crew Provider

Claims"). The Offshore Crew Providers are critical to the Debtors ability to manage their Workforce, and, often may have the ability to assert liens for unpaid bills.

65. In addition, the Debtors pay various staffing agencies (the "Staffing Providers"), who refer the Temporary Workers. The Debtors estimate that they pay approximately $225,000 a month to the Staffing Providers and that, as of the Petition Date, approximately $350,000 in claims owed to the Staffing Providers was accrued and unpaid (the "Staffing Provider Claims"). If the Staffing Providers are not paid, the Staffing Providers may withdraw the Temporary Workers or refuse to provide the Debtors with replacement workers. Although the Debtors could replace the Temporary Workers over time, the abrupt departure of the Temporary Workers could significantly disrupt the Debtors' businesses.

66. In the ordinary course of business, the Debtors also provide offshore allowances to non-vessel personnel working offshore in the amount of approximately $300 a day or less (the "Offshore Allowances"), onshore assignment allowances to Employees working on onshore facilities with extended shifts (the "Onshore Allowances"), and oversea assignment allowances to certain Employees who are sent on international assignments in foreign countries (the "Oversea Assignment Allowances" and together with the Offshore Allowances and the Onshore Allowances, the "Allowances").

67. The Allowances are an important component of these Employees' overall compensation and provide substantial value to the Debtors' estates because they encourage the Employees to work away from their families for extended periods of time. Based on the average Allowances paid out in 2016, the Debtors estimate they pay an average of approximately $5,000 per pay period for the U.S. Employees and $6,000 for the Non-U.S. Employees.

68.     The Debtors also provide eligible Employees with paid time off ("PTO"), which is available for use for, among other things, vacation time, holiday time, sick time, and other paid time off, including, where applicable, medical leave, compassionate leave, marriage leave, and maternity/paternity leave.  The precise amount of PTO depends on the nature of the PTO, the Employee's length of service, position, skills, and other factors, with a maximum limit of 240 accumulated hours per year for those with ten years of service and certain executives.

69.     In the ordinary course of business, the Debtors have, in their sole discretion, provided severance payments that were available to certain of the Employees upon termination (the "Severance Obligations").  In particular, Employees may be given one week of salary per year of service rounded to the nearest year up to a maximum of ten years.  In addition, some Employees may receive two weeks of severance pay in lieu of service or severance equal to the applicable employee's earnings for a contractually prescribed notice period. The Debtors pay the Severance Obligations in a lump sum payment in the Employees' final paycheck.  Currently, there are no former Employees who are receiving payments due under the Severance Obligations.

70.     In the ordinary course of business, the Debtors offer a bonus plan (the "Bonus Plan") to their Employees.  The Bonus Plan uses certain benchmarks to determine the participants' eligibility for payments on account of, among others, job level and employee and Company performance.

71.     In the ordinary course of business, the Debtors provide service awards for Singapore and U.S. Employees who have completed certain terms of continuous service (the "Service Awards").  Singapore Employees receive their first Service Award after providing five years of service, and then an additional Service Award upon the completion of each subsequent

26

five year period. Similarly, the U.S. Employees receive their awards in kind at the completion of one, five, and ten years of service.

72.     The Debtors routinely reimburse the Employees for certain expenses incurred within the scope of their employment (the "Reimbursable Expenses").  There is a lag time between the time expenses are incurred and the time an expense is processed and reimbursed. Consequently, it is difficult for the Debtors to determine with precision the actual amount of incurred but not reported reimbursable expenses as of any particular time.  Typically, however, the average aggregate monthly amount expended by the Debtors for the Reimbursable Expenses is between $100,000 and $600,000.

73.     Moreover, the Debtors engage Instone International (UK) Limited ("Instone") to move crews to and from vessels.  Instone bills the Debtors directly for these moving costs (the "Moving Expenses").  The Debtors estimate that they owe Instone approximately $300,000 for prepetition Moving Expenses.

74.     In addition, the Debtors offer certain Employees who are relocated on an international assignment for at least one year an employee relocation assistance of $9,000[28] (the "Relocation Assistance Program").  Benefits under the Relocation Assistance Program include reimbursement of certain expenses related to home sale, new home search, new home purchase, and household goods shipment, as well as payment of a cost-of-living allowance once the relocation is complete (the "Relocation Assistance Expenses").

75.     **Employee Benefits**.  In the ordinary course of business, the Debtors maintain various customary plans and policies to provide the Employees with the Health Plans, the

---

[28]   This amount is on top of any cost of living, housing, transportation, child education subsidy, or other similar allowances that may be applicable depending on the host location and family status.

Employee Insurance Benefits, and the Other Employee Benefits (each as defined herein) (collectively, the "Employee Benefits"). An important element of the Employee Benefits in the U.S. is the medical, dental, and vision benefits, which the Debtors provide for all of their current Employees, who work 30 hours or more per week, primarily through a number of self-insured and premium-based insurance plans (collectively, the "U.S. Health Plans"), as described more fully below.

76.     **The U.S. Health Plans.** An important element of the Employee Benefits in the U.S. is the medical, dental, and vision benefits, which the Debtors provide for all of their current U.S. Employees, who work 30 hours or more per week, primarily through a number of self-insured and premium-based insurance plans (collectively, the "U.S. Health Plans"), as described more fully below.

(a)     **Medical Plan**:  The Debtors provide medical benefit plans (the "Medical Plan") administered by UnitedHealth Group Inc. ("UnitedHealthcare") to their U.S. Employees.  The U.S. Employees may elect either a preferred provider organization or a low premium plan.  The Debtors pay a monthly average of less than $200,000 to UnitedHealthcare for administration of the Medical Plan.  The Debtors are requesting authority to continue to operate the Medical Plan in the ordinary course of business.

(b)     **Dental Plan**:  The Debtors provide a dental plan (the "Dental Plan") to the U.S. Employees through Delta Dental Plans Association ("Delta Dental"). The Debtors pay approximately $15,000 monthly to Delta Dental for administration of the Dental Plan.  The Debtors estimate that, as of the Petition Date, no amounts are outstanding on account of administration fees related thereto.  The Debtors are requesting authority to continue to operate the Dental Plan in the ordinary course of business.

(c)      **Vision Plan**:  The Debtors provide a vision plan (the "Vision Plan") for their U.S. Employees through EyeMed, a division of Fidelity Security Life Insurance Company.  The Vision Plan is fully funded by the Employees, including the administrative fees thereunder.  Therefore, no amounts attributable to the Debtors are currently outstanding.

(d)      **HSA**:  The Company offers  the U.S. Employees the ability to participate in a health savings account ("HSA") administered through Optum.  Over the course of 26 pay periods, the Company funds the HSA accounts in the amount of $500 for Employees only and $1,000 for Employees plus family.  The Debtors estimate that approximately $1,300 may be outstanding as of the Petition Date on account of the HSA.

(e)      **The Non-U.S. Health Plans.**  Similarly, outside of the U.S., the Debtors provide their Non-U.S. Employees with various health benefits through a number of insurance providers[29] and plans (the "Non-U.S. Health Plans" and with the U.S. Health Plans, the "Health Plans").[30]  The Company pays the insurance premiums for the Non-U.S. Health Plans at the start of the year and there is no co-payment owed by the Non-U.S. Employees.  The Debtors estimate the cost of maintenance of the Non-U.S. Health Plans is approximately $900,000 annually in the aggregate.  As of the Petition Date, the Debtors believe minimal prepetition amounts are outstanding on account of the Non-U.S. Health Plans.

---

[29]   The Non-US Employees receive medical plans through Great Eastern for certain of the Singapore Employees, Cigna for certain of the Singapore Employees and the U.K. Employee, and Generali for the Thai Employees.

[30]   The Non-U.S. Health Plans do not include dental or vision coverage.

77.    **The Employee Insurance Benefits.**[31]

(a)    <u>**Life Insurance and Disability Benefits**</u>:  The Debtors provide their Employees life insurance, accidental death and dismemberment coverage, and short- and long-term disability benefits (the "<u>Life Insurance</u>," "<u>AD&D Coverage</u>," and "<u>Disability Benefits</u>," respectively).   In the United States, these benefits are provided through Liberty Mutual.   The Non-U.S. Employees receive Life Insurance and AD&D Coverage through a variety of providers including Chubb, Great Eastern, R. Meese n Zoonen, and Generali.   The Life Insurance provides all active, full-time U.S. Employees of the Debtors with up to 1.5 times their annual compensation, up to $500,000, and active full-time Singapore employees with two times their annual compensation, up to $712,250.  Additional coverage is available to the U.S. Employees at their own cost.  The AD&D Coverage provides coverage to U.S. Employees upon serious injury.  Finally, Liberty Mutual pays up to 60% of an Employee's salary for covered disabilities up to specified amounts.  As of the Petition Date, the Debtors do not believe any amounts are outstanding for premiums owed and claims asserted under these programs.[32]

(b)    <u>**Business Travel Accident Insurance**</u>:  The Debtors also provide business travel accident coverage (the "<u>Business Travel Insurance</u>").  As set forth on Schedule 1 to the Insurance Motion, the Debtors pay approximately $140,000 per year to certain insurance carriers who provide Business Travel Insurance for the Employees.

---

[31]    Payment of employee insurance costs is also addressed in the Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing Debtors to (A) Maintain Existing Insurance Policies and Pay All Insurance Obligations Thereunder, (B) Renew, Revise, Extend, Supplement, Change, or Enter Into New Insurance Policies, and (C) Continue to Honor Premium Financing Obligations and (II) Directing Financial Institutions to Honor All Related Payment Requests (the "<u>Insurance Motion</u>"), filed substantially contemporaneously herewith.

[32]    As set forth in the Insurance Motion, the Debtors are also required under applicable law to maintain workers' compensation insurance coverage for the Employees.  Under the Insurance Motion, the Debtors are seeking to maintain coverage under their workers' compensation program.

30

The Debtors are paid in full through <u>June</u>, 2017, thus, as of the Petition Date, the Debtors do not believe that any amounts are outstanding for premiums owed under the Business Travel Insurance.

78.     **The Other Employee Benefits**.  The Debtors maintain other employee benefits, including FSA, the Employee Education Program, the 401(k) Plan, Immigration Services, Gym Discounts, and a Car Allowance (each defined below, and collectively, the "<u>Other Employee Benefits</u>").

(a)     **Flexible Spending Accounts**:  The Debtors also offer U.S. Employees the opportunity to use tax-advantaged flexible spending accounts ("<u>FSA</u>") to use pre-tax dollars toward the payment of medical or dependent care expenses.  At the beginning of each calendar year, the FSA participants commit a set amount of funds for the FSA, and the Debtors collect a pro-rated amount at each payroll period and pay claims as they come due (up to the pre-committed amount).  The participant submits claims to the claims administrator, and the claims administrator reimburses the Employee for the claimed amount and seeks reimbursement from the Debtors.  The Debtors pay an administrative fee of approximately $200 per month to United Healthcare for the FSA. As of the Petition Date, the Debtors do not believe they owe any money on account of administrative fees and claims under the FSA.

(b)     **Employee Education Program**:  The Debtors offer the Singapore Employees educational benefits, including a tuition reimbursement program and a child education assistance program (collectively, the "<u>Employee Education Program</u>").  The Employee Education Program is offered on a case-by-case basis to certain of the Singapore Employees at no cost to the Employee.  As of the Petition Date, the Debtors

31

owe approximately $33,100 for the Employee Education Program, representing payments to six individual Employees.

(c)      **401(k) Plan**:  The Debtors offer their current U.S. Employees the opportunity to participate in a 401(k) savings plan (the "401(k) Plan"), which is Administered by BOK Financial.  The U.S. Employees may contribute up to 100% of their base pay, subject to regulatory limits.  The Debtors provide matching contributions on a sliding scale, commensurate with the employee contributions, up to a maximum of 6% of the Employee's base pay, which for 2017 is expected to total, in the aggregate, approximately $44,655 per biweekly pay period.  As of the Petition Date, the Debtors estimate they owe approximately $25,000 on account of the employer match portion of the 401(k) Plan.  Administration and investment fees for the 401(k) Plan are paid by the Employees.

(d)      **Immigration Services**:      Certain of the Employees are on immigration visas that require payment by the Company of certain, routine costs, including payment of renewal fees (the "Immigration Services").  As of the Petition Date, the Debtors estimate that no amounts are outstanding on account of the Immigration Services.

(e)      **Gym Discounts**:  The Company offers U.S. Employees gym discounts at Lifetime Fitness (the "Gym Discounts").  There is no cost to the Company as the Company pays the invoice to the gym and is then reimbursed through a payroll deduction for participating Employees.

32

(f)    **Use of Company Car:**    Finally, five Employees receive car allowances totaling $4,000 a month[33] (the "Car Allowance").  The Debtors are requesting authority to continue such programs in the ordinary course of business.

79.    The Debtors believe that performing their obligations under the above-described Employee Benefits is important for preserving the value of the Debtors' estates.  Any disruption in the benefits under such programs will call into question the Debtors' commitment to their Employees, who are essential to continuing the operations of the Debtors.

39.    In connection with paying the Unpaid Compensation and the Employee Benefit Obligations, the Debtors routinely deduct and/or withhold from the Employees' paychecks amounts that the Debtors are required to transmit to third parties.  For example, the Debtors may deduct from the Employees' earnings, among other things, (a) payroll taxes related to federal, state, and local income taxes, FICA, Social Security, and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority; (b) employee contributions for health benefits and health care and dependent care spending accounts; (c) employee contributions to employee life insurance, long-term care insurance, long-term disability insurance, voluntary property and casualty insurance, and personal accident insurance; (d) employee contributions to 401(k) plans and 401(k) loan repayments; (e) legally ordered deductions, such as child support and garnishments; and (f) voluntary contributions to the charitable organizations (collectively, the "Employee Withholdings").  The Debtors then forward amounts equal to the Employee Withholdings from general operating accounts to appropriate third-party recipients.

---

[33]    In addition, the Company has assigned the use of a company car to an international Employee working in the United States for his exclusive use.  The car has been fully paid off.  Moreover, the Company has a few pool cars that are all fully paid off that Employees can check out for use.

80.     Generally, these funds are deducted from Employee earnings, but due to the commencement of the Chapter 11 Cases, may not have been forwarded to the appropriate third-party recipients.  Such withheld funds, to the extent they remain in the Debtors' possession, may constitute moneys held in trust and therefore may not be property of the Debtors' estates.  As of the Petition Date, the Debtors estimate that they owe less than $800,000 on account of Employee Withholdings.

81.     **Taxes Motion**.  The Debtors, in the ordinary course of their businesses, incur various tax liabilities and have generally paid such tax liabilities as they became due.  Specifically, the Debtors are subject to a number of Taxes, including, without limitation:

(a)     Payroll Taxes.  In the normal course of business, payroll related to trust fund taxes accrue as employees provide services to the Debtors.  Where applicable, these payroll related taxes include federal, state, local, and foreign income tax, social security tax, Medicare, state unemployment insurance, and state disability insurance (collectively, the "Payroll Taxes").[34]  Generally, these funds are deducted from employee earnings, but due to the commencement of the Chapter 11 Cases, may not have been forwarded to the appropriate third-party recipients.  Such withheld funds, to the extent they remain in the Debtors' possession, constitute moneys held in trust and therefore are not property of the Debtors' estates.[35]

(b)     Income Taxes.  As a result of their operations throughout the world, the Debtors incur tax liabilities in various jurisdictions (the "Income Taxes").  The Debtors typically pay Income Taxes in the ordinary course of business.  As of the Petition Date, the Debtors do not believe any amounts are outstanding on account of the Income Taxes; however, certain Income Taxes and other Taxes attributable to the prepetition period may come due during the Chapter 11 Cases.  Thus, the Debtors request authority to pay all

---

[34]    Given the payroll cycle and the Petition Date, the Debtors believe that they owe less than $800,000 on account of prepetition obligations related to the Payroll Taxes.

[35]    In addition, Debtor EMAS-AMC Pte. Ltd. allegedly owes approximately $8.6 million in principal amount, interest, and penalties (the "IRS Claim") to the Internal Revenue Service (the "IRS") related to withholding taxes for certain crew on vessels operating in the United States in 2014 and 2015.

prepetition Income Taxes that have accrued as of the Petition Date and to continue to pay such obligations in the ordinary course on a postpetition basis.

(c)     <u>Franchise Taxes and Business License Taxes</u>:  In addition, the Debtors must pay franchise taxes (the "<u>Franchise Taxes</u>") so that they can operate their businesses in the applicable taxing jurisdiction, including Delaware, Alabama, and Texas. The Franchise Taxes are typically paid annually to the applicable Taxing Authorities in March.  Therefore, the Debtors do not believe any amounts of Franchise Taxes are currently owed, but expect to pay approximately $200,000 in Franchise Taxes during the Chapter 11 Cases.   Similarly, certain Debtors are required to pay business license taxes, which are based on revenue (the "<u>Business License Taxes</u>").  The Debtors do not believe any amounts are outstanding on account of the Business License Taxes, but expect that approximately $50,000 of Business License Taxes will come due in March 2017.

(d)     <u>Value Added Taxes</u>.  Certain of the Debtors are required to pay value added taxes ("<u>VAT</u>"), known in some countries as a goods and services tax.  The Debtors expect to pay approximately $155,000 on account of prepetition and postpetition VAT during the Chapter 11 Cases.   The Debtors request authority to pay all prepetition VAT that has accrued as of the Petition Date and to continue to pay such obligations in the ordinary course of business on a postpetition basis.

82.     The continued payment of the Taxes on their normal due dates will ultimately preserve the resources of the Debtors' estates, thereby creating a greater recovery for creditors and stakeholders.  If the Taxes are not timely paid, the Debtors would be required to expend disproportionate attorneys' fees and other costs to resolve various issues related to such obligations in light of the relatively de minimis amount of the Taxes.  The Debtors believe some of the Taxes constitute trust fund obligations that are not property of the Debtors' estates, and as to which the Debtors' officers and directors may have personal liability in the event of nonpayment.  Efforts by the Taxing Authorities to collect such trust fund amounts would provide obvious distractions to the Debtors and their officers and directors in their efforts to maximize the value of the Debtors' estates.

83.     And, even with respect to the Taxes that are not trust fund taxes, the Debtors believe that paying such Taxes will ultimately benefit the Debtors' estates and their stakeholders. Many of those Taxes may be entitled to priority under the Bankruptcy Code or may be subject to liens (e.g. taxes on property are subject to liens on the property that is being taxed).  Therefore, other creditors, stakeholders, and other parties in interest will not be prejudiced if such prepetition taxes are paid.

84.     **Insurance Motion**. In connection with the operation of their international businesses, the Debtors maintain workers' compensation, marine comprehensive liability, cargo and contractors equipment, inland marine and onshore property, vessel (both Protection & Indemnity ("P&I") and Hull & Machinery ("H&M"), business automobile, business travel, and various other liability, property, professional liability, directors and officers ("D&O"), and other insurance programs (collectively, the "Insurance Programs").

36

85.     The Debtors maintain approximately 30 insurance policies to provide coverage for both general commercial business risks and risks specific to the deepsea construction industry.  Many of the policies relate to the Company's vessels (e.g. the H&M, P&I, cargo and contractors equipment liability, and marine liability policies) while others include, but are not limited to, coverage for the Debtors' property, general liability, automobile liability, foreign liability, workers' compensation, D&O, excess liability, and business travel (collectively, as such policies may be supplemented, amended, extended, renewed, or replaced, the "Insurance Policies").

86.     The Debtors pay an aggregate amount of approximately $11.7 million[36] in annual premiums on account of the Insurance Policies.[37]  For many of the Insurance Policies, the Company effectively makes quarterly installment payments in arrears throughout the year (e.g., generally, the Company might make a quarterly installment period on January 15 for the three month period from November 1 through January 31).  As of the Petition Date, the Debtors owe approximately $4.6 million on account of outstanding premiums under the Insurance Policies.

87.     Some, but not all, of the Insurance Policies in the United States are financed through a premium finance agreement (the "Premium Financing Agreement") with AFCO Premium Credit LLC ("AFCO"), to whom the Debtors pay monthly installments in advance for the following quarter along with a small fee owed to AFCO for financing the policy (collectively, any and all other fees and costs associated with the Premium Financing Agreement, the "Premium Financing Obligations") .  The next monthly installment under the Premium

---

[36]   The Company's total annual premiums are approximately $13.1 million, but only approximately $11.7 million of this is paid by Debtor entities with the remainder paid by non-Debtor affiliates.

[37]   The Insurance Policies renew throughout the year.

Financing Agreement is due on March 1, 2017.  As of the Petition Date, the Debtors believe they are current on the Premium Financing Obligations.

88.     I believe that continuation of the Insurance Policies, and the continued payment under the Premium Financing Agreement, as well as the ability to enter into new Insurance Policies, are essential to preserving the value of the Debtors' businesses, properties, and assets. Additionally, in many cases, the coverage provided by the Insurance Policies is required by applicable regulations, laws, and contracts that govern the Debtors' commercial activities, including the requirements set forth in the United States Trustee's Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees.  I believe that if the Debtors do not continue to perform their obligations under the Insurance Policies and the Premium Financing Agreement, the Debtors' coverage under the Insurance Policies could be voided.  I believe this would cause serious and irreparable harm to the Debtors' businesses and restructuring efforts, as the Debtors would likely be exposed to increased costs and risks of loss.

89.     Accordingly, I believe that the relief sought through the Insurance Motion is necessary for the Debtors to continue operating their businesses in chapter 11 without disruption and is in the best interest of the Debtors, their estates, creditors, stakeholders, and other parties in interest.

90.     **Motion to Enforce the Automatic Stay**.  The Debtors have requested that the Court enter a declaratory order enforcing and restating the automatic stay and  *ipso* *facto* under Bankruptcy Code sections 362 and 365(e)(1).  The Debtors are a leading subsea construction contracting company and serve customers worldwide.  As a result of their international operations, the Debtors have many foreign creditors and other parties-in-interest in various countries who may not be well versed in the protections and restrictions of the Bankruptcy Code.

Some of these creditors do not transact business on a regular basis with companies that have filed for chapter 11, or are unfamiliar with the scope of a debtor-in-possession's authority to conduct its business.   Such circumstances warrant an order apprising parties—especially non-U.S. customers, creditors, and vendors—of Bankruptcy Code sections 362 and 365(e)(1) and the protections provided thereby.

91.     Though I'm advised by proposed counsel for the Debtors that the automatic stay, ipso facto, and non-discrimination protections, are fundamental aspects of the  Bankruptcy Code that arise as a matter of law upon the commencement of a chapter 11 case, in my experience I know that not all parties affected or potentially affected by the commencement of a chapter 11 case are aware of the aforementioned Bankruptcy Code provisions.  Nor are all parties cognizant of the significance and impact of these provisions.  Accordingly, I respectfully submit that this motion should be approved.

92.     **Utilities Motion.**  In connection with the operation of their businesses and the management of their properties, the Debtors obtain water, sewer, electricity, gas, telecommunications, internet, and similar utility products and services (collectively, the "Utility Services") from the Utility Companies..

93.     I believe that uninterrupted Utility Services are essential to the Debtors' ongoing operations.  Additionally, any interruption of the Utility Services, even for a brief period of time, likely would negatively affect the Debtors' reorganization efforts.  Therefore, it is critical that the Utility Services continue uninterrupted during the Chapter 11 Cases.

94.     On average, prior to the Petition Date, the Debtors spent approximately $80,000 each month on account of Utility Services.  The Debtors estimate that their monthly costs going forward will be substantially similar for the initial stages of the Chapter 11 Cases, but may be

reduced as part of the Debtors' cost-saving measures.  Thus, the Debtors have proposed for the Utility Companies the establishment of a newly-created, segregated account in which the Debtors will place a deposit equal to approximately two (2) weeks of Utility Services minus any amounts for deposits already on hand, or approximately $40,000 (the "Utility Deposit Account"). I believe that creation of the Utility Deposit Account and the additional procedures set forth in the motion adequately protect the rights that I have been advised are provided to the Utility Companies under the Bankruptcy Code, while also protecting the Debtors' need to continue to receive, for the benefit of their estates, the Utility Services upon which their businesses depend.

95.     I believe that the procedures proposed in the Utilities Motion are necessary because, if such procedures are not approved, the Debtors could be forced to address numerous requests by the Utility Companies for adequate security in a disorganized manner during the critical first weeks of the Chapter 11 Cases.  Moreover, a Utility Company could blindside the Debtors by unilaterally deciding that it is not adequately protected and threaten to discontinue service or make an exorbitant demand for payment to continue service.

96.     **DIP Motion**: As set forth above, deteriorating market conditions and falling demand for the Company's services, among other things, has adversely affected the Debtors' liquidity.  Without DIP financing, the Debtors will be forced to liquidate their assets in piecemeal liquidations across the globe and their existing projects would wither on the vine unable to be executed. Therefore, the Debtors require immediate access to the DIP Facility to operate their businesses, preserve value, and pursue their restructuring goals.

97.     In addition, immediate access to funding under the DIP Facility will demonstrate to customers, employees, vendors, suppliers, and other key constituencies that the Debtors have sufficient resources available to meet their obligations in the ordinary course during the Chapter

40

11 Cases.  Moreover, the DIP Facility will provide the Debtors with an opportunity to formulate and implement a reorganization plan to right-size their obligations and continue portions of their international operations as part of a global restructuring.

98.     The DIP Facility represents the best—indeed the only realistic— available source of financing under the circumstances. The Debtors and their advisors approached several prepetition lenders to whom the Debtors owed senior secured debt obligations (holders of such claims, the "Prepetition Secured Parties"), but none of them expressed an interest in providing post-petition financing.  Potential alternative providers of financing less willing to engage with the Debtors given the existence of the senior secured debt obligations, which placed the Debtors in the untenable position of either (i) engaging in a priming fight with the Prepetition Secured Parties, whose liens would be primed, (ii) obtaining the consent of the Prepetition Secured Parties, or (iii) locating a third-party postpetition lender willing to provide DIP Financing on an unsecured basis or secured by liens junior (at a minimum) in priority to the prepetition secured debt.  Such alternatives are simply not realistic under the circumstances.  As a result, the only possible DIP lenders that emerged were existing shareholder Chiyoda Corporation and Subsea 7.

99.     Notwithstanding that the DIP Proposal was the only realistic, available option and that it included existing shareholder Chiyoda, which has a designee on the ECS board, the Debtors engaged in hard fought negotiations for the best possible terms over several weeks, resulting in an agreement designed to permit the Debtors to obtain the needed liquidity to maximize the value of their assets. There were numerous video conferences, telephone calls, and meetings among the parties that spanned several weeks prior to entry into a detailed DIP term sheet and then the DIP Credit Agreement.  Similarly, the Debtors pushed hard for the most favorable terms in the DIP Credit Agreement that they could negotiate and the parties exchanged

multiple drafts before a an agreement was reached.   As a result, and given the alternative, I believe that entry into the DIP Credit Agreement is a sound exercise of the Debtors' business judgment.

42

I swear under penalty of perjury that the foregoing is true and correct.

Dated:  February 27, 2017

By: _____

Name: Stephen H. McGuire
Title:  General Counsel



LEGEND
Debtor Entities
Non – Debtor Entities
Ezra Holdings Limited (Singapore)
100%
100%
Emas Ghana Pte. Ltd.
Chiyoda Coporation (Japan)
Emas-AMC Holdings Pte Ltd (Singapore)
NYK LINE (Japan)
49%
Sri EMAS (51% Ghanaian individual)
35%
40%
25%
EMAS CHIYODA Subsea Limited (UK)
100%
100%
100%
100%
100%
100%
100%
100%
Emas-AMC AS (Norway)
Lewek Falcon Shipping Pte.Ltd. (Singapore)
EMAS CHIYODA Subsea Services B.V. (Netherlands)
EMAS CHIYODA Subsea Services (UK) Limited (Scotland)
EMAS CHIYODA ROV Pte. Ltd (Singapore)
Lewek Constellation Pte. Ltd. (Singapore)
EMAS CHIYODA Subsea Services Pte Ltd (Singapore)
Emas-AMC Pte. Ltd. (Singapore)
100%
EMAS CHIYODA Subsea Services LLC (Delaware)
20%
Gallatin Marine Management, LLC (Delaware)
100%
Lewek Constellation AS (Norway)
70%
30%
99.97%
Emas Saudi Arabia Ltd. (Saudi Arabia)
EMAS CHIYODA Subsea (Thailand) Co., Ltd. (Thailand)
100%
40%
100%
100%
EMAS CHIYODA Subsea Pty Ltd (Australia)
Fode & Emas Joint Venture Company Ltd (Nigeria)
EMAS CHIYODA Subsea Marine Base Holding Co., LLC (Texas)
EMAS CHIYODA Subsea Inc (formerly EMAS-AMC Inc) (Delaware)
100%
EMAS CHIYODA Subsea Marine Base LLC (Texas)

**EXHIBIT A**