## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | : | |
| **In re:** | : | **Chapter 11** |
| | : | |
| **EMAS CHIYODA SUBSEA LIMITED,** *et al.*, | : | **Case No. 17-31146 (MI)** |
| | : | |
| | : | **(Jointly Administered)** |
| Debtors.[1] | : | |

## THIRD AMENDED DISCLOSURE STATEMENT WITH RESPECT TO THE THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF CERTAIN AFFILIATED DEBTORS OF EMAS CHIYODA SUBSEA LIMITED

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

George N. Panagakis
Justin M. Winerman
Robert Fitzgerald
Roy Leaf
155 N. Wacker Dr.
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Fax: (312) 407-0411

PORTER HEDGES LLP

John F. Higgins (No. 09597500)
Joshua W. Wolfshohl (No. 24038592)
Aaron J. Power (No. 24058058)
Brandon J. Tittle (No. 24090436)
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Fax: (713) 228-1331

Co-Counsel for Debtors and Debtors in Possession

Dated: May 24, 2017
          Houston, Texas

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number and jurisdiction of formation are as follows: EMAS CHIYODA Subsea Limited (UK) (3187); EMAS Chiyoda Subsea Inc. (Delaware) (7884); EMAS CHIYODA Subsea Marine Base LLC (Texas) (5974); Lewek Falcon Shipping Pte. Ltd. (Singapore) (041E); EMAS CHIYODA Marine Base Holding Co., LLC (Texas) (7463); EMAS Chiyoda Subsea Services Pte. Ltd. (Singapore) (333Z); EMAS-AMC Pte. Ltd. (Singapore) (0442); EMAS Saudi Arabia Ltd. (Saudi Arabia) (0669); Lewek Constellation Pte. Ltd. (Singapore) (376E); EMAS CHIYODA ROV Pte. Ltd. (Singapore) (049M); EMAS CHIYODA Subsea Services B.V. (Netherlands) (4073); EMAS CHIYODA Subsea Services (UK) Limited (Scotland) (3187); EMAS CHIYODA Subsea Services LLC (Delaware) (1728); EMAS CHIYODA Subsea (Thailand) Co., Ltd. (Thailand) (1011); Gallatin Marine Management, LLC (Delaware) (8989).  The address of the Debtors' U.S. headquarters is 825 Town & Country Ln, Suite 1500, Houston, TX 77024.

**DISCLAIMER**

THIS THIRD AMENDED DISCLOSURE STATEMENT WITH RESPECT TO THE THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF CERTAIN AFFILIATED DEBTORS OF EMAS CHIYODA SUBSEA LIMITED CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF CERTAIN AFFILIATED DEBTORS' THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION AND CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION.  THE INFORMATION INCLUDED IN THIS DISCLOSURE STATEMENT IS PROVIDED FOR THE PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY PURPOSES OTHER THAN TO DETERMINE WHETHER AND HOW TO VOTE ON THE PLAN. THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE.  THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS WHICH ARE ATTACHED TO, OR INCORPORATED BY REFERENCE IN, THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH INFORMATION AND DOCUMENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION INCORPORATED IN THIS DISCLOSURE STATEMENT BY REFERENCE, THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES.

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAVE BEEN MADE AS OF THE DATE OF THIS DISCLOSURE STATEMENT UNLESS OTHERWISE SPECIFIED.  HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT ASSUME AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH IN THIS DISCLOSURE STATEMENT SINCE THE DATE OF THIS DISCLOSURE STATEMENT.

EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETIES BEFORE CASTING A BALLOT.  THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.  ANY ENTITIES DESIRING ANY SUCH ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS ATTACHED TO THIS DISCLOSURE STATEMENT.  ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE PLAN WHICH ARE OTHER THAN AS SET FORTH, OR INCONSISTENT WITH, THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE DOCUMENTS ATTACHED TO THIS DISCLOSURE STATEMENT, AND THE PLAN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING, THREATENED, OR POTENTIAL LITIGATION OR OTHER ACTIONS, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN THE CONTEXT OF SETTLEMENT NEGOTIATIONS UNDER RULE 408 OF THE FEDERAL RULES OF EVIDENCE.

THE FINANCIAL INFORMATION CONTAINED IN OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED, UNLESS SPECIFICALLY INDICATED OTHERWISE.

THE FINANCIAL PROJECTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT, HAVE BEEN PREPARED BY THE DEBTORS' MANAGEMENT TOGETHER WITH THEIR ADVISORS. THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS' MANAGEMENT AND THEIR ADVISORS, MAY NOT ULTIMATELY BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE PROJECTIONS OR TO THE ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND MAY NOT HAVE BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES ("GAAP").

PLEASE REFER TO ARTICLE VIII OF THIS DISCLOSURE STATEMENT, ENTITLED "PLAN-RELATED RISK FACTORS," FOR A DISCUSSION OF CERTAIN FACTORS THAT A CREDITOR VOTING ON THE PLAN SHOULD CONSIDER.

FOR A VOTE ON THE PLAN TO BE COUNTED, THE BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY EPIQ BANKRUPTCY SOLUTIONS LLC, THE DEBTORS' CLAIMS, NOTICING, AND SOLICITATION AGENT, **NO LATER THAN 4:00 P.M. (PREVAILING CENTRAL TIME), ON JUNE 23, 2017**. SUCH BALLOTS SHOULD BE CAST IN ACCORDANCE WITH THE SOLICITATION PROCEDURES AND IN THE DISCLOSURE STATEMENT

ORDER. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL NOT BE COUNTED UNLESS OTHERWISE DETERMINED BY THE DEBTORS IN THEIR SOLE AND ABSOLUTE DISCRETION.

THE CONFIRMATION HEARING WILL COMMENCE ON **JUNE 29, 2017** AT [__ __.M.] (PREVAILING CENTRAL TIME), BEFORE THE HONORABLE MARVIN ISGUR, UNITED STATES BANKRUPTCY JUDGE, IN COURTROOM 404, IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, 515 RUSK STREET, HOUSTON, TEXAS 77002. THE DEBTORS MAY CONTINUE THE CONFIRMATION HEARING FROM TIME TO TIME WITHOUT FURTHER NOTICE OTHER THAN AN ADJOURNMENT ANNOUNCED IN OPEN COURT OR A NOTICE OF ADJOURNMENT FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE MASTER SERVICE LIST AND THE ENTITIES WHO HAVE FILED AN OBJECTION TO THE PLAN. THE BANKRUPTCY COURT, IN ITS DISCRETION AND BEFORE THE CONFIRMATION HEARING, MAY PUT IN PLACE ADDITIONAL PROCEDURES GOVERNING THE CONFIRMATION HEARING. THE PLAN MAY BE MODIFIED, IF NECESSARY, PRIOR TO, DURING, OR AS A RESULT OF THE CONFIRMATION HEARING, WITHOUT FURTHER NOTICE TO PARTIES IN INTEREST.

**THE PLAN OBJECTION DEADLINE IS JUNE 23, 2017 AT 4:00 P.M. (PREVAILING CENTRAL TIME), OTHER THAN FOR PLAN OBJECTIONS WITH RESPECT TO THE FINANCIAL CAPABILITIES OF NEWCO.** ALL PLAN OBJECTIONS MUST BE FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE DEBTORS AND CERTAIN OTHER PARTIES IN INTEREST IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER SO THAT THEY ARE RECEIVED ON OR BEFORE THE PLAN OBJECTION DEADLINE.

THE PLAN, THIS DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, EXHIBITS, AND THE PLAN SUPPORT AGREEMENT, WHICH SHALL BE FILED BY JUNE 7, 2017, ONCE EACH IS FILED, AND OTHER DOCUMENTS AND MATERIALS RELATED THERETO MAY BE OBTAINED BY: (A) ACCESSING THE DEBTORS' RESTRUCTURING WEBSITE AT http://dm.epiq11.com/ECS, OR (B) CALLING THE DEBTORS' RESTRUCTURING HOTLINE AT (844) 616-6629, WITHIN THE UNITED STATES OR CANADA, OR +1 (503) 597-5538, OUTSIDE OF THE UNITED STATES OR CANADA. COPIES OF SUCH DOCUMENTS AND MATERIALS MAY ALSO BE EXAMINED BETWEEN THE HOURS OF 8:00 AM AND 4:00 PM, MONDAY THROUGH FRIDAY, EXCLUDING FEDERAL HOLIDAYS, AT THE OFFICE OF THE CLERK OF THE COURT, 515 RUSK STREET, HOUSTON, TEXAS 77002.

## EXECUTIVE SUMMARY

On February 27, 2017, EMAS CHIYODA Subsea Limited ("ECS") and certain of its affiliates, the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors" and, together with ECS, "EMAS" or the "Company") each commenced a case (collectively, the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to operate their business and manage their properties as debtors and debtors in possession under Bankruptcy Code sections 1107(a) and 1108.

The Plan Debtors' (defined below) proposal for the reorganization of their business is set forth in the Third Amended Joint Chapter 11 Plan of Reorganization of Certain Affiliated Debtors of EMAS CHIYODA Subsea Limited, a copy of which is attached hereto as Exhibit A (the "Plan").[2] The Plan, among other things, sets forth the proposed treatment of Claims against, and Interests in, the Plan Debtors.

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plans Debtors' proposed Plan, as attached hereto. Certain provisions of the Plan, and thus the description and summaries contained herein, will be the subject of continuing negotiations among the Plan Debtors and various parties. Accordingly, the Plan Debtors reserve the right to modify the Plan consistent with Bankruptcy Code section 1127, Rule 3019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Section 14.3 of the Plan.

The Plan provides for an equitable distribution of recoveries to the Plan Debtors' Creditors, preserves the value of certain portions of the Debtors' business as a going concern, and preserves jobs of certain of the Debtors' employees. The Plan is the result of extensive discussions between and among the Debtors and their creditor constituents. The Debtors believe that any alternative to confirmation of the Plan, such as liquidation of all the Plan Debtors or attempts by another party in interest to file a competing plan, could result in significant delays, litigation and related costs, job loss, and/or lesser recoveries. Moreover, as further described herein, the Plan permits ongoing review of bids submitted by potential Alternative Plan Sponsors who may provide a superior exit path. **For these reasons, the Plan Debtors and the Creditor's Committee urge you to return your ballot accepting the Plan.**

---

[2]   All capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Plan.

## Plan Overview and Summary of Distributions

The following summary is a general overview only and is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Third Amended Disclosure Statement with respect to the Plan and the Plan itself.

A.    Overview of the Plan

The Plan provides for the restructuring of the Emerging Debtors and the Liquidating Debtors (collectively, the "Plan Debtors").  The Emerging Debtors consist of: EMAS-AMC Pte. Ltd ("Singapore Debtor"), EMAS Saudi Arabia Ltd ("Saudi Arabia Debtor"), EMAS CHIYODA Subsea Services Pte Ltd ("SSPL Debtor", and together with the Singapore Debtor and the Saudi Arabia Debtor, the "Singapore/Saudi Debtors"), and EMAS CHIYODA Subsea Inc. (the "US Debtor").  The Liquidating Debtors consist of Lewek Constellation Pte. Ltd. ("Constellation Debtor"), EMAS CHIYODA Subsea Marine Base LLC ("Marine Base Opco Debtor"), and Lewek Falcon Shipping Pte. Ltd. ("Falcon Debtor").

The remaining Debtors who are not Plan Debtors (collectively, the "Non-Reorganizing Debtors") are not dealt with in the Plan.  The Non-Reorganizing Debtors are likely to convert to a chapter 7 or be dismissed.  The rights of creditors to the Non-Reorganizing Debtors against those entities are not affected by the Plan.

Under the Plan, Chiyoda Corporation ("Chiyoda") and Subsea 7 Finance (UK) PLC ("Subsea 7") will serve as plan sponsors (Chiyoda and Subsea 7, in their capacities as Plan Sponsor, the "Plan Sponsors" and, in their capacities as post-petition lenders, the "DIP Lenders").  However, the Plan Support Agreement permits the ongoing review of potential alternative investors (an "Alternative Plan Sponsor") who, in the discretion of the Debtors, in consultation with the Creditors' Committee, may provide a superior exit path.  As more fully set forth herein, an Alternative Plan Sponsor must repay the DIP Facility in Cash in full at such time that the Debtors may elect to go forward with such alternative investor.

The Plan provides for the acquisition of (a) the capital stock of the reorganized Singapore/Saudi Debtors, (b) certain assets of the US Debtors through an asset purchase or, through a stock transfer (as determined by Subsea 7 in its sole and absolute discretion), and (c) certain assets of other Debtors (collectively referred to herein as the "Purchased Assets") by a newly formed entity ("Newco") to be owned by a member of the Subsea 7 Group and designated by Subsea 7.  The Purchase Price (defined below) paid by Newco for the Purchased Assets shall be used to fund the Plan, including the payment or assumption by Newco of administrative, priority, and unsecured claims in accordance with the Plan.  In particular, the Purchase is comprised of: GUC Cash, Plan Contribution Cash, DIP Loan Cash, and the Assumed Liabilities. The GUC Cash is comprised of (i) $4.5 million in Cash, plus (ii) the first $1.25 million of Cure Cost Savings, plus (iii) 25% of incremental Cure Cost Savings above the first $1.25 million, exclusive of any savings on account of STX Offshore & Shipbuilding Co. Ltd. contract-related matters in an amount not to exceed $1.5 million, plus (iv) 50% of the proceeds of the sale of the Ingleside Spool Base received by the Emerging Debtors over and above the Stalking Horse Bid of $14,850,000, as reflected in the Ingleside Spool Base Motion, in an amount not to exceed $2.5

million.  For the avoidance of doubt, the GUC Cash (i) may be used only to fund the Wind-Down Account in an amount not to exceed $300,000 and (ii) shall only be distributed to holders of General Unsecured Claims in Classes 1G through 3G and 5G.  The Plan Cash Contribution means all Cash (other than the GUC Cash) necessary to make the distributions required to be made under the Plan from Additional Cash minus the Existing Cash.  As of July 1, 2017, the DIP Loan Cash is projected to be $86,892,000.  The "Assumed Liabilities" shall be as follows: (a) all obligations under the Assumed Contracts, which, for the avoidance of doubt, include all Cure amounts, (b) all Assumed Parent Obligations, (c) such other liabilities and obligations identified by the Plan Sponsors within five Business days after entry of the Disclosure Statement Order or as soon as reasonably practicable thereafter, and (d) such other liabilities and obligations expressly assumed by Newco in its sole and absolute discretion, including Ordinary Course Administrative Claims and the Bank Guarantee Claims within five Business days after entry of the Disclosure Statement Order, or as soon as reasonably practicable thereafter.

On the Effective Date, (a) the Singapore/Saudi Debtors shall authorize and directly or indirectly issue (or transfer) all of the New Equity Interests to Newco; (b) Newco shall purchase free and clear of all Claims and Interests, the assets of the US Debtor set forth on Plan Supplement through an asset purchase pursuant to the Plan; provided, however, that Newco may, in its sole and absolute discretion, elect to acquire such assets through a stock sale; (c) Newco shall extend offers of employment to certain of the US Debtor's employees; and (d) Newco or its designee may acquire free and clear of all Claims and Interests, additional assets from the Debtors through an asset purchase under the Plan.  Except as set forth in the Plan, on the Effective Date, the Emerging Debtors shall be discharged from all debts arising on or before the Effective Date and their respective assets shall be free and clear of all claims and interests to the fullest extent permitted by Bankruptcy Code section 1141(c).

As more particularly set forth in the Plan, the Debtors will continue their marketing efforts with respect to the sale of the Constellation Vessel or a long-term bareboat charter in consultation with the Constellation Lenders.  Regardless of the disposition of the Constellation Vessel, the Debtors shall retain the right to use the Constellation Vessel pursuant to a short term charter of sufficient length so that the Debtors can complete pending projects that require use of the such vessel.  In the event that a third party sale or long term bareboat charter is not effectuated, then ownership of the Constellation Vessel shall be transferred to the Constellation Lenders in satisfaction their secured claim.  In the event that Subsea 7 remains a plan sponsor on the Effective Date, the Constellation Lenders will have a "put" option which will require Subsea 7 to accept  a one-year charter.  If the Constellation Lenders exercise that option, then Subsea 7 will have 14 days to can convert that one-year charter into a three-year charter.

To the extent that OCBC desires to fund all costs associated with owning and selling the Falcon Vessel (including all costs of operating, maintaining, docking, and running a sales process), the Debtors will accept reasonable direction from OCBC in connection with its disposition, including running a 363 sales process, lifting the automatic stay to permit OCBC to take control of the Falcon Vessel, etc.).  If OCBC does not fund such costs, the Debtors will seek to abandon their interest in such vessel and dismiss the Falcon Debtor chapter 11 case.  If the Falcon Debtor and OCBC agree upon appropriate consideration (whether in the form of Cash or a waiver of Claims against the Debtors) to the Debtors for managing the Falcon Vessel in a sale process and as long as any administrative claims only arise against the Falcon Debtor, then the

Falcon estate for so long as OCBC funds it may conduct a sale of the Falcon Vessel, and OCBC would receive the proceeds of any sale in Final Satisfaction of the Allowed Falcon Lender Secured Claim.

B.      Summary of Treatment of Claims and Interests under the Plan

The Plan contains separate Classes for Holders of Claims and Interests.   Under Bankruptcy Code section 1122, set forth below is a designation of Classes of Claims and Interests.  A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.   In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims, DIP Facility Claims, Professional Claims, and Priority Tax Claims have not been classified.  The treatment of all such unclassified claims is set forth in Article II of the Plan.

All Allowed Administrative Claims shall be paid in full either from the proceeds of the DIP Facility or will be assumed by Newco and be paid in the ordinary course of business.

Maritime Liens are Other Secured Claims.

The table below summarizes the classification and treatment of Claims and Interests under the Plan.  These summaries are qualified in their entirety by reference to the provisions of the Plan.  For a more detailed description of the terms and provisions of the Plan, see Article VI below.  The tables below also set forth the estimated percentage recovery for Holders of Claims and Interests in each Class and Interests in each Class, and the Debtors' estimates of the amount of Claims that will ultimately become Allowed in each Class based upon (i) review by the Debtors of their books and records, (ii) all Claims scheduled by the Debtors, (iii) review of the Claims filed by Creditors as of May 15, 2017, and (iv) consideration of the provisions of the Plan that affect the allowance of certain Claims.  The aggregate Claim amounts in each Class and the estimated percentage recoveries in the table below are set forth for the Debtors on a consolidated basis.[3]

A summary of the Claims filed in this case and the Debtors' reconciliation efforts can be found in Article V of this Disclosure Statement. The Debtors believe that many of the filed Proofs of Claim are invalid, untimely, duplicative, or overstated, and, therefore, have assumed for purposes of estimating recoveries that such Claims shall be expunged from, or reduced in

---

[3]     Estimates herein assume a July 27, 2017 Effective Date.  Although the Debtors believe that the estimated recoveries are reasonable, there is no assurance that the actual amounts of Allowed Claims in each Class will not materially exceed the estimated aggregate amounts shown in the table below. The actual recoveries under the Plan will depend upon a variety of factors, including: (i) the reconciliation of asserted Claims; (ii) Cure amounts; (iii) whether, and in what amount and with what priority, contingent Claims against the Debtors become non-contingent and fixed; (iv) whether, and to what extent, Disputed Claims are resolved in favor of the Debtors; and (v) any and all other factors set forth in Article VIII "Plan-Related Risk Factors."  Accordingly, no representation can be or is being made with respect to whether each estimated recovery amount shown in the table above will be realized.

amount in, the official register of Claims and Interests maintained by the Debtors' Claims and Solicitation Agent.

| Class Description | Proposed Treatment |
|---|---|
| **Unclassified Claims** | |
| **Administrative Claims**<br><br>**Estimated Recovery: 100%** | Except to the extent that the Holder of an Allowed Administrative Claim agrees to less favorable treatment, Allowed Administrative Claims (other than Professional Fee Claims, which shall be subject to Section 2.3 of the Plan and DIP Facility Claims, which shall be paid out of the DIP Loan Cash) shall be paid in Cash as set forth below:<br><br>(a) In Final Satisfaction of Allowed Ordinary Course Administrative Claims against an Emerging Debtor, on the Effective Date, such Claims shall be Assumed Liabilities and shall be paid by the respective Emerging Debtor or the affiliate of Newco into which purchased assets are transferred in the ordinary course of business in accordance with their terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.<br><br>(b) In Final Satisfaction of Allowed Non-Ordinary Course Administrative Claims against an Emerging Debtor or Allowed Administrative Claims against the Constellation Debtor (which, for the avoidance of doubt, includes post-petition maritime-related claims), on, or as soon as reasonably practicable after, the later of (a) the Effective Date for the Chapter 11 Plans of the Emerging Debtors, or (b) the date on which an Administrative Claim becomes an Allowed Administrative Claim, each Holder of an Allowed Administrative Claim shall receive Cash paid out of the Additional Cash equal to the unpaid portion of such Allowed Administrative Claim; <u>provided</u>, <u>however</u>, that no payments shall be made in respect of any Claims under Bankruptcy Code section 507(b); <u>provided</u>, <u>further</u>, <u>however</u>, that Allowed post-petition maritime-related Claims against the Constellation Debtor shall be paid from the DIP Facility.  To the extent that the Additional Cash is insufficient, such Non-Ordinary Course Administrative Claims shall be assumed by Newco; and all Administrative Claims must be paid in |

| Class Description | Proposed Treatment |
|---|---|
| | accordance with the Bankruptcy Code.<br><br>(c) In Final Satisfaction of Allowed Administrative Claims against Marine Base Opco Debtor, on, or as soon as reasonably practicable after, the later of (a) the Effective Date, or (b) the date on which an Administrative Claim becomes an Allowed Administrative Claim, each Holder of An Allowed Administrative Claim against Marine Base Opco Debtor shall receive the Cash out of the Excess Spool Base Proceeds equal to the unpaid portion of such Allowed Administrative Claim.<br><br>(d) In Final Satisfaction of Allowed Administrative Claims against the Falcon Debtor, on, or as soon as reasonably practicable after the later of (a) the Effective Date, or (b) the date on which an Administrative Claim becomes an Allowed Administrative Claim, each Holder of an Allowed Administrative Claim against Falcon Debtor shall receive Cash from the Falcon Lender equal to the unpaid portion of such Allowed Administrative Claim.<br><br>Holders of Administrative Claims (other than Ordinary Course Administrative Claims) shall have filed an Administrative Claim Request Form by the Administrative Claims Bar Date (unless otherwise provided herein) and such Claim shall have become an Allowed Claim prior to receiving any payment hereunder (unless otherwise provided herein).  Except as otherwise provided herein, all requests for payment of Administrative Claims must be filed, in substantially the form of the Administrative Claim Request Form contained in the Plan Supplement, with the Claims, Noticing, and Solicitation Agent and served on counsel for the Debtors and the Plan Debtors no later than the Administrative Claims Bar Date.  Any request for payment of an Administrative Claim under Section 2.1 of the Plan that is not timely filed and served shall be Disallowed automatically without the need for any objection from the Debtors or the Plan Debtors.  The applicable Debtors or Plan Debtors, before the Effective Date, or Plan Sponsor or Newco, after the Effective Date, may settle an Administrative Claim without further Bankruptcy Court approval.  In the event that |

| Class Description | Proposed Treatment |
|---|---|
|  | the Debtors or the Plan Debtors, before the Effective Date, or Plan Sponsors or Newco, after the Effective Date, objects to an Administrative Claim and there is no settlement, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim. |

| Class Description | Proposed Treatment |
|---|---|
| **DIP Facility Claims**<br><br>**Estimated Amount: $86,892,000**<br><br>**Estimated Recovery: 100%** | The DIP Obligations shall be Allowed in the aggregate amount of principal outstanding plus accrued interest to the Effective Date plus applicable fees.  Holders of Allowed DIP Facility Claims shall be paid in full from the DIP Loan Cash on the Effective Date and such payment shall be in Final Satisfaction of each and every DIP Facility Claim; <u>provided</u>, <u>however</u>, that in the case of an All Asset Qualified Offer, the DIP Obligations must have been paid in full, in Cash. |
| **Professional Claims**<br><br>**Estimated Recovery: 100%** | Prior to the Effective Date, Professionals shall provide good-faith estimates of accrued but unpaid Professional fees as of the Effective Date, which shall be funded into the Professional Fee Escrow.  All final requests for payment of Professional Claims and requests for reimbursement of expenses of members of the Creditors' Committee must be filed no later than thirty (60) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior orders of the Bankruptcy Court, the Allowed amounts of such Professional Claims and expenses shall be determined by the Bankruptcy Court and paid in full from the Professional Fee Escrow established under the DIP Credit Agreement or from the proceeds of the DIP Facility.  For the avoidance of doubt, the treatment set forth in this Section 2.3(a) shall apply to Professional Claims whether incurred on behalf of the Emerging Debtors, the Liquidating Debtors, or the Non-Reorganizing Debtors. |

| Class Description | Proposed Treatment |
|---|---|
| **Priority Tax Claims**<br><br>**Estimated Amount: $6,445,771**<br><br>**Estimated Recovery: 100%** | Priority Tax Claims consist of the Allowed Priority Tax Claims against each of the Debtors.<br><br>Except to the extent that a Holder of an Allowed Priority Tax Claim against a Plan Debtor and such Plan Debtor agree to a less favorable treatment to such Holder, on, or as soon as reasonably practicable after, the later of (a) the Effective Date, or (b) the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive (from the respective source set forth in subsection (b) below), one of the following treatments in Final Satisfaction of such Claim: (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, (b) Cash in an amount agreed to by the relevant Plan Debtor and such Holder, provided, however, that such parties may further agree for the payment of such Allowed Priority Tax Claim to occur at a later date, or (c) at the sole option of such Plan Debtor, Cash in the aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of not more than five (5) years after the Petition Date under Bankruptcy Code section 1129(a)(9)(C); provided, however, that any Priority Tax Claim that is not an Allowed Claim, including any Allowed Priority Tax Claim not due and owing on the Effective Date, will be paid in accordance with the applicable sections of the Plan when such Claim becomes due and owing.<br><br>All payments on account of Allowed Priority Tax Claims in respect of (a) the Emerging Debtors and Constellation Debtor shall be paid from Additional Cash, (b) the Marine Base Opco Debtor shall be paid from the Excess Spool Base Proceeds, and (c) the Falcon Debtor shall be paid by the Falcon Lender. |

| Class Description | Proposed Treatment |
|---|---|
| **Classified Claims** | |
| **Classes 1A – 5A: Other Secured Claims (Emerging Debtors)**<br><br>**Estimated Amount**: $4,557,736<br><br>**Estimated Recovery: 100%** | Except to the extent that the Holder of an Allowed Other Secured Claim against an Emerging Debtor and the Emerging Debtor agree to a less favorable treatment to such Holder, on, or as soon as reasonably practicable after, the later of (i) the Effective Date, or (ii) the date on which such Secured Claim becomes an Allowed Secured Claim, in Final Satisfaction of every Allowed Other Secured Claim, each such Holder shall, at the sole option of the Plan Sponsor, (a) have its Allowed Other Secured Claim Reinstated and rendered Unimpaired in accordance with Bankruptcy Code section 1124(2), notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the Holder of an Allowed Other Secured Claim to demand or to receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, or (b) receive the collateral securing its Allowed Other Secured Claim. |
| **Classes 6A – 8A: Other Secured Claims (Liquidating Debtors)**<br><br>**Estimated Amount**: $0<br><br>**Estimated Recovery: 100%** | Notwithstanding any other provision of the Plan, except to the extent that a Holder of an Allowed Other Secured Claim and the relevant Liquidating Debtor agree to a less favorable treatment to such Holder, on, or as soon as reasonably practicable after, the later of (i) the Effective Date, or (ii) the date on which such Secured Claim becomes an Allowed Secured Claim, in Final Satisfaction of every Allowed Other Secured Claim, each such Holder of an Allowed Other Secured Claim shall have its Allowed Other Secured Claim Reinstated and rendered Unimpaired in accordance with Bankruptcy Code section 1124(1) and shall retain all rights under applicable law to enforce and collect on their security interest with regard to their respective interest in the Falcon or Constellation vessels. |

| Class Description | Proposed Treatment |
|---|---|
| **Class 8B – Helix Secured Claims (Marine Base Opco Debtor)**<br><br>**Estimated Amount: $10,457,714.95**<br><br>**Estimated Recovery: 100%** | Except to the extent that a Holder of an Allowed Helix Secured Claim and Marine Base Opco Debtor agree to a less favorable treatment to such Holder, on, or as soon as reasonably practicable after, the later of (i) the Effective Date, (ii) the date on which such Secured Claim becomes an Allowed Secured Claim, or (iii) the date on which the sale of the Ingleside Spool Base closes, in Final Satisfaction of every Allowed Helix Secured Claim, each such Holder of an Allowed Helix Secured Claim shall receive Cash in the Allowed amount of such Claim out of the proceeds of such sale. |
| **Class 6C – Constellation Lender Secured Claims (Constellation Debtor)**<br><br>**Estimated Amount: $388,607,842.41**<br><br>**Estimated Recovery: 100%** | The Holders of Allowed Constellation Lender Secured Claims shall have the following treatment:<br><br>(a) If the Constellation Lenders accept a Constellation Qualified Offer, the Constellation Vessel shall be conveyed by the Constellation Debtor to the purchaser identified in the Constellation Qualified Offer free and clear of all liens, claims, and encumbrances (other than any Other Secured Claims, including Secured Maritime Lien Claims, the treatment of which is provided for in Section 5.2 of the Plan) with such liens, claims, and encumbrances to attach to the proceeds of such sale in order of priority, and on the terms and conditions set forth in such Constellation Qualified Offer and the Constellation Lenders shall receive from the Constellation Debtor the gross proceeds of the Constellation Qualified Offer (net of any outstanding amounts required to administer the Constellation Debtor's estate during any period after the Effective Date of all Emerging Debtors' Plans and before the Effective Date of the Constellation Debtor Plan) up to the amount of their Allowed Constellation Lender Secured Claim against the Constellation Debtor in Final Satisfaction of each and every Allowed Constellation Lender Secured Claim.  The Constellation Debtor shall file with the Bankruptcy Court a notice disclosing the identity of the purchaser, the amount of the accepted Constellation Qualified Offer, and attaching the definitive documentation. Such notice may be filed after confirmation of the chapter 11 plan of the Constellation Debtor, in which case the Constellation Debtor will request entry of a supplemental order authorizing and approving the sale to the purchaser.  The deposit paid in connection with the accepted Constellation Qualified |

| Class Description | Proposed Treatment |
|---|---|
| | Offer, as proceeds of the Constellation Vessel, shall be held in an account with the agent under the Constellation Credit Agreement.<br><br>(b) If the Constellation Lenders do not accept a Constellation Qualified Offer, then on the Effective Date, at the direction of the Required Constellation Lenders (a) the Constellation Vessel shall be conveyed by the Constellation Debtor to a special purpose vehicle owned by the Constellation Lenders, (b) all Interests in the Constellation Debtor shall be cancelled and reissued or transferred by the Constellation Debtor to the Constellation Lenders, in each case, in Final Satisfaction of every Constellation Lender Secured Claim, and the Constellation Debtor shall be dissolved hereunder, or (c) the automatic stay shall be lifted to permit the Constellation Lenders to immediately exercise any rights or remedies they may have in relation to the Constellation Vessel.  The Constellation Debtor shall file a notice with the Bankruptcy Court setting forth the Constellation Lenders' election in accordance with this Section, which such notice may be filed after confirmation of the chapter 11 plan of the Constellation Debtor.<br><br>(c) The Short Term Bareboat Charter, Initial Bareboat Charter and the Long Term Bareboat Charter, in each case only as applicable pursuant to Section 7.19 hereof, shall survive (a) the purchase of the Constellation Vessel under a Constellation Qualified Offer, (b) the direct or indirect transfer of the Constellation Vessel to the Constellation Lenders, whether pursuant to Section 5.4(b)(ii) or otherwise, and (c) the entry by the Constellation Lenders, directly or indirectly, into a third party charter agreement. In connection with the Short Term Bareboat Charter, the party granting such Short Term Bareboat Charter shall be granted access to the Constellation Vessel for ten (10) certified seafarers. Without limiting the generality of the foregoing, no agreement in respect of the Constellation Vessel or any direct or indirect transfer of the Constellation Vessel under the Plan shall affect, modify or impair any of the rights of Subsea 7 under the Short Term Bareboat Charter, Initial Bareboat Charter (if any) or the Long Term Bareboat Charter (if any) and any such charters shall be unaffected in any manner whatsoever by the |

| Class Description | Proposed Treatment |
|---|---|
| | Confirmation of the Plan or the occurrence of the Effective Date.   For the avoidance of doubt, any purchaser of the Constellation Vessel pursuant to a Constellation Qualified Offer under this Plan shall acquire title to the Constellation Vessel free and clear of any liens, claims, or encumbrances, including free and clear of any obligation to enter into the Initial Bareboat Charter or the Long Term Bareboat Charter, provided, however, that such purchaser shall be required to acquire the Constellation Vessel subject to the terms of the Short Term Bareboat Charter. |

| Class Description | Proposed Treatment |
|---|---|
| **Class 7D – Falcon Lender Secured Claims (Falcon Debtor)**<br><br>**Estimated Amount**: $99,769,361.29<br><br>**Estimated Recovery: 100%** | Except to the extent that a Holder of an Allowed Falcon Lender Secured Claim and the Falcon Debtor agree to a less favorable treatment to such Holder, on, or as soon as reasonably practicable after, the later of (i) the Effective Date, or (ii) the date on which such Secured Claim becomes an Allowed Secured Claim, in Final Satisfaction of every Allowed Falcon Lender Secured Claim, each such Holder of an Allowed Falcon Lender Secured Claim shall, at the sole option of the Falcon Lender, (a) have its Allowed Falcon Lender Secured Claim Reinstated and rendered Unimpaired in accordance with Bankruptcy Code section 1124(2), notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the Holder of an Allowed Other Secured Claim to demand or to receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, (b) receive the collateral securing its Falcon Lender Secured Claim and the Falcon Debtor shall be dissolved hereunder, (c) at the direction of the Falcon Lender, all Interests in the Falcon Debtor shall be cancelled and reissued or transferred to the Falcon Lender, or (d) if the Falcon Debtor and OCBC agree upon appropriate consideration (whether in the form of Cash or a waiver of Claims against the Debtors) to the Debtors for managing the Falcon Vessel in a sale process and as long as any administrative claims only arise against the Falcon Debtor, then the Falcon Debtor's estate for so long as OCBC funds it may conduct a sale of the Falcon Vessel, free and clear of all liens, claims, and encumbrances (other than any Other Secured Claims, including Secured Maritime Lien Claims, the treatment of which is provided for in Section 5.2 of the Plan) such liens, claims, and encumbrances to attach to the proceeds of such sale in order of priority, and OCBC would receive from the Falcon Debtor the proceeds of any sale (net of any outstanding amounts required to administer the Falcon Debtor's estate) up to the amount of their Allowed Falcon Lender Secured Claim against the Falcon Debtor in Final Satisfaction of each and every Allowed Falcon Lender Secured Claim. |

| Class Description | Proposed Treatment |
|---|---|
| **Classes 1E through 5E – Other Priority Claims (Emerging Debtors)**<br><br>**Estimated Amount**: $93,791<br><br>**Estimated Recovery: 100%** | Except to the extent that the Holder of an Allowed Other Priority Claim agrees to less favorable treatment, Allowed Other Priority Claims shall be paid in Cash as set forth below:<br><br>(a): In Final Satisfaction of Allowed Ordinary Course Other Priority Claims, on, or as soon as reasonably practicable after the later of (a) the Effective Date, or (b) the date on which an Ordinary Course Other Priority Claim becomes an Allowed Ordinary Course Other Priority Claim, such Claims shall be Assumed Liabilities and shall be paid by the respective Restructured Emerging Debtor or the affiliate of Newco into which purchased assets are transferred in the ordinary course of business in accordance with their terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.<br><br>(b): In Final Satisfaction of Non-Ordinary Course Other Priority Claims, (a) on or as soon as reasonably practicable after the Effective Date, the Plan Administrator shall receive on behalf of all Holders of such Claims against the applicable Emerging Debtor, the Additional Cash, and (b) on the Initial Distribution Date, the Plan Administrator shall pay the Holder of such Allowed Non-Ordinary Course Other Priority Claim Cash in the full amount of such Claim. To the extent the Additional Cash is insufficient, such Non-Ordinary Course Other Priority Claim shall be assumed by Newco and all Other Priority Claims must be paid in accordance with the Bankruptcy Code. For the avoidance of doubt, the Allowed Non-Ordinary Course Priority Claims shall not be paid from the GUC Cash. |

| Class Description | Proposed Treatment |
|---|---|
| **Class 6E – Other Priority Claims (Constellation Debtor)**<br><br>**Estimated Amount: $0**<br><br>**Estimated Recovery: 100%** | Except to the extent that a Holder of an Allowed Other Priority Claim against the Constellation Debtor and the Constellation Debtor agree to a less favorable treatment to such Holder, in Final Satisfaction of each and every Allowed Other Priority Claim, (a) on or as soon as reasonably practicable after the Effective Date, the Plan Administrator shall receive on behalf of all Holders of such Claims (in the amount of the Allowed and unpaid portion of such claims) the Cash from the Constellation Lenders (as may be agreed between the Constellation Debtor and the Constellation Lenders) with respect to Allowed Other Priority Claims against the Constellation Debtor, and (b) on the Initial Distribution Date, the Plan Administrator shall pay the Holder of such Allowed Other Priority Claim Cash in the full amount of such Claim. |
| **Class 7E – Other Priority Claims (Falcon Debtor)**<br><br>**Estimated Amount**: $0<br><br>**Estimated Recovery: 100%** | Except to the extent that a Holder of an Allowed Other Priority Claim against the Falcon Debtor and the Falcon Debtor, agree to a less favorable treatment to such Holder, in Final Satisfaction of each and every Allowed Other Priority Claim, (a) on or as soon as reasonably practicable after the Effective Date, the Plan Administrator shall receive on behalf of all Holders of such Claims, Cash (in the amount of the Allowed and unpaid portion of such claims) from the Falcon Lender with respect to Allowed Other Priority Claims against the Falcon Debtor, and (b) on the Initial Distribution Date, the Plan Administrator shall pay the Holder of such Allowed Other Priority Claim Cash in the full amount of such Claim. |
| **Class 8E – Other Priority Claims (Marine Base Opco Debtor)**<br><br>**Estimated Amount**: $0<br><br>**Estimated Recovery: 100%** | Except to the extent that a Holder of an Allowed Other Priority Claim against the Marine Base Opco Debtor and the Marine Base Opco Debtor agree to a less favorable treatment to such Holder, in Final Satisfaction of each and every Allowed Other Priority Claim against the Marine Base Opco, on, or as soon as reasonably practicable after the later of (a) the Effective Date, or (b) the date on which an Other Priority Claim becomes an Allowed Other Priority Claim, the Holder of the Allowed Other Priority Claim shall receive Cash out of the Excess Spool Base Proceeds equal to the Allowed and unpaid portion of such Claim. |

| Class Description | Proposed Treatment |
|---|---|
| **Classes 1F through 8F – Bank Guarantee Claims (All Plan Debtors)**<br><br>**Estimated Amount**: $13,000,000 - $15,000,000<br><br>**Estimated Recovery: 100%** | Except to the extent that a Holder of an Allowed Bank Guarantee Claim against the relevant Plan Debtor and the applicable Plan Debtor agree to a less favorable treatment to such Holder, each Allowed Bank Guarantee Claim will be Reinstated and rendered Unimpaired in accordance with Bankruptcy Code section 1124(2), notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the Holder of an Allowed Bank Guarantee Claim to demand or to receive payment of such Allowed Bank Guarantee Claim prior to the stated maturity of such Allowed Bank Guarantee Claim from and after the occurrence of a default. |
| **Classes 1G through 3G and 5G – General Unsecured Claims (Emerging Debtors)**<br><br>**Estimated Amount**: $155,000,000 – $835,000,000<br><br>**Estimated Recovery: 0.6 - 5%** | (a) In Final Satisfaction of each and every Allowed General Unsecured Claim against the relevant Plan Debtor, (i) on or as soon as reasonably practicable after the Effective Date, the Plan Administrator shall receive on behalf of all Holders of such Claims against the relevant Debtor, the GUC Cash, and (ii) on the Initial Distribution Date, the Plan Administrator shall pay each Holder of an Allowed General Unsecured Claim its Pro Rata share of the Net GUC Cash as to which all Holders of Allowed General Unsecured Claims would be entitled as if Classes 1G through 3G and 5G were a single class; provided, however, that any Holder of an unsecured guarantee Claim against more than one relevant Plan Debtor shall be limited to a single recovery on account of such guarantee Claims; provided, further, however, that distributions on account of the Constellation Lender Guarantee Claims shall be made to the holders of the other General Unsecured Creditors in Classes 1G through 3G and 5G.<br><br>(b) If a Plan as to a particular Plan Debtor is not confirmed or a Plan is withdrawn, then the Holders of Allowed General Unsecured Claims with respect to such Debtor will not receive the treatment set forth above, and the recovery they would have otherwise received shall be distributed among the other Holders of Allowed General Unsecured Claims in the remaining classes. |

| Class Description | Proposed Treatment |
|---|---|
| **Classes 6G and 7G – General Unsecured Claims (Constellation Debtor and Falcon Debtor)**<br><br>**Estimated Amount**: **$123,204,618**<br><br>**Estimated Recovery for Class 6G Claims: 0 -1 %**<br><br>**Estimated Recovery for Class 7G Claims: 0 %** | In Final Satisfaction of each and every Allowed General Unsecured Claim against the relevant Plan Debtor, on the Effective Date, or as soon as reasonably practicable thereafter, the Plan Administrator shall receive on behalf of each Holder of an Allowed General Unsecured Claim against the relevant Plan Debtor, such Holder's Pro Rata share of distributable value from the relevant Debtor's estate, if any, after payment of all senior claims in respect of the relevant Plan Debtor. |
| **Class 8G – General Unsecured Claims (Marine Base Opco Debtor)**<br><br>**Estimated Amount**: **$41,000,000**<br><br>**Estimated Recovery: 7.8 - 8.2%** | In Final Satisfaction of each and every such Claim, on the Effective Date, or as soon as reasonably practicable thereafter, the Plan Administrator shall receive such Holder's Pro Rata share of the Excess Spool Base Proceeds, if any, after payment of all senior claims in respect of the Marine Base Opco Debtor. |
| **Classes 1H through 8H – Cancelled Intercompany Claims (All Plan Debtors)**<br><br>**Estimated Recovery: 0%** | Holders of Allowed Cancelled Intercompany Claims will receive the following treatment:<br><br>(a): Intercompany Claims amongst the Singapore/Saudi Debtors shall be cancelled or subordinated<br><br>(b): Intercompany Claims as between the Singapore/Saudi Debtors on the one hand and the US Debtor on the other shall be cancelled or subordinated.<br><br>(c): Intercompany Claims allegedly held by ECS against any Emerging Debtor shall be cancelled or subordinated, based on evidence to be provided on the record at the Confirmation Hearing. |
| **Class 1I through 8I – Subordinated Claims (All Plan Debtors)**<br><br>**Estimated Recovery: 0%** | Holders of Allowed Claims in Classes 1I through 8I shall not receive any distributions on account of such Allowed Claims in Classes 1I through 8I, and on the Effective Date all Allowed Claims in Classes 1I through 8I shall be released, waived, and discharged. |

| Class Description | Proposed Treatment |
|---|---|
| **Class 1J through 8J – Interests (All Plan Debtors)**<br><br>**Estimated Recovery: 0%** | On the Effective Date, Interests in Classes 1J through 8J shall be deemed automatically cancelled, released, and extinguished without further action by the Debtors or the Plan Debtors and the obligations of the Debtors and the Plan Debtors thereunder shall be discharged and the Holders of Interests in Classes 1J through 8J shall not receive or retain any property or interests on account of such Interests in Classes 1J through 8J; <u>provided</u>, <u>however</u>, that Interests in any Emerging Debtors other than an Emerging Debtor that is an immediate subsidiary of the DIP Borrower and, unless Subsea 7 agrees otherwise in its sole and absolute discretion, the US Debtor, shall remain intact solely to preserve corporate structure, but shall not be entitled to any distribution; <u>provided</u>, <u>further</u>, <u>however</u>, with respect to the Liquidating Debtors, in the event that there are any excess proceeds available after all creditors at any particular Liquidating Debtors are paid in full, those proceeds will be distributed to shareholders of such Liquidating Debtor Pro Rata. |

THE DEBTORS AND THE CREDITORS' COMMITTEE BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR THE HOLDERS OF CLAIMS. THE DEBTORS AND THE CREDITORS' COMMITTEE <u>STRONGLY RECOMMEND</u> THAT YOU VOTE TO <u>ACCEPT</u> THE PLAN.

**A VOTE TO ACCEPT THE PLAN OR A DECISION TO ABSTAIN FROM VOTING ON THE PLAN CONSTITUTES YOUR CONSENT TO THE RELEASE SET FORTH IN ARTICLE XI OF THE PLAN OF THE PARTIES SPECIFIED IN ARTICLE XI OF THE PLAN UNLESS YOU OPT OUT OF SUCH RELEASE IN ACCORDANCE WITH THE PROCEDURES SET FORTH IN YOUR BALLOT.**

# TABLE OF CONTENTS

ARTICLE I. INTRODUCTION ...................................................................................................1

ARTICLE II. OVERVIEW OF THE PLAN ...............................................................................2
    A.    Summary of the Plan ...........................................................................................2
    B.    Unclassified Claims ............................................................................................3
    C.    Treatment of Claims and Interests Under the Plan .............................................3
    D.    Liquidation Analyses ..........................................................................................4

ARTICLE III. VOTING PROCEDURES .....................................................................................4
    A.    Voting Status of Each Class ...............................................................................4
    B.    Class Entitled to Vote ........................................................................................6
    C.    Voting Procedures ..............................................................................................6

ARTICLE IV. GENERAL INFORMATION ...............................................................................7
    A.    Overview of the Company's Business and Certain Assets ..................................7
    B.    Prepetition Corporate and Capital Structure ....................................................13
    C.    Ezra Bankruptcy...............................................................................................16
    D.    Non-Debtor Affiliate Insolvency Cases ..........................................................16

ARTICLE V. THE CHAPTER 11 CASES .................................................................................17
    A.    Events Leading to the Commencement of the Chapter 11 Cases .......................17
    B.    Debtor in Possession Financing .......................................................................18
    C.    First Day Papers ...............................................................................................19
    D.    Procedural Motions and Professional Retention Applications ..........................21
    E.    Appointment of the Creditors' Committee and Retention of Committee
          Professionals ....................................................................................................21
    F.    Schedules and Statements .................................................................................22
    G.    Contract Rejection Motion ...............................................................................22
    H.    Ingleside Spool Base Motion ...........................................................................22
    I.    Framework Agreement Motion.........................................................................23
    J.    Critical Employee Recognition Program and Executive Incentive Plan ...........23
    K.    Analysis and Resolution of Claims...................................................................23
    L.    Plan Support Agreement ...................................................................................25
    M.    Subsea 7 and Chiyoda Memorandum of Understanding. ..................................25

ARTICLE VI. PLAN SUMMARY .............................................................................................25
    A.    Overview of Chapter 11 ...................................................................................25
    B.    Overall Structure of the Plan............................................................................27
    C.    Administrative Expenses and Priority Claims ..................................................27
    D.    Classification of Claims and Interests...............................................................30
    E.    Identification of Classes of Claims and Interests Impaired and Unimpaired
          by the Plan........................................................................................................33
    F.    Provision for Treatment of Claims and Interests ..............................................35
    G.    Acceptance .......................................................................................................43
    H.    Means for Implementation of the Plan...............................................................44

I.      Unexpired Leases and Executory Contracts ..........................................52
J.      Procedures for Resolving Disputed Claims and Interests.......................56
K.      Provisions Governing Distributions........................................................59
L.      Effect of the Plan on Claims and Interests.............................................63
M.      Conditions Precedent .............................................................................69
N.      Retention of Jurisdiction ........................................................................71
O.      Miscellaneous Provisions.......................................................................73

ARTICLE VII. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE
PLAN ...........................................................................................................................78
A.      The Confirmation Hearing......................................................................78
B.      Confirmation Standards ..........................................................................78
C.      Liquidation Analysis ..............................................................................80
D.      Financial Feasibility...............................................................................81
E.      Acceptance by Impaired Classes ............................................................81
F.      Confirmation Without Acceptance by All Impaired Classes..................81

ARTICLE VIII. PLAN-RELATED RISK FACTORS ................................................83
A.      General ....................................................................................................83
B.      Plan May Not Be Accepted.....................................................................83
C.      Certain Bankruptcy Considerations ........................................................83
D.      Claims Estimations .................................................................................83
E.      The Emerging Debtors' Business Is Uncertain........................................84
F.      Bankruptcy-Specific Risk Factors That Could Negatively Impact the
        Debtors' Business....................................................................................85
G.      The Debtors' Employees Face Uncertainty Due to the Chapter 11 Case. ............85
H.      Classification and Treatment of Claims and Interests ............................86
I.      Conditions Precedent to Consummation of the Plan ..............................86
J.      Liquidation Under Chapter 7 ..................................................................87
K.      Tax ..........................................................................................................87
L.      Anti-Trust Issues ....................................................................................87
M.      Uncertainty of Extraterritorial Recognition of Plan Confirmation ........87
N.      Arrest of Vessels ....................................................................................87
O.      The Conditions to the Effective Date May Not Be Waived or May Not
        Occur.......................................................................................................87

ARTICLE IX. CERTAIN UNITED STATES FEDERAL INCOME TAX
CONSEQUENCES ......................................................................................................88
A.      Consequences to the Debtors..................................................................89
B.      Consequences to Holders of Interests.....................................................91
C.      Consequences to Holders of General Unsecured Claims ........................91

ARTICLE X. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF
THE PLAN ..................................................................................................................93
A.      Continuation of the Bankruptcy Cases ...................................................93
B.      Sale of Substantially all of the Debtors' Assets Under Bankruptcy Code
        Section 363..............................................................................................93

C.      Alternative Plans of Reorganization ....................................................................94
D.      Liquidation Under Chapter 7 or Chapter 11 .........................................................94

ARTICLE XI. PLAN SUPPLEMENT ........................................................................95

ARTICLE XII. RECOMMENDATION AND CONCLUSION ...................................................96

# EXHIBITS

**Exhibit A**      Third Amended Joint Chapter 11 Plan of Reorganization of Certain Affiliated Debtors of EMAS CHIYODA Subsea Limited

**Exhibit B**      Liquidation Analysis

**Exhibit C**      Corporate Structure Chart

**Exhibit D**      Disclosure Statement Approval Order

# ARTICLE I.

# INTRODUCTION

The Company is an international heavy lift subsea, offshore and onshore contractor offering engineering, procurement, construction, transportation, installation, and commissioning services at every stage of the project lifecycle to deliver complex construction projects for customers.  For example, in its subsea business, the Company's key activities include assembly of both rigid and flexible pipes, umbilical and power cable installations, heavy lift operations, and subsea structure installations.

On February 27, 2017, the Debtors filed voluntary petitions for relief under the Bankruptcy Code and commenced the Chapter 11 Cases.  The Debtors' cases are pending in the Bankruptcy Court and are jointly administered under Case No. 17-31146 (MI).  No trustee has been appointed in the Chapter 11 Cases.  On March 21, 2017, the Office of the United States Trustee for the Southern District of Texas (the "United States Trustee") appointed an official committee of unsecured Creditors (the "Creditors' Committee") under Bankruptcy Code section 1102.

The Plan Debtors' proposal for reorganization (or in the case of the Liquidating Debtors, liquidation) of their business is set forth in the Plan, a copy of which is attached hereto as Exhibit A.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operations and financial history, their reasons for seeking protection under chapter 11, and significant events that have occurred during the Chapter 11 Cases.  This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan.  In addition, this Disclosure Statement discusses the requirements for Confirmation of the Plan and the voting procedures that Holders of Claims entitled to vote on the Plan must follow for their votes to be counted.  All capitalized terms used and not otherwise defined in this Disclosure Statement shall have the meanings ascribed to such terms in the Plan.

FOR A DESCRIPTION OF THE PLAN AND THE VARIOUS RISKS AND OTHER FACTORS PERTAINING TO THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS AND INTERESTS, PLEASE SEE ARTICLES VI AND VIII HEREIN.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATED TO THE PLAN, CERTAIN EVENTS IN THE CHAPTER 11 CASES, AND CERTAIN FINANCIAL INFORMATION.  TO THE EXTENT ANY PORTION OF THIS DISCLOSURE STATEMENT CONFLICTS WITH THE PLAN, THE PLAN SHALL GOVERN.  ALTHOUGH THE DEBTORS BELIEVE THAT THE SUMMARIES CONTAINED HEREIN ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE DOCUMENTS OR STATUTORY PROVISIONS THEY ARE SUMMARIZING.  THE DEBTORS'  MANAGEMENT  HAS  PROVIDED  THE  FACTUAL  INFORMATION

CONTAINED IN THIS DISCLOSURE STATEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

## ARTICLE II.

## OVERVIEW OF THE PLAN

A.      Summary of the Plan

In general, the Plan provides for the restructuring of the Plan Debtors. The Plan is structured with Chiyoda Corporation ("Chiyoda") and Subsea 7 Finance (UK) PLC ("Subsea 7") to serve as Plan Sponsors (Chiyoda and Subsea 7, in their capacities as Plan Sponsor, the "Plan Sponsors" and, in their capacities as post-petition lenders, the "DIP Lenders"). However, the Plan permits the ongoing review of potential alternative investors (an "Alternative Plan Sponsor") who may in the discretion of the Debtors, in consultation with the Creditors' Committee, provide a superior exit path. As more fully set forth herein an Alternative Plan Sponsor must repay the DIP Facility in Cash in full at such time that the Debtors may elect to go forward with such alternative investor.

As more fully set forth in the Plan, the Plan provides for the acquisition of the equity in or assets of the Emerging Debtors, as applicable, and certain assets of other Debtors (collectively referred to herein as the "Purchased Assets") by a newly formed entity ("Newco") to be owned by a member of the Subsea 7 Group and designated by Subsea 7. Additional information regarding the financial wherewithal of Newco will be set forth in the Plan Supplement, which will be filed prior to the Voting Deadline.

If Newco acquires the equity in and/or assets of the Emerging Debtors, the Plan shall be funded from the proceeds of the Purchase Price (as defined below). The purchase price to be paid by the Newco for the Purchased Assets shall be: (i) the GUC Cash (as defined below), plus (ii) Plan Cash Contribution, plus (iii) cash (the "DIP Loan Cash") in an amount equal to all of the outstanding obligations of the DIP Borrower under the DIP Credit Agreement (the "DIP Obligations"), plus (iv) the assumption of the Assumed Liabilities (as defined below) (collectively, the "Purchase Price").

The Purchase Price paid by Newco for the Purchased Assets shall be used to fund the Plan, including the payment of administrative, priority, and unsecured claims in accordance with the terms in the Plan. The Plan Contemplates a pool of cash for Holders of Allowed General Unsecured Claims against the Emerging Debtors called the "GUC Cash." The GUC Cash shall be (i) $4.5 million in Cash, plus (ii) certain savings associated with reductions in anticipated cure claims, plus (iii) 50% of the proceeds of the sale of the Ingleside Spoolbase (as defined below) due to the Emerging Debtors over and above the Stalking Horse Bid of $14,850,000 as set forth in the Ingleside Spoolbase Motion, up to $2.5 million. For the avoidance of doubt, the GUC Cash may be used only to (i) fund the Wind-Down Account in an amount not to exceed $300,000 and (ii) shall only be distributed to holders of General Unsecured Claims in Classes 1G through 3G and 5G.

B.     Unclassified Claims

In accordance with Bankruptcy Code section 1123(a)(1), the Plan does not classify Administrative Claims, DIP Facility Claims, and Priority Tax Claims. These Claims are therefore excluded from the Classes of Claims set forth in Article II of the Plan.  The projected percentage of recoveries provided below are projected as of May 22, 2017.

| Claim | Plan Treatment | Projected Recovery Under the Plan |
|---|---|---|
| DIP Facility Claims | Paid in full | 100% |
| Administrative Claims and Professional Claims | Paid in full | 100% |
| Priority Tax Claims | Paid in full | 100% |

C.     Treatment of Claims and Interests Under the Plan

The table below summarizes the classification, treatment, and estimated percentage recoveries of the Claims and Interests under the Plan.  Estimated percentage recoveries have been calculated based upon a number of assumptions.  For certain Classes of Claims, the actual percentage recovery is contingent upon a number of factors.

| Class | Claim or Interest | Status | Estimated % Recovery Under the Plan |
|---|---|---|---|
| 1A - 5A | Other Secured Claims (Emerging Debtors) | Unimpaired | 100% |
| 6A-8A | Other Secured Claims ( Liquidating Debtors) | Unimpaired | 100% |
| 8B | Helix Secured Claims (Marine Base Opco Debtor) | Unimpaired | 100% |
| 6C | Constellation Lender Secured Claims (Constellation Debtor) | Unimpaired | 100% |
| 7D | Falcon Lender Secured Claims (Falcon Debtor) | Unimpaired | 100% |
| 1E - 5E | Other Priority Claims (Emerging Debtors) | Unimpaired | 100% |
| 6E | Other Priority Claims (Constellation Debtor) | Unimpaired | 100% |
| 7E | Other Priority Claims (Falcon Debtor) | Unimpaired | 100% |
| 8E | Other Priority Claims (Marine Base Opco Debtor) | Unimpaired | 100% |
| 1F - 8F | Bank Guarantee Claims (All Plan Debtors) | Unimpaired | 100% |
| 1G - 3G, 5G | General Unsecured Claims (Emerging Debtors) | Impaired | 0.6 - 5% |

3

| 6G and 7G | General Unsecured Claims (Constellation Debtor and Falcon Debtor) | Impaired | 0 – 0.3 % 0 % |
| 8G | General Unsecured Claims (Marine Base Opco Debtor) | Impaired | 7.8 – 8.2 % |
| 1H - 8H | Cancelled Intercompany Claims (All Plan Debtors) | Impaired | 0% |
| 1I - 8I | Subordinated Claims (All Plan Debtors) | Impaired | 0% |
| 1J - 8J | Interests (All Plan Debtors) | Impaired | 0% |

D.    Liquidation Analyses

The Debtors have prepared a liquidation analysis, attached hereto as Exhibit B (the "Liquidation Analysis") to assist Holders of Claims and Interests in evaluating the Plan.  The Liquidation Analysis compares the Creditor recoveries to be realized if the Debtors were to be liquidated in a hypothetical case under chapter 7 of the Bankruptcy Code with the distributions to Holders of Allowed Claims and Interests under the Plan.   The analysis is based upon the estimated value of the Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date.   Further, the analyses is subject to potentially material changes, including with respect to economic and business conditions and legal rulings.  Therefore, the actual liquidation value of the Debtors could vary materially from the estimates provided in the Liquidation Analysis.

The Debtors believe that the Plan provides the same or a greater recovery for Holders of Allowed Claims and Interests as would be achieved in a liquidation under chapter 7 of the Bankruptcy Code because of, among other things, the additional Administrative Claims generated by conversion to a chapter 7 case, the administrative costs of liquidation and associated delays in connection with a chapter 7 liquidation, the negative impact on the market for the Debtors' assets caused by attempting to sell a large number of assets in a short time frame, and the cessation of operations and the failure to realize the greater going concern value of the Debtors' assets, each of which likely would diminish the value of the Debtors' assets available for distributions.   Put simply, for all but one of the Plan Debtors, the Liquidation Analysis shows a 0.5% or less recovery even in the high case.  For the one Plan Debtor, Marine Base Opco, for whom the Liquidation Analysis depicts a 14% recovery in the high case, such Creditors should receive the same or greater recovery under the Plan, due to, the factors noted above, among others.

**ARTICLE III.**

**VOTING PROCEDURES**

A.    Voting Status of Each Class

Under the Bankruptcy Code, Creditors are entitled to vote if their contractual rights are Impaired by the Plan and they are receiving a distribution under the Plan.  Creditors are not entitled to vote if their contractual rights are Unimpaired by the Plan or if they will receive no

4

distribution of property under the Plan.  The following table sets forth which Classes of Claims will or will not be entitled to vote on the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1A - 5A | Other Secured Claims (Emerging Debtors) | Unimpaired | Deemed to Accept |
| 6A - 8A | Other Secured Claims (Liquidating Debtors) | Unimpaired | Deemed to Accept |
| 8B | Helix Secured Claims (Marine Base Opco Debtor) | Unimpaired | Deemed to Accept |
| 6C | Constellation Lender Secured Claims (Constellation Debtor) | Unimpaired | Deemed to Accept |
| 7D | Falcon Lender Secured Claims (Falcon Debtor) | Unimpaired | Deemed to Accept |
| 1E - 5E | Other Priority Claims (Emerging Debtors) | Unimpaired | Deemed to Accept |
| 6E | Other Priority Claims (Constellation Debtor) | Unimpaired | Deemed to Accept |
| 7E | Other Priority Claims (Falcon Debtor) | Unimpaired | Deemed to Accept |
| 8E | Other Priority Claims (Marine Base Opco Debtor) | Unimpaired | Deemed to Accept |
| 1F - 8F | Bank Guarantee Claims (All Plan Debtors) | Unimpaired | Deemed to Accept |
| 1G - 3G, 5G | General Unsecured Claims (Emerging Debtors) | Impaired | Entitled to Vote |
| 4G, 6G, and 7G | General Unsecured Claims (Constellation Debtor and Falcon Debtor) | Impaired | Entitled to Vote |
| 8G | General Unsecured Claims (Marine Base Opco Debtor) | Impaired | Entitled to Vote |
| 1H - 8H | Cancelled Intercompany Claims (All Plan Debtors) | Impaired | Deemed to Reject |
| 1I - 8I | Subordinated Claims (All Plan Debtors) | Impaired | Deemed to Reject |
| 1J - 8J | Interests (All Plan Debtors) | Impaired | Deemed to Reject |

B.    <u>Class Entitled to Vote</u>

The following Classes are the only Classes entitled to vote to accept or reject the Plan:

| Classes | Claim or Interest | Status |
|---------|-------------------|--------|
| 1G-3G, 5G | General Unsecured Claims against Emerging Debtors | Impaired |
| 6G, and 7G | General Unsecured Claims against Constellation Debtor and Falcon Debtor | Impaired |
| 8G | General Unsecured Claims against Marine Base Opco Debtor | Impaired |

If your Claim or Interest is not included in these Classes, you are not entitled to vote and you will not receive a solicitation package.

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims is determined by calculating the number and the amount of claims voting to accept, based on the actual total allowed claims voting on the plan, not including insiders.  Acceptance by a class requires more than one-half of the number of total allowed claims in the class to vote in favor of the plan and at least two-thirds in dollar amount of the total allowed claims in the class to vote in favor of the plan.

C.    <u>Voting Procedures</u>

The Debtors retained Epiq Bankruptcy Solutions, LLC ("<u>Epiq</u>" or the "<u>Claims, Noticing, and Solicitation Agent</u>") to, among other things, act as the Debtors' agent in connection with the solicitation of votes to accept or reject the Plan.

The Voting Record Date (as defined in the Disclosure Statement Motion)[4] is [May 24, 2017].  The Voting Record Date is the date for determining (i) which Holders of Claims are entitled to vote to accept or reject the Plan and receive a solicitation package in accordance with the Solicitation Procedures (as defined in the Disclosure Statement Motion) and (ii) whether Claims have been properly assigned or transferred to an assignee under Bankruptcy Rule 3001(e) such that the assignee can vote as the Holder of a Claim.  The Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' Creditors and other parties in interest.

---

[4]    As used herein, the "<u>Disclosure Statement Motion</u>" refers to the Motion of the Debtors for Entry of an Order Approving (I) Adequacy of the Disclosure Statement and Notice of the Disclosure Statement Hearing, (II) Hearing Date to Consider Confirmation of the Plan and Procedures for Filing Objections to the Plan, (III) Deadlines Related to Solicitation and Confirmation, (IV) Solicitation Procedures for Confirmation of the Plan and the form of Various Ballots and Notices in Connection Therewith, and (V) Voting and General Tabulation Procedures [Docket No. 375].

Under the Plan, Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan. In order for the Holder of a Claim in the Voting Classes to have such Holder's Ballot (as defined in the Solicitation Motion) counted as a vote to accept or reject the Plan, such Holder's Ballot, must be properly completed, executed, and delivered in accordance with the instructions included in the Ballot by: (i) first class mail; (ii) courier; or (iii) personal delivery to the Claims, Noticing, and Solicitation Agent, so that such Holder's Ballot is **actually received** by the Claims, Noticing, and Solicitation Agent prior to **4:00 p.m. (Prevailing Central Time) on June 23, 2017** (the "Voting Deadline"). It is important that the Holder of a Claim in the Voting Classes follow the specific instructions provided on such Holder's Ballot and the accompanying instructions.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE IN THEIR SOLE AND ABSOLUTE DISCRETION.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST.

IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT, AS APPROPRIATE, WHEN SUBMITTING A VOTE.

IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS DISCLOSURE STATEMENT, THE PLAN, OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT, EPIQ, AT (646) 282-2500 AND ASK TO SPEAK WITH A MEMBER OF THE SOLICITATION TEAM, OR EMAIL TABULATION@EPIQSYSTEMS.COM WITH A REFERENCE TO "EMAS CHIYODA" IN THE SUBJECT LINE.

## ARTICLE IV.

## GENERAL INFORMATION

A.    Overview of the Company's Business and Certain Assets

The Company is an international heavy lift subsea, offshore and onshore contractor offering engineering, procurement, construction, transportation, installation, and commissioning services at every stage of the project lifecycle to deliver complex construction projects for

customers.  For example, in its subsea business, the Company's key activities include assembly of both rigid and flexible pipes, umbilical and power cable installations, heavy lift operations, and subsea structure installations.

To deliver its services in the subsea and offshore construction business, the Company has made major investments in industry leading specialized vessels and facilities.  The Company's project enabling vessels[5] helped catapult it to the top tier of deepwater subsea construction service companies.

     1.    The Company's Fleet and Facilities.

     (a)    **The Vessels**:  The Company provided these global services to customers through the operation of a diverse fleet of subsea construction and installation vessels, two of which it owns and the others it leases.  In particular, the Debtors own the Lewek Constellation[6] (pictured below), which is the Company's flagship vessel, and the Lewek Falcon.[7]

The Debtors also lease the Lewek Champion (the "Champion") (also pictured below).[8] Hai Jiang 1401 Pte. Ltd. ("Hai Jiang") is the owner of the Champion.  Prior to the Petition Date, the Debtors time chartered the Champion from non-debtor Lewek Champion Shipping Pte. Ltd., to whom Hia Jiang had originally chartered the Champion  (the "First Champion Charter").  On March 28, 2017, the Bankruptcy Court entered an order granting the Debtors' motion to reject the First Champion Charter, among other contracts discussed more fully in Article V(G) of this Disclosure Statement [Docket No. 178].  Subsequently, the Debtors entered negotiations with Hai Jiang to directly bareboat charter the Champion.  On April 5, 2017, the Bankruptcy Court entered an Order Authoring and Approving Debtors' Entry into the Bareboat Charter for the Vessel "Lewek Champion" (the "Short Term Bareboat Charter") [Docket No. 252].  By directly chartering the Champion from Hia Jiang, the Debtors were able to reduce the charter rate by approximately 50% when compared with the First Champion Charter.  The Short Term Bareboat Charter runs until June 30, 2017.

The Debtors are currently negotiating a long-term bareboat charter with Hia Jiang to begin upon the termination of the Short Term Bareboat Charter.

---

[5]    Project enabling vessels are those vessels that are able to stay on or near field throughout the project.  For example, in the case of the Constellation, a real barge can meet the vessel in field where the Constellation will be able to off-load empty reels and re-load with fully loaded reels.  This reduces project time by, for example, removing the need to transit back to the spoolbase to pick up additional product.

[6]    The Lewek Constellation is a highly specialized, deepwater, subsea, reel lay vessel.

[7]    The Lewek Falcon is a multifunctional anchor handling tug and subsea umbilical riser and flowline construction vessel.  It is also designed and capable of tasks including subsea construction, ROV intervention, subsea maintenance and repair work.

[8]    The Lewek Champion is heavy lift and pipe lay barge equipped for pipe lay and platform operations.





(b)    **The Barge**:   In addition, the Non-Reorganizing Debtor, Gallatin Marine Management, LLC bare boat chartered the RB1 from Crowley Marine Services, LLC ("Crowley").  The RB1 is a reel barge that partners with the Constellation by transporting spools of welded pipe between the vessel and an onshore production facility.  Gallatin, in turn, time chartered the RB1 to US Debtor, who have guaranteed to Crowley the prompt payment by Gallatin of any amounts payable by Gallatin to Crowley under the charter.

There may be a dispute as to whether the charter is or is not expired.  Crowley alleges the Debtors did not redeliver the RB1 in accordance with the terms of the charter.  The Debtors have maintained control and insurance on the RB1 throughout the duration of these cases.  The Debtors are continuing to analyze the situation and have failed to pay Crowley both pre-petition and post-petition.  Moreover, Crowley believes it is entitled to assert maritime liens against the Constellation vessel and Debtors' equipment aboard the RB1.  The Debtors may dispute those allegations.  In any event, the Debtors and Crowley have been engaged in discussions for several months with respect to renegotiating the terms of the charter and other related issues.  The Debtors and Crowley have exchanged several proposals, but so far have not been able to reach an agreement.

The Debtors' disposition of the RB1 and the equipment contained thereon (the "KIT") will depend on a variety of factors between now and the Confirmation Hearing.  The first factor is whether the Chevron TVEX project contracts are retained because the Debtors only

foreseeable use for the RB1 or the KIT is in connection with that contract.  Third, the disposition will depend on who the owner of the Constellation vessel turns out to be and whether that owner desires to purchase the Debtors' interests in the RB1 and the KIT.  However, the way the Plan is structured, recoveries to Creditors do not depend on the ultimate disposition of the RB1 and the KIT.

If the RB1 is assumed, it will be a Purchased Asset, as illustrated currently on the Schedule A Purchased Assets attached to the Plan Support Agreement.  Under this arrangement, any administrative and/or cure claims would have to be paid as of the Effective Date by the Plan Sponsors or a resolution would have to be reached with Crowley before the RB1 could be assumed and/or assumed and assigned, in accordance with any requirements set forth in the Bankruptcy Code.  Gallatin is a Non-Reorganizing Debtor who is likely to convert to a chapter 7 case or be dismissed.  However, if Gallatin elects an assumption and assignment, to the extent necessary to effectuate such assumption and or assignment, Gallatin will file a motion or otherwise seek relief to assume and assign the charter.

If on the other hand, the RB1 is not executory, or the bare boat charter is rejected, then the proposed consideration negotiated between the Plan Sponsors and the Creditors' Committee for receipt by Holders of Allowed General Unsecured Claims does not change, and Crowley would be entitled to assert any rejection damage claims, which could be impacted by Crowley's alleged maritime and possessory liens and treated in accordance with the Plan.

(c)      **Non-Debtor Vessels**:  In addition, as of the Petition Date, non-Debtor Emas-AMC AS ("Norway") also leased the Lewek Centurion,[9] the Lewek Express,[10] the Lewek Inspector,[11] and the Lewek Connector.[12]

(d)      **ROVs**:  In addition, the Company owns approximately 15 remotely operated underwater vehicles (collectively, the "ROVs"), which are tethered underwater mobile devices that can be operated by a crew aboard a vessel.  The ROVs are essential for drilling support and subsea constructions services to enable deepsea exploration projects to be carried out.  Specifically, the ROVs are linked to a host ship to perform offshore work in ultra-deep water challenging subsea environments.  Eight are owned by EMAS CHIYODA ROV Pte. Ltd., five are owned by Debtor EMAS CHIYODA Subsea Services Pte. Ltd, and two are owned by Debtor Lewek Falcon Shipping Pte. Ltd.

(e)      **Spoolbases**:  Finally, the Debtors own a marine base in Ingleside, Texas (the "Ingleside Spoolbase").  Non-Debtor Norway leases a marine base in Gulen, Norway (the "Gulen Spoolbase").[13]  The Gulen Spoolbase is used for pipe storage and handling as well as

---

[9]      The Lewek Centurion is a S-lay pipeline installation vessel for shallow and deep water.

[10]      The Lewek Express is another project enabling asset designed to undertake the SURF and rigid pipeline installation work.

[11]      The Lewek Inspector is a light construction vehicle used for inspection, maintenance, and repair.

[12]      The Lewek Connector has cable and flex lay capability.

fabrication, among other things.   The Ingleside Spoolbase (pictured below) is a 120-acre, deepwater support facility as well as a pipeline fabrication base designed to serve the onshore and offshore pipelay and subsea construction needs of the Gulf of Mexico and Mexico's Bay of Campeche.  As set forth more fully in Article V(H) of this Disclosure Statement, the Debtors are currently marketing the Ingleside Spoolbase in connection with a sale.



2.   Marketing of Assets

On February 15, 2017, the Debtors retained KPMG to serve as, among other things, its investment banker.   Thereafter, KPMG, on behalf of the Debtors, launched an extensive marketing process to explore a potential sale (or sales) as an alternative to a stand-alone reorganization plan.  To that end, KPMG set up a dataroom and approached more than 90 parties (more than 40 potential strategic buyers and more than 50 potential financial buyers) regarding a sale of all or a substantial portion of the Debtors' businesses.  Of those parties, 34 accepted the Debtors' invitation to receive due diligence materials and signed confidentiality agreements. KPMG has held numerous follow-up diligence calls with a number of these potential investors. While negotiations with many of such parties continue, KPMG believes  that the robust process to date, along with its ability to continue to seek higher and better bids, ensures that the transactions contemplated by the Plan will deliver fair market value for the assets sold.  At this time, KPMG believes that the transactions contemplated by the Plan are superior to any other potential sale proposals at this time, and any higher and better bids will only enhance the market value.

---

*(cont'd from previous page)*
[13]   A spoolbase is a shore-based facility used for fabrication and storage of pipelines to facilitate continuous pipe laying for offshore oil and gas production.

       3.      Customers and The Debtors' Existing Projects[14]

The Company's lifeblood is its ability to win bids for contracts for projects and then to complete the work.  Contracts are typically awarded on a competitive bid basis.  Pricing is often the primary factor in determining which qualified contractor is awarded a job, although other factors, including technical capability of service and equipment, unit availability, and crew quality may be considered.

The Company individually negotiates its contracts to provide services and they vary in their terms and provisions.[15]  Once a contract is won, each project undertaken by the Company is unique in geographic location, specifications, and customer needs, requiring customized design and engineering for each project and likewise necessitating customized design and engineering for the components used in each project.  As of December 31, 2016, the Company had an order backlog with potential revenue in excess of more than $1 billion stemming from 15 existing products, including the below.

       (a)    The Aramco Projects

The Company, in consortium with Larsen & Toubro Hydrocarbon Engineering ("LTHE"), is currently engaged in a series of projects with client Saudi Arabian Oil Company ("Saudi Aramco")[16] as part of a long-term agreement for six years with options to extend.  Under the long-term agreement, LTHE and the Debtors will  provide Saudi Aramco with engineering, procurement, construction, and installation services in the offshore facilities off the coast of Saudi Arabia.  In particular, in July 2016, the Company,[17] in partnership with LTHE, was awarded a contract by Saudi Aramco valued at more than $1.6 billion.[18]  The first of these projects awarded under the long-term agreement was for the development and expansion of the Hasbah Offshore Gas field situated off the coast of Saudi Arabia (the "Hasbah Project"), including building platforms and pipelines.  The project is scheduled to be completed over a period of three and a half years.  The work relies on various suppliers of materials (e.g., clad pipes), vendors, and other service providers (e.g., welding, pipelaying, etc.).

---

[14]    The following is only a summary of certain of the Company's current projects.  In addition, any description of any of the projects or agreements herein is only a summary of the project or agreement and is not meant to modify or amend any terms of the agreement.  In the event of a conflict or inconsistency between the First Day Declaration and the terms of the underlying agreements, the terms of the agreements shall control.

[15]    Notably, however, each of the existing contracts has a termination for convenience clause under which the customers are able to terminate the contracts at will, subject only to the limitations set forth in the contract.

[16]    Saudi Aramco is the state-owned oil company of the Kingdom of Saudi Arabia.

[17]    Specifically, Debtor EMAS-AMC Pte. Ltd. is the counterparty with LTHE to the out of country contract with Saudi Aramco.  EMAS Saudi Arabia Ltd. is the counterparty with Larsen Toubro Arabia LLC to the in country contract with Saudi Aramco.

[18]    The Company's scope covers approximately 40 percent of the contract value.

In addition, as part of the long-term agreement awarded by Saudi Aramco, the Company and LTHE are party to a contract with Saudi Aramco to upgrade 17 platforms in various offshore fields in the Arabian Sea off the coast of Saudi Arabia (the "17 Cranes Project") and a contract with Saudi Aramco for the supply and installation of four wellhead decks in the Safaniya field in the Person Gulf, the largest offshore oil field in the world (the "4 Decks Project" and together with the Hasbah Contract and the 17 Cranes Project, the "Aramco Projects"). Given the importance of the Aramco Projects, the Company and LTHE met shortly after the Petition Date to develop the Framework Agreement, as described in more detail below.

(b)      Offshore Cape Three Points ("OCTP") Projects

The Company has also been engaged by Eni Ghana Exploration and Production Ltd for transportation, installation, and pre-commissioning of subsea equipment offshore Ghana.[19] Specifically, there are two OCTP projects: the subsea, umbilical, riser, and flowlines ("SURF") offshore transportation and installation work and the gas export line project to install rigid offshore pipe line facilities for the purposes of gas exports ("GEL," and together with SURF, the "OCTP Projects"). Part of the Debtors responsibility for the OCTP Projects is project management, engineering, transportation, and installation for a floating storage offloading vessel, some of which requires the use of various vendors, suppliers, and other service providers.

(c)      The Chevron TVEX Project

The Company is party to a contract with Chevron U.S.A. Inc. ("Chevron") for engineering, procurement, construction, and installation work related to client expansion of its existing facility in the Tahiti field, located in the Gulf of Mexico. In particular, the Company is engaged to, among other things, perform subsea installation work in relation to this project, including the laying of subsea manifolds, flowlines, umbilicals, and associated equipment.

B.      Prepetition Corporate and Capital Structure

1.      Corporate Structure

ECS, organized under the laws of the United Kingdom (the "UK"), is the ultimate parent company of multiple vessel-owning or vessel-leasing subsidiaries, in addition to other subsidiaries responsible for operations and provision of services. The Company's domestic and foreign Debtor and non-Debtor subsidiaries are incorporated throughout the world, including in the United States, Singapore, Saudi Arabia, the Netherlands, Scotland, and Thailand. A corporate organization chart of the Debtors and certain non-Debtor affiliates, as of the Petition Date, is attached hereto as Exhibit C.

---

[19]   The primary contract is between ENI Ghana and non-Debtor SriEmas (a Ghanaian company 49 percent owned by ECS's indirect 40 percent owner, Ezra Holdings Limited. A back-to-back subcontract for much of the work is to be signed between SriEmas and Debtor EMAS Chiyoda Subsea Inc., although work by EMAS Chiyoda Subsea Inc. is already ongoing.

2.      Capital Structure

As of the Petition Date, the Debtors' funded debt consists of approximately $480 million of debt secured by collateral and approximately $175 million of unsecured debt, as set forth in more detail below. In addition, the Debtors estimate contingent debt under Bank Guarantees (defined below) of approximately $58 million, more than $150 million of remaining lease amounts under certain charters (not including those owed by non-Debtor affiliates), and approximately $100 million in trade debt as of the Petition Date.

(a)      Lewek Constellation Pte. Ltd. Secured Loan Facility

On May 16, 2012, Debtor Lewek Constellation Pte. Ltd. ("Constellation Debtor") entered into that certain credit agreement among Constellation Debtor as borrower, each lender from time to time party thereto (the "Constellation Lenders"),[20] DNB Bank ASA, Singapore Branch ("DNB") as agent and security trustee ("Agent"), which was later amended (as amended and restated from time to time, the "Constellation Credit Agreement"). Under the Constellation Credit Agreement, a syndicate of banks, with DNB as Agent, extended to Constellation Debtor a secured term loan in the aggregate principal amount of $403 million ("Facility A") and an additional bank guaranty facility credit line of $100 million ("Facility B") (Facility A and Facility B, the "Constellation Loan" ). Certain of Constellation Debtor's obligations under the Constellation Loan are guaranteed by shareholder Ezra Holdings Limited ("Ezra"), ECS, the Singapore Debtor, the US Debtor, and a non-Debtor EMAS AMC AS (collectively, the "Prepetition Guarantors").

In addition, Constellation Debtor's obligations are secured by, among other things, first and Third preferred naval mortgages over the Constellation Vessel, a first and Third priority charge over the earnings account held in Constellation Debtor's name, fixed and floating charges over vessel-related assets owned by Constellation Debtor, first and Third priority assignments of insurances, earnings, compensation charter rights, and proceeds thereof, as further described in the Constellation Credit Agreement and related loan documents, and a first priority share charge granted by ECS over the shares of Constellation Debtor. Currently, there is approximately $370 million in principal amount outstanding under Facility A of the Constellation Loan. In addition, there is approximately $17.9 million in contingent bank guarantee claims on account of Facility B of the Constellation Loan.

(b)      Lewek Falcon Shipping Pte. Ltd. Secured Loan Facility

Debtor Lewek Falcon Shipping Pte. Ltd. ("Falcon Debtor") is the borrower under that certain Third Supplemental Agreement with Overseas-Chinese Banking Corporation ("OCBC") as lender of a $95 million secured term loan facility (the "Falcon Loan") for the purpose of part-financing the acquisition of the vessel the Lewek Falcon. The Falcon Loan is guaranteed by the Prepetition Guarantors. Falcon Debtor's obligations under the Falcon Loan are secured by, among other things, an assignment of earnings, assignment of insurances, a mortgage, an

---

[20]   Currently, DNB and DBS (defined below) each hold 34.7 of the Constellation Loan, or more than 69 percent in the aggregate.

assignment over the bareboat charter proceeds, and charges over certain accounts (including the earnings account of Falcon Debtor and a retention account). Currently, there is approximately $94 million in principal amount outstanding on the Falcon Loan.

(c)   Helix Secured Promissory Note

Debtor EMAS CHIYODA Subsea Marine Base LLC ("Marine Base Opco Debtor") is the borrower under a $30 million secured promissory note (the "Helix Note") entered into with Helix Ingleside LLC, as lender. In connection with the Helix Note, Marine Base Opco Debtor entered into a deed of trust, security, and assignment of leases and rents to secure Marine Base Opco Debtor's obligations under the Helix Note. Currently, there is approximately $10 million of principal amount outstanding under the Helix Note.

(d)   ROV Secured Debt

Debtor EMAS CHIYODA ROV Pte. Ltd. ("ROV Pte.") is the borrower under four secured term loan facilities with DBS as lender (the "ROV Loan"). ROV Pte.'s obligations are guaranteed by Ezra. ROV Pte.'s obligations under the ROV Loan are secured by, among other things, a deed of assignment and charge, a deed of assignment of insurances, earnings, and charter agreements, and a fixed charge over ROV Pte.'s accounts held with DBS. Currently, there is approximately $8 million in principal amount outstanding under the ROV Loan.

(e)   ECS Unsecured Loan Facilities

Debtor ECS is the borrower under four separate loan agreements, as set forth in more detail below. Currently, there is approximately $144 million in aggregate principal amount outstanding, as set forth in more detail below.

(i)   <strong>DBS Revolving Credit Facility</strong> : ECS is the borrower under a $40 million unsecured working capital revolving credit facility with DBS Bank Ltd as lender (the "Parent DBS Loan"). ECS's obligations are guaranteed by Ezra. Currently, there is $40 million outstanding on the Parent DBS Loan.

(ii)   <strong>Chiyoda Shareholder Loans</strong> : ECS is the borrower under a $40 million loan facility agreement with shareholder Chiyoda Corporation ("Chiyoda") as lender (the "Chiyoda Loan"). Currently, there is $40 million outstanding on the Chiyoda Loan.

(iii)   <strong>Ezra Shareholder Loans</strong> : ECS is the borrower under a shareholder loan in the principal amount of $36 million with Ezra as lender (the "Ezra Loan"). Currently, there is $36 million outstanding on the Ezra Loan.

(iv)   <strong>NYK Shareholder Loans</strong> : ECS is the borrower under a loan facility agreement in the principal amount of $20 million with shareholder Nippon Yusen Kabushiki Kaisha ("NYK") as lender and a separate shareholder loan in the principal amount of approximately $8 million with NYK as lender (collectively, the "NYK Loans"). Currently, there is approximately $28 million outstanding on the NYK Loans.

15

(f)     EMAS-AMC Pte. Ltd. Unsecured Loan Facility

Debtor EMAS-AMC Pte. Ltd., a Singaporean entity ("Singapore Debtor"), is the borrower under a $30 million unsecured working capital revolving credit facility with DBS as lender (the "DBS Loan").  Singapore Debtor's obligations are guaranteed by Ezra.  Currently, there is $30 million in principal amount outstanding under the DBS Loan.

(g)     Bank Guarantees

The Singapore Debtor is party to certain bank guarantees required by some of the Debtors' customers as credit support to show the Debtors' financial wherewithal to complete existing projects (the "Bank Guarantees").  The Bank Guarantees are contingent liabilities that are part of the Company's off-balance sheet financing arrangement.  As of the filing of this Disclosure Statement, there are approximately $18.7 million of contingent liabilities on account of the Bank Guarantees.[21]

C.     Ezra Bankruptcy

On March 18, 2017 shareholder Ezra and two of its affiliates, Ezra Marine Services Pte. Ltd. and EMAS IT Solutions Pte. Ltd. (collectively, the "Ezra Bankruptcy Debtors"), each filed a voluntary chapter 11 petition in the United States Bankruptcy Court for the Southern District of New York in bankruptcy cases that are unrelated to the Chapter 11 Cases.  The cases of the Ezra Bankruptcy Debtors are jointly administrated under case number 17-22405 and pending before the Honorable Judge Robert D. Drain.  The bankruptcy docket for the Ezra Bankruptcy Debtors can be found at https://cases.primeclerk.com/ezra/Home-Index, and all inquiries should be directed to the Ezra Bankruptcy Debtors' bankruptcy counsel Saul Ewing LLP.

D.     Non-Debtor Affiliate Insolvency Cases

Two ECS non-debtor affiliates, Emas-AMC AS ("AMC AS") and EMAS CHIYODA Subsea Pty ("ECS Pty"), have entered their own insolvency proceedings, which are unrelated to these Chapter 11 Cases.

1.     Norway Insolvency Proceeding

On February 28, 2017, AMC AS was placed under members' voluntary liquidation in Norway.  The Norwegian trustee overseeing the AMC AS estate is represented by RO Sommernes Advokatfirma DA.  All inquiries should be directed to RO Sommernes Advokatfirma DA.

2.     Australia Insolvency Proceeding

An application to wind-up ECS Pty was filed in the Supreme Court of Western Australia on March 28, 2017.  A hearing for the application is scheduled for May 9, 2017.  ECS Pty is

---

[21]     This amount does not include any issued to the Constellation Debtor under Facility B of the Constellation Loan.

represented by Corrs Chambers Westgarth.  All inquiries should be directed to Corrs Chambers Westgarth.

## ARTICLE V.

## THE CHAPTER 11 CASES

The following is a general summary of the Chapter 11 Cases, including certain events preceding the Chapter 11 Cases and the Debtors' restructuring initiatives implemented since the Petition Date.

A.      Events Leading to the Commencement of the Chapter 11 Cases

1.      Challenging Macroeconomic Conditions

The Company's revenue and cash flows have come under significant strain due to, among other things, failing demand for the Company's services as a result of the depressed market conditions in the offshore and subsea construction market it serves; significant vessel operating costs; and a tightening of credit conditions, which ultimately led to the Company's banks freezing various credit lines.

The Company provides services for onshore and offshore subsea inspection, maintenance and repair, well intervention, drilling, and decommission work.  In other words, the Company primarily serves the oil and gas sector.  As a result of the global slowdown in the oil and gas industry, there has been low growth and limited new deep water exploration and production leading to low vessel utilization, which has had a negative impact on the Company's financial situation.  Despite the challenges in the subsea market and decreasing revenue, many of the Debtors' charter agreements were entered into at a time when charter rates were considerably higher than they are today, which has kept the overall expenses high despite the challenging market conditions.  Moreover, the deepsea offshore markets in which the Company operates are highly competitive.  Certain competitors in the deepsea construction business may have greater financial and other resources than the Company.  Consequently, certain competitors may have a better ability to withstand periods of low utilization and/or compete more effectively on price.

As a result of the deteriorating market conditions in the oil and gas sector coupled with the Company's financial difficulties, the Company's lenders have frozen borrowing availability under the Company's prepetition facilities, limiting the cash available to meet its operating needs.

2. <u>Cost and Liquidity Management</u>

(a) Operational Initiatives

The Company has taken numerous actions to mitigate the effects of the decline in activity levels, especially given the substantial fixed cost pressure. In particular, management has made steady efforts to reduce operating costs, including vessel operating costs, by, among other things, attempting to renegotiate vessel repayments, reducing fixed costs (<u>e.g.</u>, as of the Petition Date, it had cold stacked half of the fleet for 2017), and reducing variable costs via staff reductions and relocations. However, these cost saving maneuvers have had mixed success.

(b) Development of New Business Plan

Together the above factors have left the Company without adequate cash to meet its day-to-day operating needs. As a result, the Company and its financial advisors set out to develop a revised business plan (as may be amended, modified, or supplemented from time to time the "<u>Business Plan</u>"). The Business Plan, which showed a need for substantial additional funding, was shown to the Company's shareholders, along with a request for additional funding to support the Business Plan. To implement the Business Plan, the Company considered both out-of-court and in-court options in various jurisdictions. The Debtors and their boards carefully considered and weighed each option.

(c) Financing Activities

After engaging certain parties, including some of their existing prepetition lenders, in discussions to provide potential financing, it became evident to the Debtors that Subsea 7 Finance (UK) PLC ("<u>Subsea</u>") and existing equityholder Chiyoda Corporation ("<u>Chiyoda</u>," and together with Subsea and Chiyoda, in such capacity the "<u>DIP Lenders</u>") were the only viable candidates to provide DIP financing on a non-priming, consensual basis and on the timeframe necessary to alleviate their liquidity demands. As a result, the Debtors engaged in earnest in extensive arm's-length negotiation spanning several weeks. Days prior to the Petition Date, the Debtors and the DIP Lenders agreed to the definitive terms of the financing package, and the Debtors determined it was then in their best interest to commence the Chapter 11 Cases.

B. <u>Debtor in Possession Financing</u>

Recognizing the Debtors' immediate need for capital and that a chapter 11 filing might be required, the Debtors and their advisors initiated a marketing process to obtain debtor-in-possession financing ("<u>DIP Financing</u>"). In connection therewith, the Debtors' advisors prepared a presentation describing the Debtors' capital structure, asset base, and financing needs. Simultaneously, the Debtors' advisors began identifying potential financing sources, with a focus on institutions with the ability to provide financing on an expedited basis.

The Debtors and their advisors approached several prepetition lenders to whom the Debtors owed senior secured debt obligations, but none of them expressed an interest in providing post-petition financing. Instead, only Chiyoda and fellow marine construction service provider Subsea were willing to provide the Debtors with any post-petition financing, in the form of the $90,000,000 line of credit (the "<u>DIP Facility</u>"). The Debtors sought approval of the debtor

in possession financing agreement (the "DIP Agreement") governing the DIP Facility. The Bankruptcy Court granted interim approval of the DIP Agreement on March 1, 2017 [Docket No. 50], March, 28, 2017 [Docket No. 179], April 13, 2017 [Docket No. 273], April 24, 2017 [Docket No. 319], and May 15, 2017 [Docket No. 387]. A hearing to consider approval of the DIP Agreement on a final basis is scheduled for May 24, 2017.  The DIP Agreement, among other things, sets forth certain milestones (the "DIP Milestones") by which certain events in the case must take place.

The Debtors are projected to draw $86.892 million in DIP Financing by the end of June.

C.     First Day Papers

Each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on February 27, 2017.  Recognizing that any interruption of the Debtors' business, even for a short period, could negatively impact customer and vendor relationships and the Debtors' goodwill, revenue, and profits, which would be detrimental to the value of the Debtors' estates, the Debtors filed certain first day motions authorizing the Debtors to continue operating their businesses in the ordinary course.  The first day motions sought to stabilize the Debtors' operations and were designed to facilitate a smooth transition into chapter 11 and ease the strain on the Debtors' business as a consequence of the filing of the Chapter 11 Cases.  The following summary highlights certain of the first day orders granted by the Bankruptcy Court.

1.     Wages and Employee Motion [Docket No. 7]

By interim order granted on March 1, 2017 [Docket No. 53] and final order granted on March 28, 2017 [Docket No. 171], the Bankruptcy Court authorized the Debtors to, among other things, pay certain prepetition wages, compensation, and amounts associated with employee benefit programs, and continue such programs post-petition in the ordinary course.

2.     Taxes Motion [Docket No. 8]

By order granted on March 1, 2017 [Docket No. 55], the Bankruptcy Court authorized the Debtors to, among other things, pay certain prepetition fees and taxes to various federal, state, county, city and foreign taxing and licensing authorities.

3.      Insurance Motion [Docket No. 9]

By interim order granted on March 1, 2017 [Docket No. 49] and final order granted on March 28, 2017 [Docket No. 172], the Bankruptcy Court authorized the Debtors, among other things, to pay prepetition amounts under various insurance policies and maintain such policies post-petition in the ordinary course of business, including, among other things, general liability, workers' compensation liability, directors and officers liability, hull and marine and other vessel-related insurance, automotive liability, pollution and remediation, commercial crime liability, employment practices liability, energy liability, excess liability, fiduciary liability, small computer and electronic data processing liability, and property liability.

4.      Utilities Motion [Docket No. 10]

By order granted on March 1, 2017 [Docket No. 48], the Bankruptcy Court, among other things, established procedures for determining adequate assurance of payment for future utility services.

5.      Critical Vendor Motion [Docket No. 11]

By interim order granted on March 1, 2017 [Docket No. 56] and final order granted on March 28, 2017 [Docket No. 173], the Bankruptcy Court authorized the Debtors to pay certain prepetition obligations in connection with their project contracts in the ordinary course of business.

6.      Cash Management Motion [Docket No. 12]

The Bankruptcy Court authorized the Debtors to continue using their cash management system by interim orders entered on March 1, 2017 [Docket No. 51], March 28, 2017 [Docket No. 174], and April 13, 2017 [Docket No. 272].  Under the Third Interim Order (I) Approving the Use of the Debtors' Cash Management System and (II) Granting Related Relief (the "Cash Management Order") [Docket No. 272] entered on April 13, 2017, the Debtors are authorized to engage in certain ordinary course intercompany transactions.  Aside from the intercompany transactions authorized under the Cash Management Order, which have been reported to the Unsecured Creditors Committee in accordance with the Cash Management Order, no other post-petition intercompany transactions have occurred, including any from Non-Reorganizing Debtors to Plan Debtors.  To the extent there have been any such postpetition intercompany transfers between Non-Reorganizing Debtors and Plan Debtors, any creditor that would be adversely affected by such postpetition intercompany transfer has standing to object.

D.     Procedural Motions and Professional Retention Applications

     1.     Administrative Motions: Motion for Joint Administration [Docket No. 2], Motion to File Consolidated List of Creditors [Docket No. 4], and Application to Retain Claims, Noticing, and Solicitation Agent [Docket No. 6]

To facilitate a smooth and efficient administration of the Chapter 11 Cases and to reduce the administrative burden associated therewith, by an order granted on February 28, 2017, the Bankruptcy Court authorized joint administration of the Debtors' cases for procedural purposes only [Docket No. 20].  By an order granted March 1, 2017, the Bankruptcy Court authorized the Debtors to file consolidated lists of creditors [Docket No. 47].  In addition, the Bankruptcy Court further authorized the retention of Epiq as Claims, Noticing, and Solicitation agent by an order granted on March 1, 2017 [Docket No. 53].

     2.     Applications for Retention of Professionals

On April 24, 2017, the Bankruptcy Court approved the Debtors' retention of certain Professionals to represent and assist the Debtors in connection with the Chapter 11 Cases.  These Professionals include, among others: (a) Skadden, Arps, Slate, Meagher & Flom as co-counsel for the Debtors [Docket No. 314]; (b) Porter Hedges LLP ("Porter Hedges") as co-counsel for the Debtors [Docket No. 313]; (c) KPMG Services Pte. Ltd. ("KPMG") as financial advisor and investment banker for the Debtors [Docket No. 315]; (d) WongPartnership LLP ("WongPartnership") as Singapore counsel for the Debtors [Docket No. 312]; and (e) CBRE, Inc. ("CBRE") as real estate broker [Docket No. 316].

The Bankruptcy Court has also authorized the Debtors to retain certain professionals utilized by the Debtors in the ordinary course of business prior to the Petition Date (order granted March 28, 2017) [Docket No. 176].  Further, the Bankruptcy Court has authorized the interim compensation and reimbursement of professional expenses during these cases (order granted March 22, 2017) [Docket No. 139].

E.     Appointment of the Creditors' Committee and Retention of Committee Professionals

On March 21, 2017, the United States Trustee appointed the Creditors' Committee under Bankruptcy Code section 1102 [Docket No. 130].[22]  The Creditors' Committee's proposed counsel, Akin, Gump, Strauss, Hauer & Feld LLP, filed its application to represent the Creditors' Committee in the Chapter 11 Cases on April 24, 2017 [Docket No. 318]. The Creditors' Committee's proposed financial advisor, Alvarez & Marsal North America, LLC, filed its application to advise the Creditors' Committee in the Chapter 11 Cases on April 24, 2017 [Docket No. 321].    On May 15, 2017, the Court entered orders granting the Creditors' Committee's application to retain and employ Akin, Gump, Strauss, Hauer & Feld LLP as the

---

[22]    The Creditors' Committee is comprised of the following entities: (i) DBS Bank, Ltd.; (ii) Oversea-Chinese Banking Corporation Limited; (iii) Serimax North America, LLC; (iv) Canyon Offshore, Inc.; and (v) Crowley Marine Services, Inc.

Creditors' Committee's counsel [Docket No. 388] and the Creditor's Committee's application to retain and employ Alvarez & Marsal North America, LLC as its financial advisor [Docket No. 389].

F.   <u>Schedules and Statements</u>

On March 1, 2017, the Bankruptcy Court entered an order extending the Debtors' deadline to file their Schedules of Assets and Liabilities (the "<u>Schedules</u>") and Statements of Financial Affairs (the "<u>Statements</u>," and together with the Schedules, the "<u>Schedules and Statements</u>") to April 12, 2017 [Docket No. 52].   The Debtors filed their Schedules and Statements on April 4, 2017 [Docket Nos. 233-247].

The Monthly Operating Report filed on May 22, 2017 [Docket No. 416] showed, among other things, that Non-Reorganizing Debtor Gallatin Marine Management, LLC had assets of approximately $13,800,000.  However, approximately $13,300,000 are capitalized expenses and amortized lease costs associated with RB-1 and the Ambassador, which have no realizable value.

G.   <u>Contract Rejection Motion</u>

The Bankruptcy Code authorizes a debtor, subject to the approval of the Bankruptcy Court, to assume, assume and assign, or reject Executory Contracts and Unexpired Leases. The Debtors are engaged in an evaluation of their Executory Contracts and Unexpired Leases.

On March 28, 2017 [Docket No. 178], the Bankruptcy Court granted a motion rejecting certain of the Debtor's burdensome contracts. During the course of the Chapter 11 Cases, the Debtors and their Professionals have and will continue to evaluate their Executory Contracts and Unexpired Leases in the context of the Debtors' business plan.  The Debtors continue to evaluate their options in connection with each of these Executory Contracts and Unexpired Leases including the potential assumption, rejection, or amendment and assumption thereof. As part of the Plan Supplement, the Debtors will identify contracts to be assumed in the Schedule of Rejected Executory Contracts and Unexpired Leases.

The Plan Supplement will further designate the proposed cure amount for those Executory Contracts and Unexpired Leases to be assumed by the Debtors under the Plan.  Except as otherwise set forth in such schedule, the Cure with respect to each of the Executory Contracts or Unexpired Leases assumed under the Plan will be designated by the Debtors as $0, subject to the determination of a different Cure pursuant to the objection procedures set forth in Article VIII of the Plan.

H.   <u>Ingleside Spool Base Motion</u>

In accordance with the DIP Milestones, and pursuant to agreed-upon extensions, on March 17, 2017, the Debtors filed a motion (the "<u>Bid Procedures Motion</u>") to establish the procedures for the sale of the Ingleside Spool Base under Bankruptcy Code section 363.  The Bid Procedures Motion sets forth, among other things, the procedures and deadlines by which interested parties could submit bids, the timeline for the Debtors to evaluate bids, and the procedures to conduct an auction if necessary.

The Bankruptcy Court entered a Bid Procedures Order on April 24, 2017 [Docket No. 317], which approved an asset purchase agreement ("APA") between the Debtors and Subsea 7 acting as stalking horse bidder, as well as established bid procedures for interested Ingleside Spool Base bidders.  Under the Bid Order, bids for the Ingleside Spool Base must be submitted by June 7, 2017 at 4:00 p.m. (Prevailing Central Time).   An auction, if necessary, is scheduled for June 19, 2017 at 1:30 p.m. (Prevailing Central Time) at the offices of Porter Hedges LLP, 1000 Main Street, 36th Floor, Houston, Texas, 77002.  The Bankruptcy Court will hold a Sale Hearing on June 20, 2017 at 2:00 p.m. (Prevailing Central Time).

I.    Framework Agreement Motion

On January 23, 2015, the Singapore Debtor and Saudi Arabia Debtor and L&T Hydrocarbon Engineering Limited and Larsen Toubro Arabia, LLC entered into an agreement to coordinate and administer the parties' performance of their obligations in connection with projects contracted with Saudi Aramco (the "Consortium Agreement").  On April 3, 2017, in order to help ensure minimal disruption to the valuable Aramco Projects, the Debtors sought approval of a motion (the "Framework Agreement Motion") to approve entry into a framework agreement (the "Framework Agreement") between the Debtors and LTHE.

The Framework Agreement amends some terms of the Consortium Agreement between the Singapore Debtor, Saudi Arabia Debtor, and LTHE, and provides certain contingency planning provisions.  In particular, the Framework Agreement provides for the ability of ECS to issue replacement parent company guarantees, weekly reporting by the Singapore/Saudi Debtors to LTHE, and a provision allowing LTHE to take over the Aramco Contracts in the event that the Singapore/Saudi Debtors' bankruptcy cases fall into liquidation, their bankruptcy cases are dismissed or converted, or they reject the Aramco Contracts or Consortium Agreement.  On April 13, the Bankruptcy Court entered an order granting the Framework Agreement Motion [Docket No. 275].

J.    Critical Employee Recognition Program and Executive Incentive Plan

On April 21, 2017, the Debtors filed a motion (the "CERP Motion") to approve their proposed critical employee recognition program (the "CERP") and executive incentive plan (the "EIP") [Docket No. 303].   The CERP provides reasonable payments to 32 rank and file employees and the EIP provides reasonable payments to three senior management team members based on the achievement of certain milestones.  The Bankruptcy Court approved the relief sought in the CERP Motion at a hearing held on May 15, 2017.

In addition, under the Plan, the Debtors are seeking authority in accordance with that certain Order Authorizing and Approving the Debtors' Executive Incentive Plan, the Debtors seek an increase of up to 10 percent of the amounts payable under the Executive Incentive Plan.

K.    Analysis and Resolution of Claims

As discussed above, on April 4, 2017, the Debtors filed their Schedules and Statements [Docket Nos. 233-247].  The Schedules provide certain information pertaining to the Claims based on the Debtors' books and records.  Interested parties may review the Schedules and Statements at the office of the Clerk of the United States Bankruptcy Court for the Southern

District of Texas, 515 Rusk Street, Houston, Texas 77002 or online at http://dm.epiq11.com/ECS.

1.  Claims Bar Date

On March 28, 2017 the Bankruptcy Court entered an order [Docket No. 177] (the "Bar Date Order") requiring all persons or entities who wish to assert claims against the Debtors' estates to file a proof of claim ("Proof of Claim") against the Debtors in the Chapter 11 Cases by no later than May 15, 2017 (the "General Bar Date"). The General Bar Date applies to all "entities" and "persons" (as defined respectively in Bankruptcy Code sections 101(15) and (41)) other than governmental units, holding or wishing to assert Claims allegedly owing as of the Petition Date, including Claims under Bankruptcy Code section 503(b)(9), or any person with an alleged Claim that arose prior to the Petition Date. Any governmental unit seeking to file a claim against the Debtors is required to do so by no later than August 28, 2017 at 5:00 p.m. (Prevailing Central Time) (the "Governmental Bar Date"). A notice of the bar dates was served on April 4, 2017 [Docket No. 249].

If the Debtors reject any Executory Contract or Unexpired Lease under Bankruptcy Code section 365, each person or entity holding a claim against the Debtors arising from such rejection must file a Proof of Claim by the later of (a) 30 days after the effective date of rejection of such executory contract or unexpired lease as provided by an order of the Bankruptcy Court or pursuant to a notice under procedures approved by the Bankruptcy Court; (b) any date set by another order of the Bankruptcy Court; or (c) the General Bar Date or the Governmental Bar Date.

In the event that the Debtors amend the Schedules and Statements, the Debtors shall give notice of any amendment to the Holders of Claims affected thereby, and if the subject amendment reduces the unliquidated, noncontingent, and liquidated amount or changes the nature or classification of a Claim against a Debtor or the Debtor liable on the Claim as reflected therein, such Holders shall be given until the later of (a) the General Bar Date or (b) 30 days from the date such notice is given (or such other time period as may be fixed by the Bankruptcy Court) to file Proofs of Claim with respect to such affected Claim, if necessary, or be barred from filing such Claim.

As of General Bar Date, Epiq received more than 600 proofs of claim asserted in the aggregate face amount of more than $6,000,000,000, plus approximately $500,000,000 in scheduled claims, for a total of more than $6,500,000,000 of claims on the claims register. The Debtors are in the process of reviewing and reconciling their books and records to determine whether Proofs of Claims are invalid, untimely, duplicative, or overstated, but such process has not yet been completed. The Debtors may file objections to claims on both substantive and non-substantive grounds, and the outcome of such future objections could impact the amount of Allowed Claims in each Class and the recoveries provided to creditors under the Plan.

2.  Causes of Action

In accordance with Bankruptcy Code section 1123(b)(3), the Debtors reserve all rights to commence and pursue any and all Causes of Action that are not released under Section 7.15(a) or

Article XI of the Plan or an order of the Bankruptcy Court, whether arising before or after the Petition Date, including any actions or categories of actions specifically enumerated in a list of retained causes of action to be included in the Plan Supplement. Such Causes of Action shall vest in the Plan Debtor as of the Effective Date.

L.    Plan Support Agreement

To effectuate the Restructuring, certain parties (collectively, the "Plan Support Parties") will enter into a Plan Support Agreement (the "PSA"), which will be filed on the docket of the Chapter 11 Cases by June 7, 2017, and, once filed, will be available for review on the Claims, Noticing, and Solicitation Agent's website at http://dm.epiq11.com/ECS. The Plan Support Parties include, the Plan Sponsors, DBS Bank Limited ("DBS"), and DNB Bank ASA ("DNB"), Singapore Branch. The PSA contains numerous covenants. The parties to the PSA and their respective advisors shall negotiate in good faith and use all deliberate speed to negotiate the definitive documentation to implement the Restructuring consistent with the PSA, the Plan, and this Disclosure Statement. The Plan Support Parties agree to vote for and support the Plan.

M.    Subsea 7 and Chiyoda Memorandum of Understanding.

Chiyoda and Subsea 7 have entered into a non-binding memorandum of understanding setting out, amongst other things, the terms on which Subsea 7 will take over certain liabilities under parent company guarantees and performance bonds benefiting certain project owners. In addition, the memorandum further sets out the terms on which Subsea 7 has agreed to provide technical and operational support in connection with certain projects in certain circumstances and subject to certain terms. In consideration for the above, Chiyoda has agreed to assign to Subsea 7 a portion of its interest in the DIP Financing.

## ARTICLE VI.

## PLAN SUMMARY

A.    Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor can reorganize its business for the benefit of itself, its creditors, and interest holders. Chapter 11 also strives to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of a debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a debtor in possession.

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by a bankruptcy court makes such plan binding upon a debtor and any creditor of or equity interest holder in such debtor, whether or not such

creditor or equity interest holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions, and except as otherwise provided in the plan or the confirmation order itself, a confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes for those debts the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual, and equitable rights of the holders of claims or interests in certain classes are to remain unaltered by the reorganization effectuated by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are presumed to accept the plan. Accordingly, a debtor need not solicit votes from the holders of claims or equity interests in such unimpaired classes. A chapter 11 plan also may specify that certain classes will not receive any distribution of property or retain any claim against a debtor. Such classes are deemed to reject the plan and, therefore, need not be solicited to vote to accept or reject the plan. Any classes that are receiving a distribution of property under the plan but are not unimpaired will be solicited to vote to accept or reject the plan.

Bankruptcy Code section 1123 provides that a plan of reorganization shall classify the claims of a debtor's creditors and equity interest holders. In compliance therewith, the Plan divides Claims and Interests into various Classes and sets forth the treatment for each Class. The Debtors believe that the Plan has classified all Claims and Interests in compliance with Bankruptcy Code section 1122, but it is possible that a Holder of a Claim or Interest may challenge the classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, the Debtors intend, to the extent permitted by the Bankruptcy Court and the Plan, to make such modifications of the classifications under the Plan to permit Confirmation and to use the Plan acceptances received in this solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which the accepting Holder is ultimately deemed to be a member. Any such reclassification could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

THE REMAINDER OF THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, THE PLAN SUPPLEMENT, AND THE EXHIBITS AND DEFINITIONS CONTAINED IN EACH DOCUMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERRED TO IN THE PLAN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO IN THE PLAN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF

SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO IN THE PLAN.

THE PLAN ITSELF AND THE DOCUMENTS IN THE PLAN CONTROL THE ACTUAL TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN AND WILL, UPON THE OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON, AMONG OTHER ENTITIES, ALL HOLDERS OF CLAIMS AND INTERESTS, THE PLAN DEBTORS, ALL ENTITIES RECEIVING PROPERTY UNDER THE PLAN, AND OTHER PARTIES IN INTEREST.   IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

B.      Overall Structure of the Plan

In general, the Plan provides for the restructuring (and/or liquidation, as applicable) of the Plan Debtors.  The Plan provides for the acquisition of the equity in or assets of the Emerging Debtors and the Purchased Assets by Newco.  However, the Plan permits the ongoing review of potential Alternative Plan Sponsors who may provide a superior exit path.  As more fully set forth herein, an Alternative Plan Sponsor must repay the DIP Facility in Cash in full at such time that the Debtors may elect to go forward with such alternative investor.

If Newco acquires the Purchased Assets in the Emerging Debtors, the Plan shall be funded from the proceeds of the Purchase Price.  The Purchase Price to be paid by the Newco for the Purchased Assets shall be: (i) the GUC Cash, plus (ii) the Plan Cash Contribution, plus (ii) the DIP Loan Cash, plus (iii) the assumption of the Assumed Liabilities (as defined below).

The Purchase Price paid by Newco for the Purchased Assets shall be used to fund the Plan, including the payment of administrative, priority, and unsecured claims in accordance with the terms in the Plan.

C.      Administrative Expenses and Priority Claims

1.      Administrative Claims

Except to the extent that the Holder of an Allowed Administrative Claim agrees to less favorable treatment, Allowed Administrative Claims (other than Professional Fee Claims, which shall be subject to Section 2.3 of the Plan and DIP Facility Claims, which shall be paid out of the DIP Loan Cash) shall be paid in Cash as set forth below:

(a)      In Final Satisfaction of Allowed Ordinary Course Administrative Claims against an Emerging Debtor, on the Effective Date, such Claims shall be Assumed Liabilities and shall be paid by the respective Emerging Debtor or the affiliate of Newco into which purchased assets are transferred in the ordinary course of business in accordance with their terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.

**(b)**     In Final Satisfaction of Allowed Non-Ordinary Course Administrative Claims against an Emerging Debtor or Allowed Administrative Claims against the Constellation Debtor (which, for the avoidance of doubt, includes post-petition martime-related claims), on, or as soon as reasonably practicable after, the later of (a) the Effective Date for the Chapter 11 Plans of the Emerging Debtors, or (b) the date on which an Administrative Claim becomes an Allowed Administrative Claim, each Holder of an Allowed Administrative Claim shall receive Cash paid out of the Additional Cash equal to the unpaid portion of such Allowed Administrative Claim; provided, however, that no payments shall be made in respect of any Claims under Bankruptcy Code section 507(b); provided, further, however, that Allowed post-petition maritime-related Claims against the Constellation Debtor shall be paid from the DIP Facility. To the extent that the Additional Cash is insufficient, such Non-Ordinary Course Administrative Claims shall be assumed by Newco; and all Administrative Claims must be paid in accordance with the Bankruptcy Code.

**(c)**     In Final Satisfaction of Allowed Administrative Claims against Marine Base Opco Debtor, on, or as soon as reasonably practicable after, the later of (a) the Effective Date, or (b) the date on which an Administrative Claim becomes an Allowed Administrative Claim, each Holder of An Allowed Administrative Claim against Marine Base Opco Debtor shall receive the Cash out of the Excess Spool Base Proceeds equal to the unpaid portion of such Allowed Administrative Claim.

**(d)**     In Final Satisfaction of Allowed Administrative Claims against the Falcon Debtor, on, or as soon as reasonably practicable after the later of (a) the Effective Date, or (b) the date on which an Administrative Claim becomes an Allowed Administrative Claim, each Holder of an Allowed Administrative Claim against Falcon Debtor shall receive Cash from the Falcon Lender equal to the unpaid portion of such Allowed Administrative Claim.

Holders of Administrative Claims (other than Ordinary Course Administrative Claims) shall have filed an Administrative Claim Request Form by the Administrative Claims Bar Date (unless otherwise provided in the Plan) and such Claim shall have become an Allowed Claim prior to receiving any payment hereunder (unless otherwise provided in the Plan).  Except as otherwise provided in the Plan, all requests for payment of Administrative Claims must be filed, in substantially the form of the Administrative Claim Request Form contained in the Plan Supplement, with the Claims, Noticing, and Solicitation Agent and served on counsel for the Debtors and the Plan Debtors no later than the Administrative Claims Bar Date.  Any request for payment of an Administrative Claim under Section 2.1 of the Plan that is not timely filed and served shall be Disallowed automatically without the need for any objection from the Debtors or the Plan Debtors.  The applicable Debtors or Plan Debtors, before the Effective Date, or Plan Sponsor or Newco, after the Effective Date, may settle an Administrative Claim without further Bankruptcy Court approval.  In the event that the Debtors or the Plan Debtors, before the Effective Date, or Plan Sponsors or Newco, after the Effective Date, objects to an Administrative Claim and there is no settlement, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim.

2.      DIP Facility Claims

The DIP Obligations shall be Allowed in the aggregate amount of principal outstanding plus accrued interest to the Effective Date plus applicable fees.  Holders of Allowed DIP Facility Claims shall be paid in full from the DIP Loan Cash on the Effective Date and such payment shall be in Final Satisfaction of each and every DIP Facility Claim; provided, however, that in the case of an All Asset Qualified Offer, the DIP Obligations must have been paid in full, in Cash.

3.      Professional Claims

(a)      **Final Fee Applications**. Prior to the Effective Date, Professionals shall provide good-faith estimates of accrued but unpaid Professional fees as of the Effective Date, which shall be funded into the Professional Fee Escrow.  All final requests for payment of Professional Claims and requests for reimbursement of expenses of members of the Creditors' Committee must be filed no later than thirty (60) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior orders of the Bankruptcy Court, the Allowed amounts of such Professional Claims and expenses shall be determined by the Bankruptcy Court and paid in full from the Professional Fee Escrow established under the DIP Credit Agreement or from the proceeds of the DIP Facility.  For the avoidance of doubt, the treatment set forth in Section 2.3(a) of the Plan shall apply to Professional Claims whether incurred on behalf of the Emerging Debtors, the Liquidating Debtors, or the Non-Reorganizing Debtors.

(b)      **Post-Effective Date Retention.** Upon the Effective Date, any requirement that Professionals comply with Bankruptcy Code sections 327 through 331 in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors and the Plan Debtors, as the case may be, shall employ and pay Professionals in the ordinary course of business (including the reasonable fees and expenses incurred by Professionals in preparing, reviewing, prosecuting, defending, or addressing any issues with respect to final fee applications).

(c)      **Constellation Success Fee.**  Any and all Professional Fee Claims constituting a success fee resulting from Confirmation of the Plan for the Constellation Debtor or a sale of the Constellation Vessel shall be payable by the Constellation Lenders, and shall not constitute Administrative Claims, provided, however, that the amount of any such Claims shall be acceptable to the Required Constellation Lenders, the Constellation Debtor and the relevant Professional with such amount to be set forth in a letter agreement between the Constellation Debtor, the Required Constellation Lenders, and the relevant Professional.

4.      Priority Tax Claims

(a)      Except to the extent that a Holder of an Allowed Priority Tax Claim against a Plan Debtor and such Plan Debtor agree to a less favorable treatment to such Holder, on, or as soon as reasonably practicable after, the later of (a) the Effective Date, or (b) the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive (from

the respective source set forth in subsection (b) below), one of the following treatments in Final Satisfaction of such Claim: (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, (b) Cash in an amount agreed to by the relevant Plan Debtor and such Holder, provided, however, that such parties may further agree for the payment of such Allowed Priority Tax Claim to occur at a later date, or (c) at the sole option of such Plan Debtor, Cash in the aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of not more than five (5) years after the Petition Date under Bankruptcy Code section 1129(a)(9)(C); provided, however, that any Priority Tax Claim that is not an Allowed Claim, including any Allowed Priority Tax Claim not due and owing on the Effective Date, will be paid in accordance with section 2.4 of the Plan when such Claim becomes due and owing.

(b)     All payments on account of Allowed Priority Tax Claims in respect of (a) the Emerging Debtors and Constellation Debtor shall be paid from Additional Cash, (b) the Marine Base Opco Debtor shall be paid from the Excess Spool Base Proceeds, and (c) the Falcon Debtor shall be paid by the Falcon Lender.

D.     Classification of Claims and Interests

    1.     Classification of Claims and Interests

(a)     There are seven (7) Plan Debtors, four (4) are Emerging Debtors and the other three (3) are Liquidating Debtors, except to the extent provided for in Sections 7.4 and 7.9 of the Plan.  Each Plan Debtor has been assigned a number below for purposes of classifying and treating Claims against and Interests in each Plan Debtor for balloting purposes.  The Claims against and Interest in each Plan Debtor, in turn, have been assigned to separate lettered Classes with respect to each such Debtor, based on the type of Claim involved.  Accordingly, the classification of any particular Claim against or Interest in any Plan Debtor depends on the particular Debtor against which such Claim is asserted (or in which such Interest is held) and the type of Claim or Interest in question.  The number will denote which Plan Debtor against which a Claim or Interest has been asserted, and the letter will denote the Class of such Claim or Interest.  The numbers applicable to the various Debtor groups are as follows:

| Plan Debtor Number | Plan Debtor Name |
|---|---|
| **EMERGING DEBTORS** | |
| 1 | EMAS-AMC Pte. Ltd. |
| 2 | EMAS Saudi Arabia Ltd. |
| 3 | EMAS CHIYODA Subsea Services Pte Ltd. |
| 4 | Intentionally Omitted |
| 5 | EMAS CHIYODA Subsea Inc. |
| **LIQUIDATING DEBTORS** | |
| 6 | Lewek Constellation Pte. Ltd. |
| 7 | Lewek Falcon Shipping Pte. Ltd. |
| 8 | EMAS CHIYODA Subsea Marine Base LLC |

(b)    The Plan is a single plan of reorganization for the jointly administered Chapter 11 Cases, but does not constitute a substantive consolidation of the Debtors' Estates for voting purposes.  Under the Plan, Holders of Allowed General Unsecured Claims of the Emerging Debtors shall receive recovery from one "pot" of money, the GUC Cash. First, doing this will dispense with the expenses and difficulties of allocating the pool of consideration among several estates.  Third, it will eliminate multiple guarantee claims where such guarantor would have duplicative claims to more than one source of recovery.  Three, the Constellation Lenders agreed to waive distributions under a single source of recovery thereby reducing the claims pool against these entities by approximately 50 percent.  Fourth, the Creditors' Committee's input, and they also agree that this is the preferable approach.

(c)    The Plan, though proposed jointly, constitutes a separate plan for each of the Plan Debtors for voting purposes.  Therefore, all Claims against and Interests in a particular Plan Debtor are placed in the Classes set forth below with respect to such Debtor. Classes that are not applicable as to a particular Plan Debtor shall be eliminated as set forth more

fully in Section 6.3 of the Plan.  In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims (including Professional Claims), DIP Facility Claims, and Priority Tax Claims of the kinds specified in Bankruptcy Code sections 507(a)(1) and 507(a)(8) have not been classified and their treatment is set forth in Article II of the Plan.

(d)     Under Bankruptcy Code sections 1122 and 1123, set forth below is a designation of classes of Claims against and Interests in the Plan Debtors.  A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and, to the extent applicable, receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

(e)     Claims and Interests are divided into lettered Classes.  Not all of the Classes apply to every Plan Debtor, and consequently not all of the lettered Classes appear in the case of each Plan Debtor.  For purposes of voting, Claims within the Class shall be counted for each applicable Plan Debtor.  Whenever such a Class of Claims or Equity Interests is relevant to a particular Plan Debtor, that class of Claims or Interests shall be grouped under the appropriate lettered Class from the following list:

| Class | Claim or Interest |
|---|---|
| A | Class A consists of all Other Secured Claims against the applicable Debtor |
| B | Class B consists of all Helix Secured Claims against the Marine Base Opco Debtor |
| C | Class C consists of all Constellation Lender Secured Claims against the Constellation Debtor |
| D | Class D consists of all Falcon Lender Secured Claims against the Falcon Secured Lender |
| E | Class E consists of all Other Priority Claims against the applicable Debtor |
| F | Class F consists of all Bank Guarantee Claims against the applicable Debtor |
| G | Class G consists of all General Unsecured Claims against the applicable Debtor |
| H | Class H consists of all Cancelled Intercompany Claims against the applicable Debtor |
| I | Class I consists of all Subordinated Claims against the applicable Debtor |
| J | Interests consists of all Interests in the applicable Debtor |

E.   Identification of Classes of Claims and Interests Impaired and Unimpaired by the Plan

1.   Classes of Claims that are Unimpaired

The following Classes of Claims are Unimpaired by the Plan:

| Classes 1A through 5A | (Other Secured Claims against the Emerging Debtors) |
|---|---|
| Classes 6A through 8A | (Other Secured Claims against the Liquidating Debtors) |
| Class 8B | (Helix Secured Claims against Marine Base |

| | |
|---|---|
| | Opco Debtor) |
| Class 6C | (Constellation Lender Secured Claims against Constellation Debtor) |
| Class 7D | (Falcon Lender Secured Claims against Falcon Debtor) |
| Classes 1E through 5E | (Other Priority Claims against the Emerging Debtors) |
| Class 6E | (Other Priority Claims against the Constellation Debtor) |
| Class 7E | (Other Priority Claims against the Falcon Debtor) |
| Class 8E | (Other Priority Claims against the Marine Base Opco Debtor) |
| Classes 1F through 8F | (Bank Guarantee Claims against All Plan Debtors) |

2.    Impaired Classes of Claims and Interests

The following Classes of Claims and Interests are Impaired by the Plan:

| | |
|---|---|
| Classes 1G through 3G and 5G | (General Unsecured Claims against Emerging Debtors) |
| Classes 6G, and 7G | (General Unsecured Claims against Constellation Debtor, and Falcon Debtor) |
| Classes 8G | (General Unsecured Claims against Marine Base Opco Debtor) |

| Classes 1H through 8H | (Cancelled Intercompany Claims, as applicable) |
| Classes 1I through 8I | (Subordinated Claims, against all Plan Debtors) |
| Classes 1J through 8J | (Interests in All Plan Debtors) |

F.      Provision for Treatment of Claims and Interests

1.      Classes 1A through 5A – Other Secured Claims (Emerging Debtors).

(a)     Classification: Classes 1A through 5A consists of all Other Secured Claims against the relevant Emerging Debtor.  The numerical portion of the Class designation corresponds to the applicable Plan Debtor number on the chart above.

(b)     Treatment: Except to the extent that the Holder of an Allowed Other Secured Claim against an Emerging Debtor and the Emerging Debtor agree to a less favorable treatment to such Holder, on, or as soon as reasonably practicable after, the later of (i) the Effective Date, or (ii) the date on which such Secured Claim becomes an Allowed Secured Claim, in Final Satisfaction of every Allowed Other Secured Claim, each such Holder shall, at the sole option of the Plan Sponsor, (a) have its Allowed Other Secured Claim Reinstated and rendered Unimpaired in accordance with Bankruptcy Code section 1124(2), notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the Holder of an Allowed Other Secured Claim to demand or to receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, or (b) receive the collateral securing its Allowed Other Secured Claim.

(c)     Voting: Classes 1A through 5A are Unimpaired, and Holders of Allowed Claims in Classes 1A through 5A are conclusively presumed to have accepted the Plan under Bankruptcy Code section 1126(f).  Therefore, Holders of Allowed Claims in Classes 1A through 5A are not entitled to vote to accept or reject the Plan.

2.      Classes 6A through 8A – Other Secured Claims (Liquidating Debtors).

(a)     Classification: Classes 6A through 8A consists of all Other Secured Claims against the relevant Liquidating Debtor.

(b)     Treatment:  Notwithstanding any other provision in the Plan, except to the extent that a Holder of an Allowed Other Secured Claim and the relevant Liquidating Debtor agree to a less favorable treatment to such Holder, on, or as soon as reasonably practicable after, the later of (i) the Effective Date, or (ii) the date on which such Secured Claim becomes an Allowed Secured Claim, in Final Satisfaction of every Allowed Other Secured Claim, each such Holder of an Allowed Other Secured Claim shall have its Allowed Other

35

Secured Claim Reinstated and rendered Unimpaired in accordance with Bankruptcy Code section 1124(1) and shall retain all rights under applicable law to enforce and collect on their security interest with regard to their respective interest in the Falcon or Constellation vessels.

(c)     Voting: Classes 6A through 8A are Unimpaired, and Holders of Allowed Claims in Classes 6A through 8A are conclusively presumed to have accepted the Plan under Bankruptcy Code section 1126(f).  Therefore, Holders of Allowed Claims in Classes 6A through 8A are not entitled to vote to accept or reject the Plan.

3.      Class 8B – Helix Secured Claims (Marine Base Opco Debtor).

(a)     Classification: Class 8B consists of all Helix Secured Claims against the Marine Base Opco Debtor.

(b)     Treatment: Except to the extent that a Holder of an Allowed Helix Secured Claim and Marine Base Opco Debtor agree to a less favorable treatment to such Holder, on, or as soon as reasonably practicable after, the later of (i) the Effective Date, (ii) the date on which such Secured Claim becomes an Allowed Secured Claim, or (iii) the date on which the sale of the Ingleside Spool Base closes, in Final Satisfaction of every Allowed Helix Secured Claim, each such Holder of an Allowed Helix Secured Claim shall  receive Cash in the Allowed amount of such Claim out of the proceeds of such sale.

(c)     Voting:  Class 8B is Unimpaired, and Holders of Allowed Claims in Class 8B are conclusively presumed to have accepted the Plan under Bankruptcy Code section 1126(f).  Therefore, Holders of Allowed Claims in Class 8B are not entitled to vote to accept or reject the Plan.

4.      Class 6C – Constellation Lender Secured Claims (Constellation Debtor).

(a)     Classification: Class 6C consists of all Constellation Lender Secured Claims against the Constellation Debtor.

(b)     Treatment: The Holders of Allowed Constellation Lender Secured Claims shall have the following treatment:

(i)     If the Constellation Lenders accept a Constellation Qualified Offer, the Constellation Vessel shall be conveyed by the Constellation Debtor to the purchaser identified in the Constellation Qualified Offer free and clear of all liens, claims, and encumbrances (other than any Other Secured Claims, including Secured Maritime Lien Claims, the treatment of which is provided for in Section 5.2 of the Plan) such liens, claims, and encumbrances to attach to the proceeds of such sale in order of priority, and on the terms and conditions set forth in such Constellation Qualified Offer and the Constellation Lenders shall receive from the Constellation Debtor the gross proceeds of the Constellation Qualified Offer (net of any outstanding amounts required to administer the Constellation Debtors' estate during any period after the Effective Date of all Emerging Debtors' Plans and before the Effective Date of the Constellation Debtor Plan) up to the amount of their Allowed Constellation Lender Secured Claim against the Constellation Debtor in Final Satisfaction of each and every Allowed Constellation

Lender Secured Claim. The Constellation Debtor shall disclose the identity of the purchaser, the amount of the accepted Constellation Qualified Offer, and the definitive documentation in the Plan Supplement. The deposit paid in connection with the accepted Constellation Qualified Offer, as proceeds of the Constellation Vessel, shall be held in an account with the agent under the Constellation Credit Agreement.

(ii)     If the Constellation Lenders do not accept a Constellation Qualified Offer, then on the Effective Date, at the direction of the Required Constellation Lenders (a) the Constellation Vessel shall be conveyed by the Constellation Debtor to a special purpose vehicle owned by the Constellation Lenders, (b) all Interests in the Constellation Debtor shall be cancelled and reissued or transferred by the Constellation Debtor to the Constellation Lenders, in each case, in Final Satisfaction of every Constellation Lender Secured Claim, and the Constellation Debtor shall be dissolved hereunder, or (c) the automatic stay shall be lifted to permit the Constellation Lenders to immediately exercise any rights or remedies they may have in relation to the Constellation Vessel. The Constellation Debtor shall file a notice with the Bankruptcy Court setting forth the Constellation Lenders' election in accordance with this Section, which such notice may be filed after confirmation of the chapter 11 plan of the Constellation Debtor.

(iii)     The Short Term Bareboat Charter, Initial Bareboat Charter and the Long Term Bareboat Charter, in each case only as applicable pursuant to Section 7.19 of the Plan, shall survive (a) the purchase of the Constellation Vessel under a Constellation Qualified Offer, (b) the direct or indirect transfer of the Constellation Vessel to the Constellation Lenders, whether pursuant to Section 5.4(b)(ii) of the Plan or otherwise, and (c) the entry by the Constellation Lenders, directly or indirectly, into a third party charter agreement. In connection with the Short Term Bareboat Charter, the party granting such Short Term Bareboat Charter shall be granted access to the Constellation Vessel for ten (10) certified seafarers. Without limiting the generality of the foregoing, no agreement in respect of the Constellation Vessel or any direct or indirect transfer of the Constellation Vessel under the Plan shall affect, modify or impair any of the rights of Subsea 7 under the Short Term Bareboat Charter, Initial Bareboat Charter (if any) or the Long Term Bareboat Charter (if any) and any such charters shall be unaffected in any manner whatsoever by the Confirmation of the Plan or the occurrence of the Effective Date. For the avoidance of doubt, any purchaser of the Constellation Vessel pursuant to a Constellation Qualified Offer under the Plan shall acquire title to the Constellation Vessel free and clear of any liens, claims, or encumbrances, including free and clear of any obligation to enter into the Initial Bareboat Charter or the Long Term Bareboat Charter, provided, however, that such purchaser shall be required to acquire the Constellation Vessel subject to the terms of the Short Term Bareboat Charter.

(c)     Voting: Class 6C is Unimpaired, and Holders of Allowed Claims in Class 6C are conclusively presumed to have accepted the Plan under Bankruptcy Code section 1126(f). Therefore, Holders of Allowed Claims in Class 6C are not entitled to vote to accept or reject the Plan.

5.      Class 7D – Falcon Lender Secured Claims (Falcon Debtor).

(a)      Classification: Class 7D consists of all Falcon Lender Secured Claims.

(b)      Treatment:  Except to the extent that a Holder of an Allowed Falcon Lender Secured Claim and the Falcon Debtor agree to a less favorable treatment to such Holder, on, or as soon as reasonably practicable after, the later of (i) the Effective Date, or (ii) the date on which such Secured Claim becomes an Allowed Secured Claim, in Final Satisfaction of every Allowed Falcon Lender Secured Claim, each such Holder of an Allowed Falcon Lender Secured Claim shall, at the sole option of the Falcon Lender, (a) have its Allowed Falcon Lender Secured Claim Reinstated and rendered Unimpaired in accordance with Bankruptcy Code section 1124(2), notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the Holder of an Allowed Other Secured Claim to demand or to receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, (b) receive the collateral securing its Falcon Lender Secured Claim and the Falcon Debtor shall be dissolved hereunder, (c) at the direction of the Falcon Lender, all Interests in the Falcon Debtor shall be cancelled and reissued or transferred to the Falcon Lender, or (d) if the Falcon Debtor and OCBC agree upon appropriate consideration (whether in the form of Cash or a waiver of Claims against the Debtors) to the Debtors for managing the Falcon Vessel in a sale process and as long as any administrative claims only arise against the Falcon Debtor, then the Falcon Debtor's estate for so long as OCBC funds it may conduct a sale of the Falcon Vessel, free and clear of all liens, claims, and encumbrances (other than any Other Secured Claims, including Secured Maritime Lien Claims, the treatment of which is provided for in Section 5.2 of the Plan) such liens, claims, and encumbrances to attach to the proceeds of such sale in order of priority, and OCBC would receive from the Falcon Debtor the proceeds of any sale (net of any outstanding amounts required to administer the Falcon Debtor's estate) up to the amount of their Allowed Falcon Lender Secured Claim against the Falcon Debtor in Final Satisfaction of each and every Allowed Falcon Lender Secured Claim.

(c)      Voting: Class 7D is Unimpaired, and Holders of Allowed Claims in Class 7D are conclusively presumed to have accepted the Plan under Bankruptcy Code section 1126(f).  Therefore, Holders of Allowed Claims in Class 7D are not entitled to vote to accept or reject the Plan.

6.      Classes 1E through 5E – Other Priority Claims (Emerging Debtors).

(a)      Classification: Classes 1E through 5E consists of all Other Priority Claims against the relevant Emerging Debtor.

(b)      Treatment:  Except to the extent that the Holder of an Allowed Other Priority Claim agrees to less favorable treatment, Allowed Other Priority Claims shall be paid in Cash as set forth below:

(i)      In Final Satisfaction of Allowed Ordinary Course Other Priority Claims, on, or as soon as reasonably practicable after the later of (a) the Effective

Date, or (b) the date on which an Ordinary Course Other Priority Claim becomes an Allowed Ordinary Course Other Priority Claim, such Claims shall be Assumed Liabilities and shall be paid by the respective Restructured Emerging Debtor or the affiliate of Newco into which purchased assets are transferred in the ordinary course of business in accordance with their terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.

(ii)    In Final Satisfaction of Non-Ordinary Course Other Priority Claims, (a) on or as soon as reasonably practicable after the Effective Date, the Plan Administrator shall receive on behalf of all Holders of such Claims against the applicable Emerging Debtor, the Additional Cash, and (b) on the Initial Distribution Date, the Plan Administrator shall pay the Holder of such Allowed Non-Ordinary Course Other Priority Claim Cash in the full amount of such Claim.  To the extent the Additional Cash is insufficient, such Non-Ordinary Course Other Priority Claim shall be assumed by Newco and all Other Priority Claims must be paid in accordance with the Bankruptcy Code.  For the avoidance of doubt, the Allowed Non-Ordinary Course Priority Claims shall not be paid from the GUC Cash.

(c)    Voting: Classes 1E through 5E are Unimpaired, and Holders of Allowed Classes 1E through 5E Claims are conclusively presumed to have accepted the Plan under Bankruptcy Code section 1126(f).  Therefore, Holders of Allowed Class 1E through 5E Claims are not entitled to vote to accept or reject the Plan.

7.    Class 6E – Other Priority Claims (Constellation Debtor).

(a)    Classification: Class 6E consists of all Other Priority Claims against the Constellation Debtor.

(b)    Treatment:  Except to the extent that a Holder of an Allowed Other Priority Claim against the Constellation Debtor and the Constellation Debtor agree to a less favorable treatment to such Holder, in Final Satisfaction of each and every Allowed Other Priority Claim, (i) on or as soon as reasonably practicable after the Effective Date, the Plan Administrator shall receive on behalf of all Holders of such Claims (in the amount of the Allowed and unpaid portion of such claims) the Cash from the Constellation Lenders (as may be agreed between the Constellation Debtor and the Constellation Lenders) with respect to Allowed Other Priority Claims against the Constellation Debtor, and (ii) on the Initial Distribution Date, the Plan Administrator shall pay the Holder of such Allowed Other Priority Claim Cash in the full amount of such Claim.

(c)    Voting: Class 6E is Unimpaired, and Holders of Allowed Class 6E, Claims are conclusively presumed to have accepted the Plan under Bankruptcy Code section 1126(f).  Therefore, Holders of Allowed Class 6E Claims are not entitled to vote to accept or reject the Plan.

8.    Class 7E – Other Priority Claims (Falcon Debtor).

(a)    Classification: Class 7E consists of all Other Priority Claims against the Falcon Debtor.

(b)     Treatment: Except to the extent that a Holder of an Allowed Other Priority Claim against the Falcon Debtor and the Falcon Debtor, agree to a less favorable treatment to such Holder, in Final Satisfaction of each and every Allowed Other Priority Claim, (a) on or as soon as reasonably practicable after the Effective Date, the Plan Administrator shall receive on behalf of all Holders of such Claims, Cash (in the amount of the Allowed and unpaid portion of such claims) from the Falcon Lender with respect to Allowed Other Priority Claims against the Falcon Debtor, and (b) on the Initial Distribution Date, the Plan Administrator shall pay the Holder of such Allowed Other Priority Claim Cash in the full amount of such Claim.

(c)     Voting: Class 7E is Unimpaired, and Holders of Allowed Class 7E Claims are conclusively presumed to have accepted the Plan under Bankruptcy Code section 1126(f).  Therefore, Holders of Allowed Class 7E Claims are not entitled to vote to accept or reject the Plan.

9.     Class 8E – Other Priority Claims (Marine Base Opco Debtor).

(a)     Classification: Class 8E consists of all Other Priority Claims against the Marine Base Opco Debtor.

(b)     Treatment: Except to the extent that a Holder of an Allowed Other Priority Claim against the Marine Base Opco Debtor and the Marine Base Opco Debtor agree to a less favorable treatment to such Holder, in Final Satisfaction of each and every Allowed Other Priority Claim against the Marine Base Opco, on, or as soon as reasonably practicable after the later of (a) the Effective Date, or (b) the date on which an Other Priority Claim becomes an Allowed Other Priority Claim, the Holder of the Allowed Other Priority Claim shall receive Cash out of the Excess Spool Base Proceeds equal to the Allowed and unpaid portion of such Claim.

(c)     Voting: Class 8E is Unimpaired, and Holders of Allowed Class 8E Claims are conclusively presumed to have accepted the Plan under Bankruptcy Code section 1126(f).  Therefore, Holders of Allowed Class 8E Claims are not entitled to vote to accept or reject the Plan.

10.     Classes 1F through 8F – Bank Guarantee Claims (All Plan Debtors).

(a)     Classification:  Classification: Classes 1F through 8F consists of all Bank Guarantee Claims against the relevant Plan Debtor.

(b)     Treatment: Except to the extent that a Holder of an Allowed Bank Guarantee Claim against the relevant Plan Debtor and the applicable Plan Debtor agree to a less favorable treatment to such Holder, each Allowed Bank Guarantee Claim will be Reinstated and rendered Unimpaired in accordance with Bankruptcy Code section 1124(2), notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the Holder of an Allowed Bank Guarantee Claim to demand or to receive payment of such Allowed Bank Guarantee Claim prior to the stated maturity of such Allowed Bank Guarantee Claim from and after the occurrence of a default.

(c)     Voting: Classes 1F through 8F are Unimpaired, and Holders of Allowed Claims in Classes 1F through 8F are conclusively presumed to have accepted the Plan under Bankruptcy Code section 1126(f).  Therefore, Holders of Allowed Claims in Classes 1F through 8F are not entitled to vote to accept or reject the Plan.

11.     Classes 1G through 3G and 5G – General Unsecured Claims (Emerging Debtors)**.**

(a)     Classification:  Classes 1G through 3G and 5G consist of all General Unsecured Claims against the relevant Debtors.

(b)     Treatment: In Final Satisfaction of each and every Allowed General Unsecured Claim against the relevant Plan Debtor, (i) on or as soon as reasonably practicable after the Effective Date, the Plan Administrator shall receive on behalf of all Holders of such Claims against the relevant Debtor, the GUC Cash, and (ii) on the Initial Distribution Date, the Plan Administrator shall pay each Holder of an Allowed General Unsecured Claim its Pro Rata share of the Net Additional Cash as to which all Holders of Allowed General Unsecured Claims would be entitled as if Classes 1G through 3G and 5G were a single class; provided, however, that any Holder of an unsecured guarantee Claim against more than one relevant Plan Debtor shall be limited to a single recovery on account of such guarantee Claims; provided, further, however, that the distributions on account of the Constellation Lender Guarantee Claims shall be made to holders of the other General Unsecured Creditors in Classes 1G through 3G and 5G.

(i)     If a Plan as to a particular Plan Debtor is not confirmed or a Plan is withdrawn, then the Holders of Allowed General Unsecured Claims with respect to such Plan Debtor will not receive the treatment set forth above, and the recovery they would have otherwise received shall be distributed among the other Holders of Allowed General Unsecured Claims in the remaining classes.

(c)     Voting: Classes 1G through 3G and 5G are Impaired and Holders of Allowed Claims in Classes 1G through 3G and 5G are entitled to vote to accept or reject the Plan.

12.     Classes 6G and 7G – General Unsecured Claims (Constellation Debtor and Falcon Debtor).

(a)     Classification:  Classes 4G, 6G, and 7G consist of all General Unsecured Claims against the relevant Debtor.

(b)     Treatment: In Final Satisfaction of each and every Allowed General Unsecured Claim against the relevant Plan Debtor, on the Effective Date, or as soon as reasonably practicable thereafter, the Plan Administrator shall receive on behalf of each Holder of an Allowed General Unsecured Claim against the relevant Plan Debtor, such Holder's Pro Rata share of distributable value from the relevant Debtor's estate, if any, after payment of all senior claims in respect of the relevant Plan Debtor.

(c)     Voting: Classes 5G through 7G are Impaired and Holders of Allowed Claims in Classes 5G through 7G are entitled to vote to accept or reject the Plan.

41

13.    Class 8G – General Unsecured Claims (Marine Base Opco Debtor).

(a)    Classification:  Class 8G consists of all General Unsecured Claims against Marine Base Opco Debtor.

(b)    Treatment: In Final Satisfaction of each and every such Claim, on the Effective Date, or as soon as reasonably practicable thereafter, the Plan Administrator shall receive such Holder's Pro Rata share of the Excess Spool Base Proceeds, if any, after payment of all senior claims in respect of the Marine Base Opco Debtor.

(c)    Voting: Class 8G is Impaired and Holders of Allowed Claims in Classes 8G are entitled to vote to accept or reject the Plan.

14.    Classes 1H through 8H – Cancelled Intercompany Claims (All Plan Debtors).

(a)    Classification:  Classes 1H through 8H consists of all Cancelled Intercompany Claims against the relevant Debtor.

(b)    Treatment: Holders of Allowed Cancelled Intercompany Claims will receive the following treatment:

(i)    Intercompany Claims amongst the Singapore/Saudi Debtors shall be cancelled or subordinated.

(ii)    Intercompany Claims as between the Singapore/Saudi Debtors on the one hand and the US Debtor on the other shall be cancelled or subordinated.

(iii)    Intercompany Claims allegedly held by ECS against any Emerging Debtor shall be cancelled or subordinated, based on evidence to be provided on the record at the Confirmation Hearing.

(c)    Voting:  Classes 1H through 8H are Impaired, and Holders of Allowed Claims in Classes 1H through 8H are conclusively presumed to have rejected the Plan under Bankruptcy Code section 1126(g).  Therefore, Holders of Allowed Claims in Classes 1H through 8H are not entitled to vote to accept or reject the Plan.

16.    Class 1I through 8I – Subordinated Claims (All Plan Debtors).

(a)    Classification:  Classes 1I through 8I consists of all Subordinated Claims against the relevant Debtor.

(b)    Treatment: Holders of Allowed Claims in Classes 1I through 8I shall not receive any distributions on account of such Allowed Claims in Classes 1I through 8I, and on the Effective Date all Allowed Claims in Classes 1I through 8I shall be released, waived, and discharged.

42

(c)      Voting: Classes 1I through 8I are Impaired, and Holders of Allowed Claims in Classes 1I through 8I are deemed to have rejected the Plan under Bankruptcy Code section 1126(g).  Therefore, Holders of Allowed Claims in Classes 1I through 8I are not entitled to vote to accept or reject the Plan.

17.      Class 1I through 8J – Interests (All Plan Debtors).

(a)      Classification:  Classes 1J through 8J consists of all Interests in the relevant Debtor.

(b)      Treatment: On the Effective Date, Interests in Classes 1J through 8J shall be deemed automatically cancelled, released, and extinguished without further action by the Debtors or the Plan Debtors and the obligations of the Debtors and the Plan Debtors thereunder shall be discharged and the Holders of Interests in Classes 1J through 8J shall not receive or retain any property or interests on account of such Interests in Classes 1J through 8J; provided, however, that Interests in any Emerging Debtors other than an Emerging Debtor that is an immediate subsidiary of the DIP Borrower, and, unless Subsea 7 agrees otherwise in its sole and absolute discretion, the US Debtor, shall remain intact solely to preserve corporate structure, but shall not be entitled to any distribution; provided, further, however, with respect to the Liquidating Debtors, in the event that there are any excess proceeds available after all creditors at any particular Liquidating Debtors are paid in full, those proceeds will be distributed to shareholders of such Liquidating Debtor Pro Rata.

(c)      Voting: Classes 1J through 8J are Impaired, and Holders of Interests in Classes 1J through 8J are deemed to have rejected the Plan under Bankruptcy Code section 1126(g).  Therefore, Holders of Interests in Classes 1J through 8J are not entitled to vote to accept or reject the Plan.

G.      Acceptance

1.      Classes Entitled to Vote

Classes 1G through 8G are Impaired and are entitled to vote to accept or reject the Plan. By operation of law, Classes 1A through 8A, 8B, 6C, 7D, 1E through 8E, and 1F through 8F are Unimpaired and are deemed to have accepted the Plan and, therefore, are not entitled to vote.  By operation of law, Classes 1H through 8H, 1I through 8I, and 1J through 8J are deemed to have rejected the Plan and are not entitled to vote.

2.      Acceptance by Impaired Classes

An Impaired Class of Claims shall have accepted the Plan if, not counting the vote of any Holder designated under Bankruptcy Code section 1126(e), (a) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept the Plan and (b) the Holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept the Plan.

43

3.      Elimination of Classes

To the extent applicable, any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of commencement of the Confirmation Hearing, shall, for each applicable Debtor, be deemed to have been deleted from the Plan for purposes of (a) voting to accept or reject the Plan and (b) determining whether it has accepted or rejected the Plan under Bankruptcy Code section 1129(a)(8).

4.      Deemed Acceptance if No Votes Cast

If no Holders of Claims eligible to vote in a particular Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the Holders of such Claims in such Class.

5.      Cramdown

To the extent necessary, the Plan Debtors shall request confirmation of the Plan, as it may be modified from time to time in accordance with the terms of the Plan, under Bankruptcy Code section 1129(b).  The Plan Debtors reserve the right to modify, amend, or withdraw the Plan, with respect to all Plan Debtors or any individual Plan Debtor or group of Plan Debtors to the extent, if any, that confirmation under Bankruptcy Code section 1129(b) requires modification.

H.      Means for Implementation of the Plan

1.      General Settlement of Claims and Interests

Under Bankruptcy Code section 1123 and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provision of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved under the Plan.

2.      Plan Funding

If Newco acquires the Emerging Debtors, the Plan shall be funded from the proceeds of the Purchase Price, plus any additional Cash received on account of Retained Avoidance Actions and the Plan Administrator Causes of Action and the sale of additional assets of the U.S. Debtor. If an Alternative Plan Sponsor acquires the Emerging Debtors, the Plan shall be funded by such Alternative Plan Sponsor.

3.      Cancellation of the Prepetition Credit Facility and Interests

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing or creating any indebtedness or obligation of or ownership in the Plan Debtors shall be cancelled, and the obligations in any way related thereto shall be fully satisfied, released, and discharged.  On the Effective Date, except to the extent otherwise provided in the Plan, all Interests in the Plan Debtors shall be cancelled, and the obligations in any way related thereto shall be fully satisfied, released, and discharged.

44

4.     Authorization and Issuance of New Equity in the Emerging Debtors to Newco and to Purchase US Debtor Assets.

On the Effective Date, the Emerging Debtors (other than the US Debtor) shall authorize and issue or indirectly issue (or transfer) all of the New Equity Interests to Newco.  With respect to the US Debtor, the Purchased Assets from the US Debtor (as identified by Newco or its designee) and the US Debtor's employees shall be conveyed to Newco or its designee through an asset purchase pursuant to the Plan; provided, however, that Newco or its designee may elect to acquire such Purchased Assets through the issuance of New Equity Interests in Newco's sole and absolute discretion.

5.     Acquisition of Additional Debtor Assets

On the Effective Date, Newco or its designee may acquire free and clear of all claims and interests to the fullest extent permitted by Bankruptcy Code section 1141(c) additional assets (including through the assumption of executory contracts) from a Liquidating Debtor through a sale or assumption, as the case may be, under the Plan.  In such a case, the purchase price of such assets shall be paid to the applicable Liquidating Debtor and shall be used by such Debtor to fund its estate.

6.     Continued Corporate Existence

Except as otherwise provided in the Plan, the Plan Debtors shall continue to exist after the Effective Date as separate entities, with all the powers under applicable law in the jurisdictions in which the Debtors have been formed, and under their certificates of formation and limited liability company agreements or other organizational documents in effect prior to the Effective Date, except to the extent such certificates of formation and limited liability company agreements or other organizational documents are amended and restated by the Plan, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.  To the extent such documents are amended, such documents are deemed to be amended under the Plan without any further notice to or action, order, or approval of the Bankruptcy Court or any other court of competent jurisdiction (other than the requisite filings required under applicable state, provincial, or federal law).

7.     Restructuring Transactions

(a)     On or following the Confirmation Date, the Debtors or Plan Debtors, as the case may be, shall take such actions as may be necessary or appropriate to effect the relevant restructuring transactions as set forth in the Plan and the Plan Transaction Documents, and may take other actions on or after the Effective Date.

(b)     Prior to, on, or after the Effective Date, and under the Plan, the Plan Debtors shall enter into the restructuring transactions described in the Plan and in the Disclosure Statement and the Plan Transaction Documents.  The Debtors or the Plan Debtors, as applicable, shall take any actions as may be necessary or appropriate to effect a restructuring of the Debtors' businesses or the overall organizational structure of the Plan Debtors.  The restructuring transactions may include one or more restructurings, conversions, dissolutions, or transfers as may be determined by the Debtors or the Plan Debtors, as the case may be, to be necessary or

45

appropriate.  The actions taken by the Debtors or the Plan Debtors, as applicable, to effect the restructuring transactions may include: (i) the execution, delivery, adoption, and/or amendment of appropriate agreements or other documents of restructuring, conversion, disposition, or transfer containing terms that are consistent with the terms of the Plan, the Disclosure Statement, the Plan Transaction Documents, and any ancillary documents and that satisfy the applicable requirements of applicable state, federal, and foreign law and any other terms to which the applicable parties may agree; (ii) the execution, delivery, adoption, and/or amendment of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Disclosure Statement, the Plan Transaction Documents, and any ancillary documents and having other terms for which the applicable parties may agree; (iii) the filing of appropriate certificates of formation, incorporation, merger, consolidation, dissolution, or conversion under applicable law, including but not limited to an amended certificate of formation, incorporation, LLC agreement, or bylaws with the appropriate governmental authorities; (iv) the cancellation of Interests, membership units, and warrants; and (v) all other actions that the Debtors or the Plan Debtors, as applicable, determine to be necessary, desirable, or appropriate to implement, effectuate, and consummate the Plan or the restructuring transactions contemplated hereby, including making filings or recordings that may be required by applicable law in connection with the restructuring transactions.

8.   <u>Plan Administrator</u>

(a)   The Plan Administrator shall have the power to administer the Remaining Administered Assets and make or authorize distributions to creditors under the Plan. Without limiting the generality of the foregoing, the Plan Administrator shall (a) hold and administer the Remaining Administered Assets; (b)  have authority to pay from the Wind-Down Account all out of pocket expenses incurred in connection with the discharge of its duties under the Plan; (c) have the power and authority to retain such attorneys, advisors, other professionals and employees as may be appropriate to perform the duties required of the Plan Administrator hereunder; (d) make distributions as provided in the Plan; (e) prosecute and settle all Retained Avoidance Actions and the Retained Plan Administrator Causes of Action, as further set forth in Section 7.15 of the Plan, and (f) file with the Court periodic reports and updates regarding the status of the administration of the Remaining Administered Assets as may be reasonably required.  The Emerging Debtors shall cooperate in a commercially reasonable manner and in good faith with the Plan Administrator to assure that the Plan Administrator has full and complete access to the Emerging Debtors' books and records in possession of the Emerging Debtors in connection with its duty to object to Claims and administer the Remaining Administered Assets.  Without limiting the generality of the foregoing, the Emerging Debtors shall preserve all records and documents (including any electronic records and documents) related to Claims and the Remaining Administered Assets until the earlier of (i) the fifth (5th) anniversary of the Effective Date, and (ii) thirty (30) days after receiving notice from the Plan Trustee that such records are no longer required to be preserved.

(b)   On the Effective Date, an amount of Cash determined by the Plan Debtors and the Creditor's Committee sufficient to perform the functions of the Plan Administrator in connection with its responsibilities, including the professional fees, shall be segregated into a Wind-Down Account.  Any excess amount remaining in the Wind-Down

Account in connection with the closing of the Chapter 11 Cases shall be treated as GUC Cash in any final distribution. In no event shall the amount of Cash determined nby the Plan Debtors and the Creditors' Committee to be segregated into a Wind-Down Account be more than $300,000 of the GUC Cash.

9.      Post-Emergence Structure of the Debtors.

As of the Effective Date, the New Equity Interests in the Emerging Debtors shall be, directly or indirectly, held by Newco.

10.      New Corporate Governance Documents

The New Corporate Governance Documents shall be adopted and amended as may be required so that they are consistent with the provisions of the Plan and otherwise comply with Bankruptcy Code section 1123(a)(6).  The Emerging Debtors shall enter into such agreements and amend its corporate governance documents to the extent necessary to implement the terms and conditions of the Plan.   After the Effective Date, the Emerging Debtors may amend and restate the New Corporate Governance Documents and other constituent documents as permitted by applicable law.

11.      Directors, LLC Managers, and Officers of the Plan Debtors

On the Effective Date, the term of the current members of the board of directors, managers, or members, as the case may be, of the Emerging Debtors shall expire.   On the Effective Date, the New Emerging Debtor Boards shall be appointed.   On and after the Effective Date, each manager or officer of the Emerging Debtors shall serve under the terms of the New Corporate Governance Documents and applicable state limited liability company law or alternative comparable law, as applicable.

12.      Corporate Action

Each of the matters provided for under the Plan involving the corporate structure of the Plan Debtors or corporate action to be taken by or required of the Debtors or the Plan Debtors shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan, and shall be authorized, approved, and to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, Creditors, or directors of the Debtors or the Plan Debtors.  Such actions may include (i) the adoption and filing of the New Corporate Governance Documents, (ii) the appointment of the New Emerging Debtor Boards, and (iii) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).

13.      Effectuating Documents; Further Transactions

On and after the Effective Date, the Plan Debtors, and the officers thereof and members of the New Emerging Debtor Boards, shall be authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, or to otherwise comply with applicable

47

law, in the name of and on behalf of the Plan Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

                14.   Employment, Retirement, and Other Agreements and Employee Compensation Plans

            (a)   **Employment Agreements.**  The Plan Debtors shall assume or reject employment, severance (change in control), retirement, indemnification, or other agreement with their pre-Effective Date managers, officers, and employees in accordance with the provisions of Article VIII of the Plan.  If the Plan Debtors do not list such agreement on the list of "Assumed Executory Contracts and Unexpired Leases" contained in the Plan Supplement in accordance with Section 8.1 of the Plan, such agreement shall be deemed rejected.  The Plan Debtors may enter into new employment arrangements and/or change in control agreements with the Plan Debtors' officers who continue to be employed after the Effective Date; provided, however, that to enter into or to obtain the benefits of any such employment agreement, such executive officer must contractually waive and release all pre-existing claims, including those arising from pre-existing employment, change in control, or other employment-related agreements and/or benefits under certain pre-existing compensation and benefit arrangements.  On or after the Effective Date, the Emerging Debtors may adopt, approve, and authorize the new employment arrangement and/or change in control agreement with respect to such officers of the Emerging Debtors without further action, order, or approval of the New Emerging Debtor Boards.

            (b)   **Other Incentive Plans and Employee Benefits.**  Unless otherwise specified in the Plan, on and after the Effective Date, the Emerging Debtors shall have the sole discretion to (a) amend, adopt, assume, and/or honor, in the ordinary course of business or as otherwise provided in the Plan, any contracts, agreements, policies, programs, and plans assumed under Article VIII of the Plan for, among other things, compensation, under the terms thereof or hereof, including any incentive plan, 401(k) plan, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation benefits, life insurance, and accidental death and dismemberment insurance for the managers, officers, and employees of the Emerging Debtors who served in such capacity from and after the Petition Date, and (b) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date.

            (c)   **Employee Incentive Plan.**  In accordance with that certain Order Authorizing and Approving the Debtors' Executive Incentive Plan, the Debtors seek an increase of up to 10 percent of the amounts payable under the Executive Incentive Plan.

                15.   Causes Of Action

            **(a)**   **Release of Avoidance Actions.**  On the Effective Date, all Avoidance Actions other than Retained Avoidance Actions shall be released.  Retained Avoidance Actions shall remain property of the applicable Plan Debtor's Estate and may be asserted by the Plan Administrator on behalf and for benefit of General Unsecured Creditors.

(b)     **Preservation of Causes of Action.** Except as otherwise set forth in the Plan (including in Section 7.15(a) above), in accordance with Bankruptcy Code section 1123(b)(3), the applicable Plan Debtors shall retain and may (but are not required to) enforce all rights to commence and pursue any and all Causes of Action that are not released under Section 7.15(a) or Section 11.5 or exculpated under Section 11.7 of the Plan or an order of the Bankruptcy Court, whether arising before or after the Petition Date, including any actions or categories of actions specifically enumerated in a list of retained Causes of Action contained in the Plan Supplement, and such Causes of Action are preserved and shall vest in the Plan Debtors as of the Effective Date.  The Plan Debtors or the Plan Administrator in the case of the Retained Avoidance Actions and the Retained Plan Administrator Causes of Action, in their sole and absolute discretion, shall determine whether to bring, settle, release, compromise, or enforce such Causes of Action (or decline to do any of the foregoing), and shall not be required to seek further approval of the Bankruptcy Court for such action.  The Plan Debtors, or the Plan Administrator in the case of the Retained Avoidance Actions and the Retained Plan Administrator Causes of Action may pursue such litigation claims in accordance with the best interests of the Plan Debtors' or any successor holding such rights of action, or, in the case of the Retained Avoidance Actions and the Retained Plan Administrator Causes of Action, the applicable Debtor's general unsecured creditors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors, Plan Debtors, or the Plan Administrator, as applicable, will not pursue any and all available Causes of Action against them.  The Plan Debtors and, in the case of the Retained Avoidance Actions, the Plan Administrator expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or an order of the Bankruptcy Court, the Plan Debtors and the Plan Administrator expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or consummation of the Plan.

16.     <u>Reservation of Rights</u>

With respect to any Cause of Action or the Retained Plan Administrator Causes of Action that the Plan Debtors or the Plan Administrator, as applicable, expressly abandon, if any, the Plan Debtors and the Plan Administrator reserve all rights, including the right under Bankruptcy Code section 502(d) to use defensively the abandoned Causes of Action as a basis to object to all or any part of a claim against any of the Estates asserted by a Creditor who obtains the benefit of the abandoned Cause of Action.  Except as set forth in Article XI of the Plan, nothing contained in the Plan shall constitute or be deemed a waiver or abandonment of any Cause of Action that the Plan Debtors, the Plan Administrator, or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

17.  Exemption from Certain Transfer Taxes and Recording Fees

Under Bankruptcy Code section 1146(a), any transfers of property under the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment to the fullest extent contemplated by Bankruptcy Code section 1146(a), and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation of any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

18.  Termination of Utility Deposit Account

On the Effective Date, the Utility Deposit Account created under Bankruptcy Code section 366 shall be automatically terminated, and funds therein vested in the Plan Debtors.  All deposits provided to utility providers under Bankruptcy Code section 366 shall likewise be sent to the Plan Debtors on the Effective Date.

19.  Constellation Debtor

The Constellation Debtor or the Debtors, as applicable, shall be authorized to evaluate Constellation Qualified Offers (as defined below) through the later of (a) June 29, 2017 and (b) so long as Subsea 7 is a Plan Sponsor on such date, the Effective Date.  If a Constellation Qualified Offer is accepted by the Constellation Lenders, then the Constellation Debtor and its assets shall be reorganized or liquidated as set forth in such offer and in accordance with the Plan.  If no Constellation Qualified Offer is accepted, then, on the Effective Date, at the option of the Required Constellation Lenders, (a) the Constellation Vessel shall be transferred to a special purpose vehicle to be owned by the Constellation Lenders and the Constellation Debtor shall be dissolved under the Plan, (b) the Constellation Lenders shall receive all of the Equity Interests of the Constellation Debtor, or (c) the automatic stay shall be lifted to permit the Constellation Lenders to immediately exercise any rights or remedies they may have in relation to the Constellation Vessel.

In addition, the Constellation Debtor or the Debtors, as applicable, in consultation with the Constellation Lenders and the Creditors' Committee, shall have the right to evaluate third party offers for a bareboat charter with respect to the Constellation Vessel through the later of (a) June 29, 2017 and (b) so long as Subsea 7 is a Plan Sponsor on such date, the Effective Date, provided that Subsea 7 shall have a right of first refusal with respect to such offers.  The Constellation Lenders shall provide Subsea 7 with written notice of any such third party offers and Subsea 7 shall have 48 hours from the receipt of such notice to exercise its right of first refusal.  Once Subsea 7 agrees to match the prevailing market charter offer, the Debtors and the Constellation Lenders will cease their efforts to market the charter.

On the Effective Date, if Subsea 7 is a Plan Sponsor on such date, the Constellation Lenders may, at their option, by written notice (the "Initial Bareboat Charter Notice") require Subsea 7 to enter into the Initial Bareboat Charter.  If the Constellation Lenders exercise such option, neither the Emerging Debtors nor Subsea 7 shall be entitled to enter into the Short Term

Bareboat Charter and Subsea 7 shall have the right to enter into the Long Term Bareboat Charter within 14 days of the receipt of the Initial Bareboat Charter Notice.

On the Effective Date, if the Constellation Lenders do not elect to cause Subsea 7 to enter into an Initial Charter, the Constellation Lenders and Subsea 7 shall enter into the Short Term Bare Boat Charter.

### 20. All Asset Qualified Offers

The Debtors may continue to seek an Alternative Plan Sponsor pursuant to an All Asset Qualified Offer through June 15, 2017. On and after the date on which the Debtors accept an All Asset Qualified Offer, all expenses of the Chapter 11 Cases shall be funded exclusively by the Alternative Plan Sponsor, including any amounts required to amend or resolicit the Plan, if any.

### 21. Falcon Vessel

To the extent that OCBC desires to fund all costs associated with owning and selling the Falcon Vessel (including all costs of operating, maintaining, docking, and running a sales process), the Debtors will accept reasonable direction from OCBC in connection with its disposition, including running a 363 sales process and/or lifting the automatic stay to permit OCBC to take control of the Falcon Vessel). If OCBC does not fund such costs, the Debtors will seek to abandon their interest in such vessel and dismiss the Falcon Debtor's Chapter 11 Case.

### 22. Sources of Cash for Plan Distributions.

With respect to the Emerging Debtors, all Cash necessary for the Plan Administrator to make distributions in respect of Administrative Claims, Priority Claims, Priority Tax Claims, Other Secured Claims (including maritime liens), and General Unsecured Claims shall be obtained from the Remaining Administered Assets, including the Additional Cash; provided, however, for the avoidance of doubt, only creditors in Classes 1G through 3G and 5G shall be entitled to receive distributions from the Net GUC Cash. With respect to Marine Base Opco, all Cash necessary for the Plan Administrator to make distributions in respect of Administrative Claims, Priority Claims, Priority Tax Claims, Other Secured Claims, and General Unsecured Claims (including Allowed Preserved Intercompany Claims), shall be obtained from the proceeds of the sale of the Ingleside Spool Base. The Constellation Lender Secured Claims shall be paid from the proceeds of the sale of the Constellation Vessel, if any. The Falcon Lender Secured Claims shall be paid from the proceeds of the sale of the Falcon Vessel, if any. Except for the payment of the Purchase Price and the assumption of the Assumed Liabilities, under no circumstances shall any Administrative Claims, Priority Claims, Priority Tax Claims, Other Secured Claims, General Unsecured Claims, Intercompany Claims or Subordinated Claims be paid by or with the assets of the Emerging Debtors, including the Purchased Assets.

### 23. Allocation of Liabilities

Except for Assumed Liabilities, all liabilities and expenses accrued by the Emerging Debtors before 12:00 a.m. (Prevailing Central Time) on the Effective Date shall be for the account of the Estates and shall not be liabilities of the Emerging Debtors on and after the Effective Date. All liabilities and expenses accrued by the Emerging Debtors on and after 12:00

a.m. (Prevailing Central Time) on the Effective Date shall be the obligations of the Emerging Debtors and enforceable in accordance with applicable law.

24.    <u>Reinstatement and Continuation of Insurance Policies</u>.

From and after the Effective Date, each of the Debtors' insurance policies in respect of the Emerging Debtors in existence immediately prior to the Effective Date shall be reinstated and continued in accordance with its terms and shall, to the extent applicable, be deemed assumed by the applicable Emerging Debtor pursuant to section 365 of the Bankruptcy Code.

I.    <u>Unexpired Leases and Executory Contracts</u>

1.    <u>Rejection of Executory Contracts and Unexpired Leases</u>

(a)    **Automatic Rejection.**  Except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease shall be deemed automatically rejected pursuant to Bankruptcy Code sections 365 and 1123 as of the Effective Date, unless any such Executory Contract or Unexpired Lease: (i) is listed on the Schedule of Assumed Executory Contracts and Unexpired Leases contained in the Plan Supplement; (ii) has been previously assumed or rejected by the Debtors by Final Order of the Bankruptcy Court or has been assumed by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (iii) is the subject of a motion to assume or reject pending as of the Effective Date; or (iv) is otherwise assumed pursuant to the terms of the Plan.

The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections pursuant to Bankruptcy Code sections 365 and 1123 as of the Effective Date; <u>provided however</u>, that until the Effective Date, the Plan Debtors may subsequently seek to assume an Executory Contract or Unexpired Lease previously slated for rejection by filing a motion to assume such Executory Contract or Unexpired Lease prior to the Effective Date, as set forth in Section 8.1(d) of the Plan  Counterparties to Executory Contracts or Unexpired Leases that are deemed rejected as of the Effective Date shall have the right to assert any Claim on account of the rejection of such Executory Contracts or Unexpired Leases subject to compliance with the requirements of the Plan.

(b)    **Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.**  Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, to the extent allowed by applicable bankruptcy law, the Plan Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or the Plan Debtors, as applicable, from counterparties to rejected Executory Contracts.

(c)    **Claims Procedures Related to Rejection of Executory Contracts or Unexpired Leases.**  Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases under the Plan or otherwise must be filed with the Claims, Noticing, and Solicitation

52

Agent no later than 30 days after the later of the Effective Date or the effective date of rejection. Any Proofs of Claim arising from the rejection of the Executory Contracts or Unexpired Leases that are not timely filed shall be disallowed automatically and forever barred, estopped, and enjoined from assertion and shall not be enforceable against the Debtors, without the need for any objection by the Plan Debtors or the Plan Administrator or any further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.  All Allowed Claims arising from the rejection of the Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims.

(d)  **Reservation of Rights.** Notwithstanding anything to the contrary in the Plan, prior to the Effective Date, the Debtors may amend their decision with respect to the rejection of any Executory Contract or Unexpired Lease.

## 2.  Assumption of Executory Contracts and Unexpired Leases

(a)  **Assumption.** Except as otherwise provided in the Plan, upon the occurrence of the Effective Date, each Executory Contract and Unexpired Lease listed on the Schedule of Assumed Executory Contracts and Unexpired Leases shall be assumed, or assumed and assigned, as applicable, and shall vest in and be fully enforceable by the Plan Debtors or its assignee in accordance with its terms, except as modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing or providing for its assumption or applicable federal law.  With respect to each such Executory Contract and Unexpired Lease listed on the Schedule of Assumed Executory Contracts and Unexpired Leases, the Plan Debtors shall, with the consent of the Plan Sponsors, designate a proposed Cure, and the assumption of such Executory Contracts and Unexpired Leases may be conditioned upon the disposition of all issues with respect to such Cure.

The Confirmation Order will constitute an order of the Bankruptcy Court approving such assumptions pursuant to Bankruptcy Code sections 365 and 1123 as of the Effective Date.  To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan (including any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Plan Debtors' assumption of such Executory Contract or Unexpired Lease, then such provision shall be deemed modified such that the transactions contemplated by the Plan will not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Each Executory Contract and Unexpired Lease assumed pursuant to Article VIII of the Plan will revest in and be fully enforceable by the Plan Debtors in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

(b)  **Modifications, Amendments, Supplements, Restatements, or Other Agreements.** Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all rights related thereto, if any, including all easements, licenses, permits,

rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Plan Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

(c)     **Proofs of Claim Based on Executory Contracts or Unexpired Leases that Have Been Assumed.**  To the extent that any and all Proofs of Claims include any claims based on Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, pursuant to the order approving such assumption, including the Confirmation Order and unless the Plan Debtors and the non-Debtor counter party agree otherwise, the portion of such Proofs of Claim addressing cure obligations for Executory Contracts or Unexpired Leases shall be deemed disallowed and expunged from the claims register as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court.

(d)     **Cure Procedures and Payments Related to Assumption of Executory Contracts and Unexpired Leases.**  With respect to each of the Executory Contracts or Unexpired Leases assumed hereunder, the Plan Debtors, with the consent of the Plan Sponsors, shall designate a proposed Cure, and the assumption of such Executory Contract or Unexpired Lease shall be conditioned upon the disposition of all issues with respect to Cure. Except as otherwise set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases in the Plan Supplement, the Cure amount with respect to each of the Executory Contracts or Unexpired Leases assumed hereunder is designated by the Plan Debtors as $0, subject to the determination of a different Cure amount under the procedures set forth in the Plan and in the Cure Notices.  Except with respect to Executory Contracts and Unexpired Leases for which the Cure is $0, the Cure shall be satisfied by the Plan Debtors or their assignee, if any, by payment of the Cure in Cash on the later of (i) 30 days following the occurrence of the Effective Date or as soon as reasonably practicable thereafter; or (ii) for any Cure amounts subject to dispute, 30 days after the underlying Cure dispute is resolved, or on such other terms as may be ordered by the Bankruptcy Court or agreed upon by the parties to the applicable Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court.  All payments on account of the Cure shall be paid by Newco or the Emerging Debtors in connection with the Assumed Contracts.

Any provisions or terms of the Executory Contracts or Unexpired Leases to be assumed under the Plan that are, or may be, alleged to be in default, shall be satisfied solely by Cure, or by an agreed-upon waiver of Cure.  If there is a dispute regarding such Cure, the ability of the Plan Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of Bankruptcy Code section 365, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Plan Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.  The Debtors or the Plan Debtors, as applicable, reserve

the right either to reject or nullify the assumption of any Executory Contract or Unexpired Lease after a Final Order determining the Cure or any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease is made.

Assumption of any Executory Contract or Unexpired Lease under the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

(e) **Cure Notices.** No later than 3 days after the Plan Debtors file the Schedule of Assumed Executory Contracts and Unexpired Leases (or any amendments thereof), the Debtors shall serve upon counterparties to such Executory Contracts and Unexpired Leases (but shall not file) a Cure Notice that will (i) notify the counterparty of the proposed assumption, (ii) list the applicable Cure, if any, set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, (iii) describe the procedures for filing objections to the proposed assumption or assumption and assignment of the applicable Executory Contract or Unexpired Lease, (iv) describe the procedures for filing objections to the proposed Cure of the applicable Executory Contract or Unexpired Lease, and (v) explain the process by which related disputes will be resolved by the Bankruptcy Court. If no objection is timely received, (x) the non-Debtor party to the Executory Contract or Unexpired Lease to be assumed shall be deemed to have consented to the assumption of the applicable Executory Contract or Unexpired Lease and shall be forever barred from asserting any objection with regard to such assumption, and (y) the proposed Cure shall be controlling, notwithstanding anything to the contrary in any applicable Executory Contract or Unexpired Lease or other document as of the date of the filing of the Plan, and the non-Debtor party to an applicable Executory Contract or Unexpired Lease shall be deemed to have consented to the Cure amount and shall be forever barred from asserting, collecting, or seeking to collect any additional amounts relating thereto against the Debtors or the Plan Debtors, or the property of any of them.

(f) **Cure Objections.** The Cure Notice shall set forth, among other things, the time period in which parties must file an objection to any Cure Notice. If a proper and timely objection to the Cure Notice or proposed Cure was filed by the Cure Objection Deadline, the Cure shall be equal to (i) the amount agreed to between the Debtors or Plan Debtors, as applicable, and the applicable counterparty, or, (ii) to the extent the Debtors or Plan Debtors and counterparty do not reach an agreement regarding any Cure or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount of such Cure and any related issues. Objections, if any, to the proposed assumption and/or Cure must be in writing, filed with the Bankruptcy Court, and served in hard-copy form on the parties identified in the Cure Notice so that they are actually received by the Cure Objection Deadline.

(g) **Hearing with Respect to Objections.** If an objection to the proposed assumption and/or to the Cure is timely filed and received in accordance with the procedures set forth in Section 8.2(f) of the Plan, and the parties do not reach a consensual resolution of such objection, a hearing with respect to such objection shall be held at such time scheduled by the Bankruptcy Court or the Debtors or Plan Debtors. Objections to the proposed

Cure or assumption of an Executory Contract or Unexpired Lease will not be treated as objections to Confirmation of the Plan.

(h)   **Reservation of Rights.**   Notwithstanding anything to the contrary in the Plan, prior to the Effective Date, the Debtors, with the consent of the Plan Sponsors as to contracts being assumed by the Emerging Debtors, may amend their decision with respect to the assumption of any Executory Contract or Unexpired Lease and provide a new notice amending the information provided in the applicable notice.   In the case of an Executory Contract or Unexpired Lease designated for assumption that is the subject of a Cure Objection which has not been resolved prior to the Effective Date, the Debtors or the Plan Debtors, as applicable, may designate such Executory Contract or Unexpired Lease for rejection at any time prior to the payment of the Cure.

3.   General Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease on the Schedule of Assumed Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors of the Plan Sponsors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Plan Debtors, or any of their Affiliates, has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Plan Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

J.   Procedures for Resolving Disputed Claims and Interests

1.   Determination of Claims and Interests

After the Effective Date, the Plan Administrator shall have and retain any and all rights, claims, causes of action, and defenses the Debtors had with respect to any Claim or Interest immediately prior to the Effective Date, including the Causes of Action retained pursuant to Section 7.15 of the Plan, except with respect to any Causes of Action expressly released under the Plan.

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Allowed Interest unless and until such Claim or Interest is deemed Allowed by the Plan Administrator in its sole discretion (including by written agreement with the affected Claim Holder or Interest Holder) or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Interest.   All settled Claims approved prior to the Effective Date under a Final Order of the Bankruptcy Court, under Bankruptcy Rule 9019 or otherwise shall be binding on all parties.   For the avoidance of doubt, any Claim determined and liquidated under (a) an order of the Bankruptcy Court, (b) applicable non-bankruptcy law (which determination has not been stayed, reversed, or amended and as to which determination or any revision, modification, or amendment thereof as to which the time to appeal or seek review or rehearing has expired and no appeal or petition for review or rehearing was filed or, if filed, remains pending), or (c) an agreement with the Debtors or the Plan

Administrator as set forth in the Plan shall be deemed an Allowed Claim in such liquidated amount and satisfied in accordance with the Plan.

Nothing contained in Section 9.1 of the Plan shall constitute or be deemed a waiver of any claim, right, or Cause of Action that the Debtors or the Plan Administrator may have against any Entity in connection with or arising out of any Claim, including any rights under section 157(b) of title 28 of the United States Code.

2.     Claims Administration Responsibility

Except as otherwise specifically provided for in the Plan, after the Effective Date, the Plan Administrator shall retain responsibility for and have authority to (a) administer, dispute, object to, compromise, or otherwise resolve all Claims against, and Interests in, the Plan Debtors, including (i) filing, withdrawing, or litigating to judgment objections to Claims or Interests, (ii) settling or compromising any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, and (iii) administering and adjusting the claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court, and (b) making distributions with respect to all Claims. After the Effective Date, the Plan Administrator shall be entitled to settle any Claim by written agreement with the claimholder, without any further notice to or action, order, or approval by the Bankruptcy Court, and the Distribution Agent shall be entitled to rely on the Plan Administrators' representation and adjust the claims register accordingly.

3.     Objections to Claims

Unless otherwise extended by the Bankruptcy Court, any objections to Claims (other than Administrative Claims) shall be served and filed on or before the Claims Objection Deadline (or such later date as may be established by the Bankruptcy Court upon request of the Plan Administrator without further notice to parties-in-interest). Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the Debtors or the Plan Administrator effect service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, (b) to the extent counsel for a Holder of a Claim or Interest is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or other representative identified on the Proof of Claim or any attachment thereto (or at the last known addresses of such Holders of Claims if no Proof of Claim is filed or if the Debtors have been notified in writing of a change of address), or (c) by first class mail, postage prepaid, on any counsel that has appeared on behalf of the Holder of the Claim in the Chapter 11 Cases and has not withdrawn such appearance.

With regard to Maritime Lien Claims, at the option of the Holder of such Claim, or the Constellation Lenders, or any other party in interest, to the extent permitted by applicable law, the jurisdiction of the Bankruptcy Court may be invoked to adjudicate the Maritime Lien Claims.

4.     Expungement or Adjustment of Claims Without Objection

Any Claim that has been fully or partially paid, satisfied, or superseded may be expunged or adjusted on the claims register by the Plan Administrator, or the Claims, Noticing, and

Solicitation Agent acting at the direction of the Plan Administrator.  Any claim that has been amended (by agreement between the Plan Administrator and the affected Creditor, or otherwise) may be adjusted on the claims register by the Plan Administrator, or the Claims, Noticing, and Solicitation Agent acting at the direction of the Plan Administrator.  The Plan Administrator is authorized to take the foregoing actions without requiring that a claims objection be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

5. <u>Disallowance of Claims</u>

EXCEPT AS OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE DEADLINE FOR FILING SUCH PROOFS OF CLAIM SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO, OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.

Nothing in the Plan shall in any way alter, impair, or abridge the legal effect of the Bar Date Order, or the rights of the Debtors, the Plan Debtors, the Creditors' Committee before the Effective Date, or other parties in interest to object to Claims on the grounds that they are time barred or otherwise subject to disallowance or modification.  Nothing in the Plan shall preclude amendments to timely filed Proofs of Claim to the extent permitted by applicable law; <u>provided</u>, <u>however</u>, that any such amendments that are filed after the Effective Date shall require permission from the Bankruptcy Court, unless such requirement is expressly waived by the Plan Administrator.

6. <u>Estimation of Claims</u>

Before or after the Effective Date, the Debtors or the Plan Administrator, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate a Claim pursuant to Bankruptcy Code section 502(c) for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Disputed Claim, including during the litigation of any objection to any Disputed Claim or during the pendency of any appeal relating to such objection.  In the event that the Bankruptcy Court estimates any Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), without prejudice to the Holder of such Claim's right to request that estimation should be for the purpose of determining the Allowed amount of such Claim, and the Plan Administrator may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.  All estimation procedures set forth in the Plan shall be applied in accordance with Bankruptcy Code section 502(c). Disputed Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Plan or the Bankruptcy Court.

58

7.      No Interest on Disputed Claims

Unless otherwise specifically provided for in the Plan or as otherwise required by Bankruptcy Code section 506(b), post-petition interest shall not accrue or be paid on Claims or Interests, and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any Claim or Interest.  Additionally, and without limiting the foregoing, unless otherwise specifically provided for in the Plan or as otherwise required by Bankruptcy Code section 506(b), interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made, when and if such Disputed Claim becomes an Allowed Claim.

8.      Amendments to Claims

On or after the Effective Date, except as otherwise provided in the Plan, a Claim may not be amended without the authorization of the Bankruptcy Court or the Plan Debtors, and, to the extent such authorization is not received, any such new or amended Claim shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.  On or after the Effective Date, except as otherwise provided in the Plan, a Claim may not be filed or amended without the authorization of the Bankruptcy Court or the Plan Debtors, and, to the extent such authorization is not received, any such new or amended Claim filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

K.      Provisions Governing Distributions

1.      Time of Distributions

Except as otherwise provided for in the Plan or ordered by the Bankruptcy Court, all distributions under the Plan on account of Claims that are Allowed Claims as of the Effective Date shall be made on or as soon as reasonably practicable after the Initial Distribution Date or, to the extent applicable, and distributions on account of Claims that become Allowed Claims after the Effective Date shall be made on the next Periodic Distribution Date in accordance with the Plan.

2.      Currency

Except as otherwise provided in the Plan or Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than US dollars shall be automatically deemed converted to the equivalent US dollar value using the exchange rate as of the Effective Date at 4:00 p.m. prevailing Central time, mid-range spot rate of exchange for the applicable currency as published in the next The Wall Street Journal, National Edition following the Effective Date.

3.      Distribution Agent

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Distribution Agent, or by such other Entity designated by the Plan Administrator as the Distribution Agent on the Effective Date.  The Distribution Agent shall not be required to give any bond or surety or other security for the performance of the Plan Administrator's duties as

Distribution Agent unless otherwise ordered by the Bankruptcy Court.  The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan.  If the Distribution Agent is an entity other than the Plan Administrator, such entity shall be paid its reasonable fees and expenses, including the reasonable fees and expenses of its attorneys or other professionals.

4.      Distributions on Account of Claims Allowed After the Effective Date

(a)     **No Distributions Pending Allowance.**  No payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order of the Bankruptcy Court, and the Disputed Claim has become an Allowed Claim.

(b)     **Distribution Claim Reserve.**  The Debtors, Plan Administrator, or Disbursing Agent (as the case may be) shall withhold a Disputed Claim reserve from the property to be distributed to particular classes under the Plan based upon the Face Amount of Disputed Claims as directed by the Plan Administrator.  The Debtors, Plan Administrator, or Disbursing Agent (as the case may be) shall withhold such amounts or property as may be necessary from property to be distributed to such Classes of Claims under the Plan on a Pro Rata basis based upon the Face Amount of such Claims.  Debtors, Plan Administrator, or Disbursing Agent (as the case may be) may request estimation for any Disputed Claim that is contingent or unliquidated, and the Disbursing Agent will withhold the applicable Disputed Claim Reserve based upon the estimated amount of each such Claim as estimated by the Bankruptcy Court.  If Debtors, Plan Administrator, or Disbursing Agent (as the case may be) elects not to request such an estimation from the Bankruptcy Court with respect to a Disputed Claim that is contingent or unliquidated, the Disbursing Agent shall withhold the applicable Disputed Claim Reserve based upon the good faith estimate of the Debtors or their designated Disbursing Agent of such Claim.  The Debtors, Plan Administrator, or Disbursing Agent (as the case may be) shall also place in the applicable Distribution Reserve any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the property withheld as the applicable Distribution Reserve, to the extent that such property continues to be withheld as the applicable Distribution Reserve at the time such distributions are made or such obligations arise.  Nothing in the Plan or the Disclosure Statement shall be deemed to entitle the Holder of a Disputed Claim to postpetition interest on such Claim.

(c)     **Distributions after Allowance.**  Payments and distributions from the Distribution Reserve to each respective Holder of a Claim on account of a Disputed Claim, to the extent that it ultimately becomes an Allowed Claim, shall be made on the first Periodic Distribution Date following the date when a Disputed Claim becomes an Allowed Claim.  Such distributions shall be based upon the cumulative distributions that would have been made to the holder of such Claim under the Plan if the Disputed Claim had been Allowed on the Effective Date and shall not be limited by the Disputed Claim Amounts previously reserved with respect to

such Disputed Claim to the extent that additional amounts are available therefor, but only to the extent that such additional amounts have not yet been distributed to holders of Allowed Claims; provided, however, that no interest shall be paid on account to such Allowed Claims unless required under applicable bankruptcy law.  Upon such distribution, the Distribution Reserve shall be reduced by an amount equal to the amount reserved with respect to such Disputed Claim.

        5.     Delivery of Distributions

        (a)    **Record Date for Distributions.**  On the Distribution Record Date, the claims register shall be closed and the Distribution Agent shall be authorized and entitled to recognize only those record Holders listed on the claims register as of the close of business on the Distribution Record Date.

        (b)    **Cash Distributions.**  Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Plan Administrator, except that Cash payments made to foreign Creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

        (c)    **Address for Distributions.**  Distributions to Holders of Allowed Claims shall be made by the Distribution Agent (i) at the addresses set forth on the Proofs of Claim filed by such Holders of Claims (or at the last known addresses of such Holders of Claims if no Proof of Claim is filed or if the Debtors or the Distribution Agent have been notified in writing of a change of address), (ii) at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related Proof of Claim, or (iii) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address.  The Debtors, the Plan Debtors, and the Distribution Agent shall not incur any liability whatsoever on account of any distributions under the Plan.

        (d)    **Undeliverable Distributions.**  If any distribution to a Holder of a Claim is returned as undeliverable, no further distributions to such Holder of such Claim shall be made unless and until the Distribution Agent is notified of the then-current address of such Holder of the Claim, at which time all missed distributions shall be made to such Holder of the Claim without interest, dividends, or accruals of any kind on the next Periodic Distribution Date.  Amounts in respect of undeliverable distributions shall be returned to the Plan Administrator until such distributions are claimed.

        (e)    **Reversion.**  Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after such distribution shall be deemed unclaimed property under Bankruptcy Code section 347(b) and such Unclaimed Distribution shall constitute a Remaining Asset free of any restrictions thereon.  Thereafter, the Claim of any Holder or successor to such Holder with respect to such property shall be cancelled, discharged, and forever barred, notwithstanding federal or state escheat, abandoned, or unclaimed property laws to the contrary.  The provisions of the Plan regarding undeliverable distributions and Unclaimed Distributions shall apply with equal force to distributions that are issued by the Plan Administrator or the Distribution Agent made under any note, indenture, or certificate (but only with respect to the initial distribution to Holders that are entitled to be recognized under the

relevant note, indenture, or certificate and not with respect to Entities to whom those recognized Holders distribute), notwithstanding any provision in such note, indenture, or certificate to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned, or unclaimed property law.

(f)     **De Minimis Distributions.**  Notwithstanding any other provision of the Plan to the contrary, the Plan Administrator and the Distribution Agent shall not be required to make a distribution on account of an Allowed Claim if (i) the aggregate amount of all distributions authorized to be made on the Periodic Distribution Date in question is or has a value less than $100,000; provided that the Plan Administrator shall make, or cause to be made, a distribution on a Periodic Distribution Date of less than $100,000 if the Plan Administrator expect that such Periodic Distribution Date shall be the final Periodic Distribution Date; or (ii) the amount to be distributed to the specific Holder of the Allowed Claim on the particular Periodic Distribution Date does not both (x) constitute a final distribution to such Holder and (y) have a value of at least $25.00.

(g)     **Fractional Distributions.**  Notwithstanding any other provision of the Plan to the contrary, the Plan Administrator and the Distribution Agent shall not be required to make distributions or payments of fractions of dollars.  Whenever any payment of Cash of a fraction of a dollar under the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

6.     Compliance Matters

In connection with the Plan, to the extent applicable, the Plan Administrator and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions under this Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Plan Administrator and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Plan Administrator reserves the right to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

7.     Claims Paid or Payable by Third Parties

The Claims, Noticing, and Solicitation Agent shall reduce in full a Claim to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtors or the Plan Administrator without any further notice to or action, order, or approval of the Bankruptcy Court.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Debtors or the Plan Administrator on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution under the Plan to the Plan Administrator to the extent the

Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

### 8.  Setoffs and Recoupment

Except as otherwise expressly provided for in the Plan, the Plan Administrator under the Bankruptcy Code (including Bankruptcy Code section 553), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against or recoup from any Allowed Claim and the distributions to be made under the Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature that the Debtors may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Plan Administrator of any such Claims, rights, and Causes of Action that the Plan Administrator may possess against such Holder.

### 9.  Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

## L.  Effect of the Plan on Claims and Interests

### 1.  Vesting of Assets

Except as otherwise explicitly provided in the Plan, on the Effective Date, all property comprising the Estates (including Causes of Action, but excluding the Remaining Administered Assets and property that has been abandoned under an order of the Bankruptcy Court) shall vest in the Plan Debtors free and clear of all Claims, Liens, charges, encumbrances, rights, and Interests.  As of and following the Effective Date, the Plan Debtors may operate their business and use, acquire, and dispose of property and settle and compromise Claims, Interests, or Causes of Action without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

### 2.  Discharge of Certain of the Plan Debtors

The Plan specifically provides for a charter option of the Constellation Vessel, which will permit the Constellation Debtor to engage in business after consummation of the Plan.  When the Falcon Vessel is sold, it is unclear whether the Falcon Debtor will continue to engage in business; however, to the extent it does, a discharge is appropriate.  The Marine Base Opco and Thailand Debtor are not seeking a discharge under Bankruptcy Code section 1141. The remaining Plan Debtors, i.e., the Emerging Debtors are continuing to engage in business after consummation of the Plan.

Specifically, the Plan provides that:

**Pursuant to Bankruptcy Code section 1141(d), except as otherwise specifically provided in the Plan or the Confirmation Order, and effective as of the Effective Date: (a) the distributions and rights that are provided in the Plan, if any, and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Causes of Action (whether known or unknown, including any interest accrued on such Claims from and after the Petition Date) against, liabilities of, Liens on, obligations of, rights against, and Interests in the Plan Debtors (other than Marine Base Opco Debtor) or any of their assets or properties, regardless of whether any property shall have been distributed or retained under the Plan on account of such Claims, rights, and Interests, including, but not limited to, Claims and Interests that arose before the Effective Date and all debts of the kind specified in Bankruptcy Code sections 502(g), 502(h), or 502(i), in each case whether or not (i) a Proof of Claim or Interest based upon such Claim, debt, right, or Interest is filed or deemed filed under Bankruptcy Code section 501, (ii) a Claim or Interest based upon such Claim, debt, right, or Interest is allowed under Bankruptcy Code section 502, or (iii) the Holder of such a Claim, right, or Interest accepted the Plan; (b) the Plan shall bind all Holders of Claims and Interests notwithstanding whether any such Holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the Plan Debtors' (other than Marine Base Opco's) liability with respect thereto shall be extinguished completely, including any liability of the kind specified under Bankruptcy Code section 502(g); and (d) all Entities shall be precluded from asserting against the Plan Debtors (other than Marine Base Opco Debtor), the Estates, their successors and assigns, and their assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims against and Interests in the Plan Debtors (other than the Marine Base Opco Debtor), subject to the occurrence of the Effective Date.**

### 3.    The Emerging Debtors

Without limiting the generality of Section 11.1 and Section 11.2 of the Plan, on the Effective Date and as otherwise set forth in the Plan, the Purchased Assets shall vest in Newco, its designee, or the Emerging Debtors (as the case may be) free and clear of all Claims and Interests arising on or before the Effective Date and the Emerging Debtors shall have no responsibility of any kind or nature whatsoever for any liabilities of, Liens on, obligations of, rights against, and Interests in the Debtors that arose on the before the Effective Date. Further, except for the payment of the Purchase Price, neither Newco nor any Emerging Debtor shall have any responsibility whatsoever for the administration of the Plan on and after the Effective Date and all cost related to such administration shall be paid from the Additional Cash and any other Remaining Administered Assets.

4.    Compromises and Settlements

The Plan is intended to incorporate the agreements reached in the Plan Support Agreement.  Under Bankruptcy Rule 9019(a), the Debtors may compromise and settle various (a) Claims or Interests and (b) Causes of Action that the Debtors have against other Entities up to the Effective Date.  After the Effective Date, any such right shall pass to the Plan Debtors as contemplated in Section 11.1 of the Plan, without the need for further approval of the Bankruptcy Court.  Under Bankruptcy Code section 363 and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan or any distribution to be made on account of an Allowed Claim, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that any such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests, and is fair, equitable, and reasonable

5.    Release by Plan Debtors

**Pursuant to Bankruptcy Code section 1123(b), as of the Effective Date, the Plan Debtors and their Estates, and each of their respective current and former Affiliates shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted or capable of being asserted on behalf of the Plan Debtors and their Estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Plan Debtors, the operation of the Plan Debtors prior to, on, or after the Petition Date, the Plan Debtors' restructuring, the Chapter 11 Cases, the DIP Facility, the purchase, sale, or rescission of the purchase or sale of any security of the Plan Debtors, provided under any applicable law, rule, or regulation, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the DIP Credit Agreement, the Plan, the Disclosure Statement, the Plan Support Agreement, the Plan Supplement, any other Plan Transaction Document, or related agreements, instruments, exhibits, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct or gross negligence as determined by a Final Order. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

For the avoidance of doubt, nothing in Section 11.5 of the Plan shall in any way affect the operation of Section 11.2 of the Plan, under Bankruptcy Code section 1141(d).

6.    Release by Holders of Claims and Interests

As of the Effective Date, the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged the Plan Debtors, their Estates, non-Debtor Affiliates, and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted or capable of being asserted, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the operation of the Debtors prior to, on, or after the Petition Date, the Debtors' restructuring, the Chapter 11 Cases, the DIP Facility, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Plan Debtors provided under any applicable law, rule, or regulation, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the DIP Credit Agreement, the Plan, the Disclosure Statement, the Plan Support Agreement, the Plan Supplement, any other Plan Transaction Document, or related agreements, instruments, exhibits, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence as determined by a Final Order. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

For the avoidance of doubt, except as expressly provided in the Plan, nothing in Section 11.6 of the Plan shall in any way affect the operation of Section 11.2 of the Plan, under Bankruptcy Code section 1141(d). Furthermore, the Constellation Lenders, DNB, and DBS shall not grant, or be deemed to have granted, any release, waiver or discharge of Claims against the Constellation Debtor under Section 11.6 of the Plan unless and until the Effective Date as to the Plan for the Constellation Debtor has occurred.

7.    Exculpation and Limitation of Liability

The Exculpated Parties shall neither have, nor incur any liability to any Entity for any Exculpated Claim; provided, however, that the foregoing "exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; provided, further, that no Exculpated Party shall be exculpated under Section 11.7 for any Exculpated Claim against the Constellation Debtor related to the Plan for the Constellation

Debtor or any sale of the Constellation Vessel unless and until the Effective Date as to the Plan for the Constellation Debtor has occurred..

The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and, therefore, are not and shall not be liable at any time for the violations of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made under the Plan.

8.     Indemnification Obligations

From and after the Effective Date, any obligations or rights of any Plan Debtor to indemnify, defend, or advance expenses to its present and former directors, officers, employees, agents, representatives, or other Indemnitees under any Debtor's certificate of incorporation, certificate of formation, bylaws, operating agreement, other corporate governance documents, employee indemnification policy, or under state law, or any agreement with respect to any claim, demand, suit, cause of action, or proceeding related to such person's service with, for, or on behalf of any of the Debtors prior to the Effective Date shall be nullified and rejected as of the Effective Date, and the Plan Debtors' shall not be required to indemnify, defend, or advance expenses to any such party or Indemnitee for any such obligations (including Indemnification Obligations) based on claims, transactions, events, or occurrences occurring prior to the Effective Date.  The treatment of Indemnification Obligations in Section 11.8 of the Plan and under the Plan shall be in complete satisfaction, discharge, and release of any such indemnity claims or Indemnification Obligations, subject to the effectiveness of Sections 11.5, 11.6, and 11.7, as such Sections appear without any amendment or modification in the original filing of the Plan.

9.     Injunction

The satisfaction, release, and discharge under Article XI of the Plan shall act as an injunction, from and after the Effective Date, against any Entity (a) commencing or continuing in any manner or in any place, any action, employment of process, or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (c) creating, perfecting, or enforcing any Lien or encumbrance, in each case with respect to any Claim, Interest, or Cause of Action satisfied, released or to be released, exculpated or to be exculpated, or discharged under the Plan or pursuant to the Confirmation Order and to the fullest extent authorized or provided by the Bankruptcy Code, including to the extent provided for or authorized by sections 524 and 1141 thereof; provided, however, that nothing contained in the Plan shall preclude such Entities from exercising their rights pursuant to and consistent with the terms of the Plan or the Confirmation Order.

10.     Subordination Rights

(a)     All Claims and all rights and claims between or among Holders of Claims relating in any manner whatsoever to distributions on account of Claims or Interests, based upon any claimed subordination rights, whether asserted or unasserted, legal or equitable,

shall be deemed satisfied by the distributions under the Plan to Holders of Claims having such subordination rights, and such subordination rights shall be deemed waived, released, discharged, and terminated as of the Effective Date. Except as otherwise specifically provided for in the Plan, distributions to the various Classes of Claims hereunder shall not be subject to levy, garnishment, attachment, or like legal process by any Holder of a Claim by reason of any subordination rights or otherwise, so that each Holder of a Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.

(b)    Except as otherwise provided in the Plan, including Section 11.4 and Section 11.6, the right of the Debtors or the Plan Debtors to seek subordination of any Claim or Interest under Bankruptcy Code section 510 is fully reserved, and the treatment afforded any Claim or Interest that becomes a subordinated Claim or Interest at any time shall be modified to reflect such subordination. Unless this Plan or the Confirmation Order otherwise provide, no distributions shall be made on account of a Claim subordinated under Section 11.10(b) o the Plan unless ordered by the Bankruptcy Court.

11.    <u>Protection Against Discriminatory Treatment</u>

Consistent with Bankruptcy Code section 525 and paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against the Plan Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Plan Debtors, or another entity with whom the Plan Debtors have been associated, solely because the Debtors have been debtors under chapter 11, have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or have not paid a debt that is dischargeable in the Chapter 11 Cases.

12.    <u>Release of Liens</u>

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document created under the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates (including any purported statutory Liens asserted by parties whose Claims are disallowed, expunged, withdrawn, or classified or reclassified as General Unsecured Claims) shall be fully released, expunged, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Plan Debtors and their successors and assigns without further action; <u>provided</u>, <u>however</u>, that the Debtors are authorized to take such action as may be necessary to effectuate the foregoing, including filing Lien releases or withdrawals on behalf of the holders of such Liens through a power of attorney or otherwise. Notwithstanding the above, nothing in the Plan or the Confirmation Order shall release any deed restriction, easement, or institutional control that runs with the land under environmental law.

M.      Conditions Precedent

        1.      Conditions to the Effective Date of the Plan

The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Section 12.2 of the Plan:

        (a)     the Plan and the Plan Transaction Documents shall be in form and substance consistent in all material respects with the Plan Support Agreement and, to the extent a Plan Transaction Document materially affects unsecured creditors, such Plan Transaction Document shall be reasonably acceptable to the Creditors' Committee, to the extent a Plan Transaction Document materially affects the Constellation Debtor, such Plan Transaction Document shall be reasonably acceptable to the Creditors' Committee or Required Constellation Lenders;

        (b)     each condition precedent in each Plan Transaction Document shall have been satisfied or waived by the Plan Sponsors;

        (c)     all Professional Fee Claims constituting a success fee resulting from Confirmation of a Plan for the Constellation Debtor or the sale of the Constellation Vessel shall not exceed amounts paid by the Constellation Lenders;

        (d)     the Bankruptcy Court shall have entered the Disclosure Statement Order in form and substance acceptable to the Plan Sponsors and the Creditors' Committee, and such order shall be a Final Order;

        (e)     the Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably satisfactory to the Debtors the Plan Support Parties (including the Plan Sponsors), the Creditors' Committee, and such order shall be a Final Order unless the Plan Sponsors, in their sole discretion, waive the requirement that the Confirmation Order be a Final Order;

        (f)     the New Corporate Governance Documents shall have been adopted and (where required by applicable law) filed with the applicable authorities of the relevant jurisdictions of organization and shall have become effective in accordance with such jurisdiction's corporation, limited liability company, or alternative comparable laws, as applicable;

        (g)     all authorizations, consents, certifications, approvals, rulings, no action letters, opinions, or other documents or actions required by any law, regulation, or order to be received or to occur in order to implement the Plan on the Effective Date shall have been obtained or shall have occurred unless failure to do so will not have a material adverse effect on the Plan Debtors;

        (h)     all other documents and agreements necessary to implement the Plan on the Effective Date shall have been executed and delivered and all other actions required to be taken in connection with the Effective Date shall have occurred;

(i)   July 27, 2017 shall not have occurred;

(j)   the total amount of Allowed Administrative Expense Claims and Allowed Other Priority Claims against the Emerging Debtors to be assumed by Newco shall be satisfactory to Subsea 7 in its sole and absolute discretion;

(k)   there shall be sufficient Cash (other than the Net GUC Cash) to satisfy all Allowed Professional Claims;

(l)   all third party consents to the acquisition of the Emerging Debtors and the assumption of the Assumed Contracts are obtained in a manner satisfactory to Subsea 7 in its sole and absolute discretion and have not been rescinded, and Subsea 7 does not in good faith determine that any party to an Assumed Contract: (i) intends to terminate such contract, whether for breach, for convenience, or otherwise in accordance with its terms; or (ii) in the case of an Assumed Contract that is a frame agreement with a client, intends to decline to permit Newco or Subsea 7 to bid for or to be awarded work thereunder; and

(m)   unless otherwise agreed to in writing by the Plan Sponsors, since the Petition Date, there has been no development, event or condition, including any political, environmental, commercial, financial, war or terrorism related event, which has had or could reasonably be expected to have a material adverse effect on the Emerging Debtors' near- and/or medium term trading prospects or market conditions or operating environment on which the Emerging Debtors depend or will depend for their business to be sustainable in the near- and/or medium term following emergence; and

(n)   all statutory fees and obligations then due and payable to the Office of the United States Trustee shall have been paid and satisfied in full.

2.      Waiver of Conditions Precedent

Except as set forth in Section 12.1 of the Plan, the conditions set forth in Section 12.1 of the Plan may be waived, in whole or in part, by the Plan Sponsors, the Debtors, and, to the extent that such waiver materially affects the Constellation Debtor, the Required Constellation Lenders, without any notice to any other parties in interest or the Bankruptcy Court and without a hearing; provided, however, that the condition set forth in Section 12.1(a), (d), (e), and (k) and any conditions which impact the amount of Net GUC Cash may only be waived with the consent of the Creditors' Committee.

3.      Notice of Effective Date

The Debtors or the Emerging Debtors as applicable shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date within a reasonable period of time after the conditions in Section 12.1 of the Plan have been satisfied or waived under Section 12.2 of the Plan.

4.      Effect of Non-Occurrence of Conditions to Consummation

If prior to consummation of the Plan, the Confirmation Order is vacated under a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action, (b) prejudice in any manner the rights of the Debtors or any other Entity, or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors or any other Entity.

N.      Retention of Jurisdiction

Under Bankruptcy Code sections 105(a) and 1142, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

(a)      resolve any matters related to Executory Contracts and Unexpired Leases, including: (i) the assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases to which the Debtors are a party or with respect to which the Debtors may be liable, and to hear and determine the allowance of Claims resulting therefrom including the amount of Cure, if any, required to be paid; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iii) the Plan Debtors' amendment, modification, or supplement after the Effective Date, pursuant to Article VIII of the Plan, of the lists of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (iv) any dispute regarding whether a contract or lease is or was executory or expired;

(b)      adjudicate any and all adversary proceedings, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases, the Plan, or that were the subject of proceedings before the Bankruptcy Court, prior to the Effective Date, proceedings to adjudicate the allowance of Disputed Claims and Disputed Interests, and all controversies and issues arising from or relating to any of the foregoing;

(c)      ensure that distributions to Holders of Allowed Claims are accomplished as provided in the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

(d)      allow in whole or in part, disallow in whole or in part, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including hearing and determining any and all objections to the allowance or estimation of Claims or Interests filed and adjudicating any disputes between Creditors regarding priority or rights to payment or turnover of consideration distributed pursuant to the Plan, both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest, and the resolution of request for payment of any Administrative Claim;

(e)      hear and determine or resolve any and all matters related to Causes of Action;

71

(f)   enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified, and/or vacated;

(g)   issue and implement orders in aid of execution, implementation, or consummation of the Plan;

(h)   consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(i)   hear and determine all applications for allowance of compensation and reimbursement of Professional Claims under the Plan or under Bankruptcy Code sections 328, 330, 331, 503(b), 1103, and 1129(a)(4);

(j)   determine requests for the payment of Claims entitled to priority under Bankruptcy Code section 507(a)(1), including compensation and reimbursement of expenses of parties entitled thereto;

(k)   adjudicate, decide, or resolve any and all matters related to Bankruptcy Code section 1141;

(l)   hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan and disputes arising in connection with any Entity's obligations incurred in connection with the Plan;

(m)   hear and determine all suits or adversary proceedings to recover assets of the Debtors and property of their Estates, wherever located;

(n)   hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code sections 346, 505, and 1146;

(o)   resolve any matters relating to the pre- and post-confirmation sales of the Debtors' assets;

(p)   grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to Bankruptcy Code section 365(d)(4);

(q)   hear any other matter not inconsistent with the Bankruptcy Code;

(r)   hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge;

(s)   enter a final decree closing any and all of the Chapter 11 Cases;

(t)   enforce all orders previously entered by the Bankruptcy Court; and

(u)     hear and determine all matters relating to any Subordinated Claim.

From the Confirmation Date through the Effective Date, the Bankruptcy Court shall retain jurisdiction with respect to each of the foregoing items and all other matters that were subject to its jurisdiction prior to the Confirmation Date.  Nothing contained in the Plan shall be construed to increase, decrease, or otherwise modify the independence, sovereignty, or jurisdiction of the Bankruptcy Court.

O.     Miscellaneous Provisions

1.     Binding Effect

Upon the Effective Date, the Plan shall be binding upon and inure to the benefit of the Debtors, the Plan Debtors, all current and former Holders of Claims, all current and former Holders of Interests, and all other parties-in-interest and their respective heirs, successors, and assigns.

2.     Payment of Statutory Fees

All fees payable under section 1930 of title 28 of the United States Code, as of the entry of the Confirmation Order as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.  The Plan Administrator shall continue to pay fees under section 1930 of title 28 of the United States Code from the Wind-Down Account until the Chapter 11 Cases are closed by entry of final decrees.  Furthermore, following entry of the Confirmation Order, the Plan Administrator shall continue to file quarterly reports in compliance with Bankruptcy Rule 2015(a)(5), which such reports shall not purport to be prepared in accordance with GAAP and may not be construed as reports filed under the Exchange Act.

3.     Adequate Protection Obligations

Without any further notice to, or action, order, or approval of, the Bankruptcy Court, the Debtors shall pay in full on the Effective Date of the Emerging Debtors' Plans: (i) the payment of professional fees and expenses of DNB, and (ii) postpetition interest due and payable under the Constellation Credit Agreement and related credit documents.  In addition, the Emerging Debtors shall pay the daily charter rate under the Short Term Bareboat Charter, if any, during any period after the Effective Date of any Emerging Debtors' Plans and before the Effective Date of the Constellation Debtor's Plan.  All such payments shall be applied on a final basis.

4.     Modification and Amendments

Subject to the terms and conditions of the Plan Support Agreement, the Plan Debtors may, with the consent of the Plan Sponsors, the Creditors' Committee to the extent any such alteration, amendment, or modification affects, involves, or is related to Net GUC Cash, and, to the extent that any such alteration, amendment, or modification materially affects the Constellation Debtor, the Required Constellation Lenders, in a manner consistent with the Plan Support Agreement alter, amend, or modify, the Plan under Bankruptcy Code section 1127(a) at any time prior to the Confirmation Date.  After the Confirmation Date and prior to substantial consummation of the Plan as defined in Bankruptcy Code section 1101(2), the Debtors may, with

the consent of the Plan Sponsors and the Creditors' Committee, under Bankruptcy Code section 1127(b), institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan.

5.      Confirmation of the Plan

The Plan Debtors request Confirmation of the Plan under Bankruptcy Code section 1129(b) with respect to any Impaired Class that does not accept the Plan under Bankruptcy Code section 1126. Subject to Section 14.4 of the Plan, the Required Constellation Lenders, the Plan Debtors reserve the right to amend the Plan to any extent, if any, that Confirmation under Bankruptcy Code section 1129(b) requires modification.

6.      Additional Documents

On or before the Effective Date, in each case subject to the terms of the Plan Support Agreement, the Debtors may file with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Plan Debtors, as applicable, and Holders of Claims receiving distributions under the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provision and intent of the Plan.

7.      Dissolution of Creditors' Committee

Effective on the later of (i) the Effective Date and (ii) the date on which the last case of the Non-Reorganizing Debtors is dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or (iii) the date on which a plan of reorganization with respect to the last Non-Reorganizing Debtor becomes effective, the Creditors' Committee shall dissolve automatically, whereupon their members, professionals, and agents shall be released from any further duties, responsibilities, and liabilities in the Chapter 11 Cases and under the Bankruptcy Code, provided that obligations arising under confidentiality agreements, joint interest agreements, and protective orders entered during the Chapter 11 Cases shall remain in full force and effect according to their terms. The Creditors' Committee may make applications for Professional Claims. The Professionals retained by the Creditors' Committee and the respective members of the Creditors' Committee shall not be entitled to compensation and reimbursement of expenses for services rendered after the Effective Date, provided, however, notwithstanding the foregoing, the Professionals retained by the Creditors' Committee shall be entitled to submit invoices for compensation and reimbursement of expenses for time spent with respect to applications for the allowance of compensation and reimbursement of expenses filed after the Effective Date and have such allowed amounts paid consistent with the procedures set forth in the Plan.

8.      Revocation, Withdrawal, or Non-Consummation

(a)      **Right to Revoke or Withdraw.**  The Plan Debtors reserve the right to revoke or withdraw the Plan in a manner consistent with the Plan Support Agreement at any time prior to the Effective Date and file subsequent chapter 11 plans.

(b)      **Effect of Withdrawal, Revocation, or Non-Consummation.**  If the Plan Debtors revoke or withdraw the Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, then the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims or the allocation of the distributions to be made hereunder), the assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed under the Plan shall be null and void in all respects.  In such event, nothing contained herein or in the Plan, and no acts taken in preparation for consummation of the Plan, shall be deemed to constitute a waiver or release of any Claims, Interests, or Causes of Action by or against the Debtors or any other Entity, to prejudice in any manner the rights and defenses of the Debtors, the Holder of a Claim or Interest, or any Entity in any further proceedings involving the Debtors, or to constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

9.      Notices

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Parties below shall be served as follows:

**If to the Debtors:**

> 825 Town & Country Lane
> Suite 1500
> Houston, TX 77024
> Attention:  General Counsel

with a copy (which shall not constitute notice) to:

> Skadden, Arps, Slate, Meagher & Flom LLP
> 155 N. Wacker Drive
> Suite 2700
> Chicago, IL 60606
> Attention:  George N. Panagakis, Esq.
>                  Justin M. Winerman, Esq.

> -and-

> Porter Hedges LLP
> 1000 Main Street, 36th Floor
> Houston, TX 77002

Attention: John F. Higgins, Esq.
              Aaron J. Power, Esq.

**If to the Plan Sponsors:**
Subsea 7 Finance (UK) PLC
40 Brighton Road
Sutton SM2 5BN
United Kingdom
Attn: Nathalie Louys


with a copy (which shall not constitute notice) to:

Freshfields Bruckhaus Deringer LLP
601 Lexington Avenue
31st Floor
New York, NY 10022
Attn: Scott Talmadge, Esq.
       Mark Liscio, Esq.

-and-

Chiyoda Corporation
Minato Mirai Grand Central Tower
4-6-2, Minatomirai, Nishi-ku
Yokohama 220-8765
Japan

with a copy (which shall not constitute notice) to:


White & Case LLP
555 South Flower Street
Suite 2700
Los Angeles, CA 90071
Attn: Roberto Kampfner, Esq.

**If to the Office of the United States Trustee:**

Office of the United States Trustee for the Southern District of Texas
515 Rusk Street, Suite 3516
Houston, Texas 77002
Attention:     Christine March

**If to the Plan Administrator:**

At the address set forth in the Plan Administrator Agreement.

10. <u>Term of Injunctions of Stays</u>

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases under Bankruptcy Code sections 105 or 362 or any order of the Bankruptcy Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

11. <u>Governing Law</u>

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York shall govern the construction and implementation of the Plan, any agreements, documents, and instruments executed in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control). Corporate governance matters shall be governed by the laws of the state or country of formation of the applicable Plan Debtor.

12. <u>Entire Agreement</u>

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

13. <u>Severability</u>

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted; <u>provided</u>, <u>however</u>, that any such revision, amendment, or modification must be consistent with the Plan Support Agreement, and shall not decrease the GUC Cash amount. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the Debtors' consent, and (c) nonseverable and mutually dependent.

14.     No Waiver or Estoppel

Upon the Effective Date, each Holder of a Claim or Interest shall be deemed to have waived any right to assert that its Claim or Interest should be Allowed in a certain amount, in a certain priority, be secured, or not be subordinated by virtue of an agreement made with the Debtors and/or their counsel, the Creditors' Committee and/or its counsel, or any other party, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court.

15.     Conflicts

In the event that the provisions of the Disclosure Statement and the provisions of the Plan conflict, the terms of the Plan shall govern.

## ARTICLE VII.

## STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the Confirmation process. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult with their own advisors.

A.     The Confirmation Hearing

Bankruptcy Code section 1128(a) provides that the Bankruptcy Court, after notice, may conduct the Confirmation Hearing to consider Confirmation of the Plan. Bankruptcy Code section 1128(b) provides that any party in interest may object to Confirmation of the Plan.

B.     Confirmation Standards

The following requirements must be satisfied under Bankruptcy Code section 1129(a) before the Bankruptcy Court may confirm a plan of reorganization. The Plan complies with the statutory requirements for Confirmation of the Plan, which are listed below.

1.     The Plan complies with the applicable provisions of the Bankruptcy Code.

2.     The proponents of the Plan have complied with the applicable provisions of the Bankruptcy Code.

3.     The Plan has been proposed in good faith and not by any means forbidden by law.

4.     Any payment made or to be made by the proponent, by a Debtor, or by a person issuing securities or acquiring property under a Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

5.      The proponents of the Plan have disclosed the identity and affiliations of any individual proposed to serve, after Confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, an Affiliate of the Debtors participating in a joint Plan with a Debtor or a successor to a Debtor under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of Creditors and Holders of Interests and with public policies.

6.      The proponents of the Plan have disclosed the identity of any Insider that will be employed or retained by the Emerging Debtors and the nature of any compensation for such insider.

7.      Any governmental regulatory commission with jurisdiction, after Confirmation, over the rates of the Debtors has approved any rate change provided for in the Plan.

8.      With respect to each Holder within an Impaired Class of Claims or Interests, each such Holder (i) has accepted the Plan or (ii) will receive or retain under the Plan on account of such Claim or Interest property of value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

9.      With respect to each Class of Claims or Interests, such Class (i) has accepted the Plan or (ii) is Unimpaired under the Plan; provided, however, that if the Plan is rejected by an Impaired Class, the Plan may be confirmed if it "does not discriminate unfairly" and is "fair and equitable" as to such Class, is feasible, and is in the "best interests" of Holders of Claims and Interests that are Impaired under the Plan.

10.     Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that:

- with respect to a Claim of a kind specified in Bankruptcy Code sections 507(a)(2) or 507(a)(3), on the Effective Date of the Plan, the Holder of the Claim will receive on account of such Claim Cash equal to the Allowed amount of such Claim, unless otherwise agreed;

- with respect to a Class of Claim of the kind specified in Bankruptcy Code sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7), each Holder of a Claim of such Class will receive (i) if such Class has accepted the Plan, deferred Cash payments of a value, on the Effective Date of the Plan, equal to the Allowed amount of such Claim or (ii) if such Class has not accepted the Plan, Cash on the Effective Date of the Plan equal to the Allowed amount of such Claim; and

- with respect to a Priority Tax Claim of a kind specified in Bankruptcy Code section 507(a)(8), the Holder of such Claim will receive on account of such claim deferred Cash payments, over a period not exceeding five years after the date of the order for relief, of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim.

11. If a Class of Claims is Impaired under the Plan, at least one Class of Claims that is Impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any Insider.

12. Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

13. All fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the hearing on Confirmation of the Plan, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

14. The Plan provides that following the Effective Date of the Plan, subject to the Emerging Debtors' rights, if any, under applicable non-bankruptcy law, unless otherwise ordered by the Bankruptcy Court, the Emerging Debtors shall continue to pay all retiree benefits, as that term is defined in Bankruptcy Code section 1114, at the level established under subsection (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to Confirmation, for the duration of the period the debtor has obligated itself to provide such benefits.

C.    Liquidation Analysis

As described above, Bankruptcy Code section 1129(a)(7) requires that each Holder of an Impaired Claim or Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

Based on the Liquidation Analysis attached hereto as Exhibit B, the Debtors believe that the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code would be no greater than the value of distributions under the Plan.

As a result, the Debtors believe Holders of Claims and Interests in all Impaired Classes will recover at least as much as a result of Confirmation of the Plan as they would recover through a hypothetical chapter 7 liquidation.

D.      Financial Feasibility

Bankruptcy Code section 1129(a)(11) requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization, unless such liquidation or further financial reorganization is provided for in the Plan. As to the Emerging Debtors, the proposed Plan provides for distribution of Additional Cash to creditors in accordance with the priority scheme of the Bankruptcy Code and the terms of the Plan. As to the Liquidating Debtors, the proposed Plan provides for the liquidation of the Liquidating Debtors' remaining assets and a distribution of Cash to creditors in accordance with the priority scheme of the Bankruptcy Code and the terms of the Plan. In either case, the ability of the Debtors to make the distributions under the Plan, thus, does not depend on future earnings of the Debtors. Accordingly, the Debtors believe the Plan is feasible and meets the requirements of Bankruptcy Code section 1129(a)(11).

E.      Acceptance by Impaired Classes

The Bankruptcy Code also requires, as a condition to Confirmation, that each Class of Claims or Interests that is Impaired but still receives distributions under the Plan vote to accept the Plan, unless the Debtors can "cram-down" such Classes, as described below. A Class that is Unimpaired is presumed to have accepted the Plan and, therefore, solicitation of acceptances with respect to such Class is not required. A Class is Impaired unless the Plan leaves unaltered the legal, equitable, and contractual rights to which the Holder of such Claim or Interest is entitled, or the Debtors cure any default and reinstate the original terms of the obligation.

Under Bankruptcy Code sections 1126(c) and 1126(d) and except as otherwise provided in Bankruptcy Code section 1126(e): (i) an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than half in number of the voting Allowed Claims have voted to accept the Plan and (ii) an Impaired Class of Interests has accepted the Plan if the Holders of at least two-thirds in amount of the Allowed Interests of such Class actually voting have voted to accept the plan.

F.      Confirmation Without Acceptance by All Impaired Classes

Bankruptcy Code section 1129(b) allows the Bankruptcy Court to confirm the Plan, even if the Plan has not been accepted by all Impaired Classes, provided that the Plan has been accepted by at least one Impaired Class entitled to vote, without counting the vote of any insider, as defined in Bankruptcy Code section 101(31). Bankruptcy Code section 1129(b) permits the Debtors to confirm the Plan, notwithstanding the failure of any Impaired Class to accept the Plan, in a procedure commonly known as "cramdown," so long as the Plan "does not discriminate unfairly" and is "fair and equitable" as to each Impaired Class that has not accepted the Plan.

1.      No Unfair Discrimination

A plan "does not discriminate unfairly" if (i) the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the non-accepting class and (ii) no class receives payments in excess of that

which it is legally entitled to receive for its claims or interests.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests.  The Debtors believe the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation.

2. <u>Fair and Equitable Treatment</u>

With respect to a dissenting class of claims or interests, the "fair and equitable" standard requires that a plan provide that either the claims or interests in each class received everything to which they are legally entitled or, with respect to unsecured claims, that classes junior in priority to the class receive nothing.

The Bankruptcy Code establishes different "fair and equitable" tests for holders of secured claims, unsecured claims, and interests, which may be summarized as follows:

a. <u>Secured Claims</u>. Either (i) each holder of a claim in an impaired class of secured claims retains its liens securing its secured claim and it receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each holder of a claim in an impaired class of secured claims realizes the indubitable equivalent of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds and the treatment of such liens on proceeds as provided in clause (i) or (ii) of this subparagraph.

b. <u>Unsecured Claims</u>. Either (i) each holder of a claim in an impaired class of unsecured claims receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the chapter 11 plan, subject to the applicability of the judicial doctrine of contributing new value.

c. <u>Interests</u>. Either (i) each holder of an equity interest in an impaired class of interests will receive or retain under the chapter 11 plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock or (b) the value of the stock or (ii) the holders of interests that are junior to the stock will not receive any property under the chapter 11 plan, subject to the applicability of the judicial doctrine of contributing new value.

The Debtors believe that the distributions provided under the Plan satisfy the "fair and equitable" requirements of the Bankruptcy Code.  Certain Classes of Claims and Interests will receive no distribution under the Plan and are therefore conclusively deemed to reject the Plan.  Accordingly, the Debtors will seek to confirm the Plan under Bankruptcy Code 1129(b) with respect to such Classes.  In addition, although the Plan is predicated on the substantial support of certain of the Debtors' creditor constituencies, the Debtors reserve the right to seek confirmation of the Plan under Bankruptcy Code section 1129(b) if one or more voting Impaired Classes votes to reject the Plan.

# ARTICLE VIII.

## PLAN-RELATED RISK FACTORS

This section of the Disclosure Statement explains that there are certain risk factors that each voting Holder of a Claim should consider in determining whether to vote to accept or reject the Plan.  Accordingly, each Holder of a Claim who is entitled to vote on the Plan should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or to reject the Plan.  There can be no guarantee that the assumptions, estimates, and projections underlying the Plan will continue to be accurate or valid at any time after the date hereof.

A.    General

The Plan sets forth the means for satisfying the Claims against and Interests in each of the Debtors.  Certain Claims are not expected to be paid in full.  Nevertheless, the reorganization of the Debtors' business and operations under the proposed Plan avoids the potentially adverse impact of the likely increased delays and costs associated with a chapter 7 liquidation of the Debtors.  The Plan has been proposed after a careful consideration of all reasonable restructuring alternatives.  Despite the risks inherent in the Plan, as described herein, the Debtors believe that the Plan is in the best interests of Creditors when compared to all reasonable alternatives.

B.    Plan May Not Be Accepted

There can be no assurance that the requisite acceptances to confirm the Plan will be obtained.  Thus, while the Debtors believe the Plan is confirmable under the standards set forth in Bankruptcy Code section 1129, there is no guarantee that the Plan will be accepted by the requisite Classes entitled to vote on the Plan.

C.    Certain Bankruptcy Considerations

Even if all voting Impaired Classes vote in favor of the Plan, and even if with respect to any Impaired Class deemed to have rejected the Plan the requirements for "cram-down" (discussed in more detail in Article VII herein) are met, the Bankruptcy Court, which, as a court of equity, may exercise substantial discretion, may choose not to confirm the Plan.  Bankruptcy Code section 1129 requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtors, and that the value of distributions to dissenting Holders of Claims and Interests will not be less than the value such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, see infra Article X.  Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

D.    Claims Estimations

The Debtors reserve the right to object to the amount or classification of any Claim or Interest except any such Claim or Interest that is deemed Allowed under the Plan or except as otherwise provided in the Plan.  The estimated Claim amounts set forth herein reflect the

Debtors' expectation of the Claims that will ultimately be allowed in each Class. However, there can be no assurance that such estimated Claim amounts are correct or accurate. In addition, certain of the Claims against the Debtors are asserted or scheduled in unliquidated amounts. The Debtors' estimation of Allowed Claims assumes that such unliquidated amounts will not have a material impact on the actual aggregate dollar amount of Allowed Claims. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual Allowed amount of Claims may vary significantly from those estimated herein. Moreover, the Administrative Claims Bar Date and the Governmental Bar Date are both on dates after the Effective Date. Therefore, while an estimated amount of unpaid Administrative Claims incurred during the Chapter 11 Cases and claims that can be asserted by governmental units have been factored into the estimated recovery values, the actual amount of such claims may vary significantly from those estimated herein.

Moreover, various factors make certainty in creditor recoveries impossible. These factors include:

- The quantity and quantum of unscheduled of Claims filed by creditors in the Chapter 11 Cases;

- The ultimate determination as to the validity and amount of any Claims scheduled as contingent, unliquidated, or disputed by the Debtors;

- The quantity and quantum of Administrative Claims or other claims entitled to priority status under the Bankruptcy Code;

The Claims estimates set forth above are based on various assumptions. The actual amounts of certain Claims may differ significantly from those estimates should one or more of the underlying assumptions prove to be incorrect. Such differences may be material and adversely affect the percentage recovery to Holders of such Allowed Claims under the Plan.

E.      The Emerging Debtors' Business Is Uncertain

The Emerging Debtors may not be able to meet their projected financial results. To the extent the Emerging Debtors do not meet their projected financial results or achieve projected revenues and cash flows, the Emerging Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, and may be unable to service their debt obligations as they come due. Any one of these failures may preclude the Emerging Debtors from, among other things: (i) increasing their current customer base; (ii) taking advantage of future opportunities; (iii) servicing existing or future customers or fulfilling obligations to these customers; (iv) growing their business; or (v) responding to competitive pressures.

Further, a failure of the Emerging Debtors to meet their projected financial results or achieve their projected revenues and cash flows could lead to cash flow and working capital constraints, which may require the Emerging Debtors to seek additional working capital. The Emerging Debtors may not be able to obtain such working capital when it is required. Further,

even if the Emerging Debtors were able to obtain additional working capital, it may only be available on unreasonable terms.  For example, the Emerging Debtors may be required to take on additional debt, the interest costs of which could adversely affect the results of the operations and financial condition of the Emerging Debtors.

In addition, the Debtors have faced  operational challenges and a difficult market in recent years.  There can be no guarantee that the Emerging Debtors will not face further operational or market-based challenges, which could prevent the Emerging Debtors from meeting the Financial Projections and servicing their debt obligations.

The Debtors' financial stability depends on their ability to win profitable contracts. While the Debtors believe that right-sizing the Emerging Debtors' capital structure will greatly improve the financial and competitive position of the Emerging Debtors, there is no guarantee that the Emerging Debtors  will succeed.

F.      Bankruptcy-Specific Risk Factors That Could Negatively Impact the Debtors' Business

During the Chapter 11 Cases, the Company's operations and its ability to execute its business strategy will be subject to risks and uncertainties associated with bankruptcy.  These risks include:

- the Company's ability to continue as a going concern;

- the Debtors' ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time;

- the Debtors' ability to develop, prosecute, confirm, and consummate the Plan

- the Company's ability to retain key vendors or secure alternative supply sources;

- the Company's ability to obtain and maintain normal payment and other terms with vendors and service providers;

- the Company's ability to maintain contracts that are critical to its operations; and

- the Company's ability to attract, motivate, and retain management and other key employees.

G.      The Debtors' Employees Face Uncertainty Due to the Chapter 11 Case.

As a result of the Chapter 11 Cases, the Debtors' employees are facing uncertainty.  A material erosion of the Debtor's employees' commitment could have a material adverse effect on the Debtors' business, particularly if the Chapter 11 Cases are protracted.

H.  Classification and Treatment of Claims and Interests

Bankruptcy Code section 1122 requires that the Plan classify Claims against, and Interests in, the Debtors.  The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class.  The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek (i) to modify the Plan to provide for whatever classification might be required for confirmation and (ii) to use the acceptances received from any Creditor under this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Creditor ultimately is deemed to be a member.  Any such reclassification of Creditors, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Creditor was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan.  There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification.  Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan of any Holder of Claims under this solicitation will constitute a consent to the Plan's treatment of such Holder regardless of the Class as to which such Holder is ultimately deemed to be a member.  The Debtors believe that under the Bankruptcy Rules, they would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim of any Creditor or equity holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest.  The Debtors believe that the Plan complies with the requirement of equal treatment.  To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

I.  Conditions Precedent to Consummation of the Plan

The Plan provides for certain conditions that must be satisfied (or waived) prior to the Effective Date.  As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived).  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

J.     Liquidation Under Chapter 7

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code, under which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and the Debtors' Liquidation Analysis is described herein and attached hereto as Exhibit B.

K.     Tax

The Debtors' evaluation of the material U.S. Federal income tax consequences of the Plan is ongoing and will be described in a subsequent amendment or supplement to this Disclosure Statement

L.     Anti-Trust Issues

Depending the jurisdiction that Subsea 7 operates, certain merger clearances may need to be obtained.  Completion of the merger may be delayed or blocked by the requirement to achieve such merger clearance.  The applicable waiting periods under the required competition laws shall have expired or shall have been terminated before closing of the merger.

M.     Uncertainty of Extraterritorial Recognition of Plan Confirmation

Certain of the Debtors are incorporated in jurisdictions other than the United States. Those Debtors are located in the United Kingdom, Singapore, Saudi Arabia, the Netherlands, Scotland, and Thailand.  Although the Debtors will make every effort to ensure that any Confirmation Order entered by the Bankruptcy Court and the steps taken pursuant to the Confirmation Order to implement the restructuring are recognized and are effective as a matter of foreign law, as applicable, it is possible that if a creditor or stakeholder were to challenge the restructuring and a foreign court were required to adjudicate on the effectiveness of the restructuring, that foreign court may refuse to recognize the effect of the Confirmation Order.

N.     Arrest of Vessels

Crew members, suppliers of goods and services to a vessel, shippers of cargo, vessel financing participants, charter parties, and other parties may be entitled to a maritime lien against a vessel for unsatisfied debts, claims or damages.  In many jurisdictions, a maritime lien holder may enforce its lien by arresting a vessel through a foreclosure proceedings.  The arrest or attachment of one or more of the Debtors' vessels could interrupt their cash flow and require them to make significant payments to have the arrest lifted.

O.     The Conditions to the Effective Date May Not Be Waived or May Not Occur

The Plan contains various conditions to the Effective Date, which must either be waived or occur before the Plan goes effective.  It is possible that some or all of the conditions may not occur.

## ARTICLE IX.

## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain Holders of Claims that are entitled to vote to accept or reject the Plan. The following summary does not address the U.S. federal income tax consequences to Holders whose Claims are Unimpaired, otherwise entitled to payment in full in cash under the Plan, or deemed to reject the Plan.

The following summary is based on the Internal Revenue Code (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given that the IRS will not challenge, nor that a court will sustain, any of the considerations discussed herein. In addition, this summary generally does not address foreign, state, or local tax consequences of the Plan, nor does it address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (such as broker-dealers, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations (including, without limitation, certain pension funds), persons holding a Claim as part of a constructive sale, straddle, or other integrated transaction, and investors in pass-through entities).

The tax treatment of Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Holder in exchange for the Claim and whether the Holder receives distributions under the Plan in more than one taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the Holder has previously included accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; (xi) whether the Claim, and any instrument received in exchange therefor, is considered a "security" for U.S. federal income tax purposes; and (xii) whether the "market discount" rules are applicable to the Holder. Therefore, each Holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

Accordingly, the following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a Holder of a Claim.

A.    Consequences to the Debtors

1.    Recognition of Gain or Loss

The Debtors will recognize gain or loss equal to the difference between the cash consideration received in exchange for their and the adjusted tax basis of such Purchased Assets. In the case of the Constellation Debtor, if no Constellation Qualified Offer is accepted, then the Constellation Debtor will recognize gain or loss equal to the different between the fair market value of the Constellation and its adjusted tax basis in the Constellation. Any net gain resulting from the transfer of assets can be offset by the tax attributes available to the Debtors, such as net operating losses, capital loss carry-forwards, bad debt deductions, asset basis, or other deductions from, or offsets to, income. Such gain should only be subject to US federal income tax if the applicable Debtor (i) is a corporation (including any entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia (collectively, a "U.S. Corporation"), or (ii) is not a U.S. corporation but is engaged in a trade or business in the United States and the assets sold are connected with such trade or business.  Any U.S. federal income tax owed as a result of the sale of assets by the Debtors will be paid by the Debtors to the IRS.

2.    Cancellation of Indebtedness

In general, the Tax Code provides that the amount of any cancellation of debt ("COD") of a solvent taxpayer is included in income. The amount of COD income realized is generally the excess of the amount of indebtedness discharged over the value of any consideration given in exchange therefor. Certain statutory or judicial exceptions may apply to limit the amount of COD income incurred for U.S. federal income tax purposes. In addition, COD income is excluded from income if a taxpayer is insolvent (but only to the extent of the taxpayer's insolvency) or if the COD income is realized pursuant to a confirmed plan of reorganization or court order in a chapter 11 bankruptcy case of the taxpayer, such as the Plan.  Thus, although the Debtors will realized COD income as a result of the Plan, they will not be required to recognize any of that COD income for U.S. federal income tax purposes.

When the insolvency or bankruptcy exception to COD income inclusion applies, the Tax Code provides that a taxpayer must reduce certain of its attributes—such as net operating loss ("NOL") carryforwards, capital losses, tax credits, and tax basis in assets—by the amount of any COD excluded from income. The taxpayer can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes.

Any reduction in tax attributes in respect of excluded COD income does not occur until after the determination of the taxpayer's income or loss for the taxable year in which the COD income is realized. If the amount of COD income excludes available NOL carryforwards and other tax attributes available for reduction, such excess is permanently excluded from income.

As a result of the discharge of Claims pursuant to the Plan, including Classes 1H through 8H – Cancelled Intercompany Claims, the Debtors expect to incur a substantial amount of COD income. The extent to which NOLs and other U.S. tax attributes of the Debtors survive tax attribute reduction (and the extent of any basis reduction and potentially the identity of the assets whose basis is reduced) will depend upon the manner of applying the attribute reduction rules. Accordingly, there can be no assurance that the Debtors will have NOLs or other U.S. tax attributes following implementation of the Plan.

3.     Limitation of NOL Carryforwards and Other Tax Attributes

Following the implementation of the Plan, any remaining NOLs and certain other U.S. tax attributes allocable to periods prior to the Effective Date (collectively, "pre-change losses") to offset the Emerging Debtors' future taxable income is likely to be limited under section 382 of the Tax Code as a result of the acquisition of the Emerging Debtors by the Plan Sponsors.

Under section 382, if a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is subject to an annual limitation. A loss corporation generally undergoes an ownership change if the percentage of stock of the corporation owned by one or more 5% shareholders has increased by more than 50 percentage points over a three-year period (with certain groups of less-than-5% shareholders treated as a single shareholder for this purpose). In general, the amount of the annual limitation to which a corporation that undergoes an ownership change would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the ownership change (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (e.g., 2.09% for ownership changes occurring in June 2017).

This annual limitation sometimes may be increased in the event the corporation has an overall "built-in" gain in its assets at the time of the ownership change. For a corporation in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the stock value generally is determined immediately after (rather than before) the ownership change after giving effect to the surrender of creditors' claims, but subject to certain adjustments (which can result in a reduced stock value); in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.

Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year. However, if the corporation does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's pre-change losses (absent any increases due to recognized net built-in gains).

Accordingly, the impact of an ownership change on the Emerging Debtor depends upon, among other things, the amount of pre-change losses remaining after any reduction of attributes due to the COD income, the value of both the stock and assets of the Emerging Debtor at or

about the Effective Date, the continuation of its respective business, and the amount and timing of future taxable income, if any.

Among the pre-change losses to which section 382 applies, section 382 can operate to limit the deduction of "built-in" losses recognized subsequent to the date of the ownership change. If a loss corporation has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of built-in income, gain, loss, and deduction), then any built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as pre-change losses and similarly will be subject to the annual limitation. In general, a loss corporation's net unrealized built-in loss will be deemed to be zero unless such loss exceeds the lesser of (a) $10 million or (b) 15% of the fair market value of its assets (with certain adjustments) before the ownership change. Whether the US Debtor will be subject to the limitation for "built-in" losses will depend upon the respective value of the US Debtor's assets immediately before the Effective Date.

An exception to the foregoing annual limitation rules generally applies where qualified (so-called "old and cold") creditors of a debtor receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a confirmed chapter 11 plan. However, the Emerging Debtors do not expect that they will qualify for this exception.

The attributes of the US Debtor will likely be limited under section 382 of the Tax Code in the same manner as described above with respect to the Emerging Debtors in the event that the Plan Sponsors elect to acquire the equity of the US Debtor rather than its assets.  Similarly, the U.S. tax attributes of the Constellation Debtor will similarly be limited in the event the Constellation Lenders acquire the equity of the Constellation Debtor.

B.      Consequences to Holders of Interests

In accordance with the Plan, Holders of Interests will not receive any recovery under the Plan. A Holder of an Interest will generally recognize a loss in an amount equal to such Holder's adjusted tax basis in the Interest. Capital losses are subject to various limitations under the Tax Code.

C.      Consequences to Holders of General Unsecured Claims

1.      Allocation of Plan Distributions between Principal and Interest

The Plan provides that, to the extent that any Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest on such indebtedness, such distribution will, to the extent permitted by applicable law, be allocated for U.S. federal income tax purposes first to the principal amount of the Claim and Third, to the extent the distribution exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest. A Holder generally recognizes a deductible loss to the extent that any accrued interest claimed or amortized original issue discount ("OID") was previously included in income and is not paid in full. Current U.S. federal income tax law is unclear on this point, and no assurance can be given that the IRS will not challenge the Debtors' position. Holders of Claims are urged to consult their own tax advisors regarding the particular U.S. federal income tax

consequences to them of the treatment of accrued but unpaid interest, as well as the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income.

If, contrary to the intended position, such a distribution were treated as allocated first to accrued but unpaid interest, a Holder would realize ordinary income with respect to such distribution in an amount equal to the accrued but unpaid interest not already taken into income under the Holder's method of accounting, regardless of whether the Holder would otherwise realize a loss as a result of the Plan. A Holder should also recognize ordinary income on the exchange (but not in excess of the amount of gain recognized, as described above) to the extent a distribution is received in exchange for market discount not previously taken into account under the Holder's method of accounting.

2.    <u>Withholding, Backup Withholding, and Information Reporting</u>

In connection with the Plan and all Distributions under the Plan, the Plan Administrator and the Distribution Agent shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all Distributions under the Plan shall be subject to any such withholding, payment, and reporting requirements. The Plan Administrator and the Distribution Agent shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements. All amounts properly withheld from Distributions to a Holder as required by applicable law and paid over to the applicable taxing authority for the account of such Holder shall be treated as part of the Distributions to such Holder. All persons holding Claims shall be required to provide any information necessary to effect information reporting and withholding of such taxes. For example, with respect to any employee-related withholding, if the Debtors are obligated by law to withhold amounts from Distributions to a present or former employee to satisfy such present or former employee's tax and other payroll obligations, the Debtors may withhold a portion of the Distributions allocated to the Holder of an Allowed Claim that is a present or former employee, whether or not such Distributions are in the form of Cash, in such amount as is determined necessary to satisfy such Holder's tax and other payroll obligations with respect to the Distributions.

Notwithstanding any other provision of the Plan, (a) each Holder of an Allowed Claim that is to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Debtors for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Debtors in connection with such Distribution. Any property to be distributed pursuant to the Plan shall, pending the implementation of such arrangements, be treated as an undeliverable Distribution pursuant to Section 10.5 of the Plan.

Moreover, under certain circumstances, Holders may be subject to "backup withholding" with respect to payments made by the U.S. Debtors pursuant to the Plan, unless such Holder either (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact, or (ii) provides a correct U.S. taxpayer identification

92

number and certifies under penalty of perjury that the Holder is a U.S. person, the taxpayer identification number is correct and the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer claiming a loss in excess of specified thresholds. Each Holder is strongly urged to consult its tax advisor regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

## ARTICLE X.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords Holders of Claims and Interests the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such Holders. If the Plan is not confirmed, however, the theoretical alternatives include: (i) continuation of the pending Chapter 11 Cases; (ii) sale of the Debtors' assets under Bankruptcy Code section 363; (iii) alternative plan or plans of reorganization; or (iv) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code or insolvency proceedings in foreign jurisdictions.

A.  Continuation of the Bankruptcy Cases

If the Debtors remain in chapter 11, they could continue to operate their business and manage their properties as debtors in possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code. It is not clear whether the Debtors could survive as a going concern in protracted chapter 11 cases. In particular, the Debtors could have difficulty gaining access to sufficient liquidity to allow them to continue their operations as a going concern. Moreover, protracted chapter 11 proceedings will make it difficult for the Debtors to expand their customer base, which is critical to the ultimate success of the Debtors' business. As further discussed herein, the Debtors believe that they have accomplished the goals that chapter 11 has allowed them to achieve, and that the Company's key remaining challenges are operational and therefore do not require that they remain in chapter 11.

B.  Sale of Substantially all of the Debtors' Assets Under Bankruptcy Code Section 363

In lieu of the present Plan, the Debtors could sell substantially all of their assets to a buyer under Bankruptcy Code section 363. A section 363 sale would leave a residual estate consisting of the proceeds of the sale and any excluded assets and unassumed liabilities. Following the sale, the Debtors would remain in chapter 11 to administer this residual estate and

distribute proceeds to Creditors pursuant to a chapter 11 plan of liquidation or a liquidation pursuant to chapter 7 of the Bankruptcy Code.

The Debtors believe that the Plan represents a superior structure than a sale under Bankruptcy Code section 363. The Debtors believe the Plan provides recoveries equal to or greater than what Creditors would likely achieve in a section 363 sale, but with the advantages of greater efficiency and greater certainty as to outcome. In particular, notwithstanding applicable bankruptcy law, it is not clear that the valuable Aramco contracts could be assigned as part of a so-called 363 sale without the consent of Saudi Aramco. To bid on Aramco projects, prospective bidders must obtain a certification from Saudi Aramco, who has an extensive process for granting the certification, which can take up to six months. Additionally, there is no guarantee that Saudi Aramco will issue certifications. Therefore, it is not clear whether a potential asset purchaser could retain the Aramco contracts and the applicable Debtors' bidding certification if it acquired some of the Debtors' assets through a section 363 sale.

Therefore, while the Debtors believe that a section 363 sale remains a viable restructuring option in the event the Plan is not confirmed, the Debtors maintain that the Plan is, for the reasons set forth above, in the best interests of Creditors.

C.     Alternative Plans of Reorganization

If the Plan is not confirmed, the Debtors, or, after the expiration of the Debtors' exclusive period in which to propose and solicit a reorganization plan, any other party in interest in the Chapter 11 Cases, could propose a different plan or plans. Additionally, until the Plan is consummated, subject to certain conditions, the Debtors may determine to withdraw the Plan and propose and solicit different reorganization plans. Any such plans proposed by the Debtors or others might involve either a reorganization and continuation of the Debtors' businesses, or an orderly liquidation of its assets, or a combination of both.

Although alternative plans of reorganization are possible, the present Plan is the result of a thorough assessment of restructuring alternatives undertaken in consultation with key stakeholders. Accordingly, the Debtors believe the prospect of an alternative plan of reorganization that delivers greater value to economic stakeholders is remote.

Moreover, any Alternative Plan Sponsor would have to pay all outstanding DIP Obligations in full.

D.     Liquidation Under Chapter 7 or Chapter 11

If no plan is confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code. In chapter 7 cases, a trustee or trustees would be appointed to liquidate the assets of the Debtors. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective Holders of Claims or Interests.

The Liquidation Analysis attached hereto as Exhibit B illustrates the recoveries the Debtors anticipate in a liquidation scenario. The Liquidation Analysis is premised upon a hypothetical liquidation in a chapter 7 case. In the Liquidation Analysis, the Debtors have taken into account the nature, status, and underlying value of their assets, the ultimate realizable value

94

of their assets, and the extent to which such assets are subject to liens and security interests.  The likely form of any liquidation in a chapter 7 proceeding would be the sale of individual assets.  Based on this analysis, it is likely that a chapter 7 liquidation of the Debtors' assets would produce less value for distribution to each class of Creditors than that recoverable under the Plan.  In the Debtors' opinion, the recoveries projected to be available in a chapter 7 liquidation are not likely to afford Holders of Claims and Interests as great a realization potential as does the Plan.

## ARTICLE XI.

## PLAN SUPPLEMENT

Exhibits to the Plan not attached hereto shall be filed in one or more Plan Supplements.  Any Plan Supplement (and amendments thereto) filed by the Debtors shall be deemed an integral part of the Plan and shall be incorporated by reference as if fully set forth therein.  The Plan Supplements, once filed, may be viewed at the office of the clerk of the Court or its designee during normal business hours, by visiting the Court's website at http://www.txs.uscourts.gov/bankruptcy (PACER account required) or at the Claims, Noticing, and Solicitation Agent website  http://dm.epiq11.com/ECS, or by written request to the Claims, Noticing, and Solicitation Agent at:

> EMAS CHIYODA Subsea Limited,
> Epiq Bankruptcy Solutions
> P.O. Box 4412
> Beaverton, OR 97076-4412
> Email: ECS@epiqsystems.com
> Telephone:
> (844) 616-6629 within the United States or Canada; or
> (503) 597-5538 outside the United States or Canada.

Certain of the documents contained in any Plan Supplements shall be subject to approval by the Bankruptcy Court under the Confirmation Order, in accordance with the Plan and the Confirmation Order.

## ARTICLE XII.

## RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors recommend the Plan because it provides for greater distributions to the Holders of Claims and Interests than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller distributions to the Holders of Claims.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan support Confirmation and vote to accept the Plan.

Dated:  Houston, Texas
        May 24, 2017

                              Respectfully submitted,


                              EMAS Chiyoda Subsea Inc.


                              _____
                              Name:
                              Title:


                              EMAS CHIYODA Subsea Marine Base LLC


                              _____
                              Name:
                              Title:


                              Lewek Falcon Shipping Pte. Ltd.


                              _____
                              Name:
                              Title:

EMAS Chiyoda Subsea Services Pte. Ltd.

_____

Name:
Title:

EMAS-AMC Pte. Ltd.

_____

Name:
Title:

EMAS Saudi Arabia Ltd.

_____

Name:
Title:

Lewek Constellation Pte. Ltd.

_____

Name:
Title:

PORTER HEDGES LLP

By:   _____
       John F. Higgins (No. 09597500)
       Joshua W. Wolfshohl (No. 24038592)
       Aaron J. Power (No. 24058058)
       Brandon J. Tittle (No. 24090436)
       1000 Main Street, 36th Floor
       Houston, Texas 77002
       Telephone: (713) 226-6000
       Fax: (713) 228-1331

       -and-

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
       George N. Panagakis (admitted *pro hac vice*)
       Justin M. Winerman (admitted *pro hac vice*)
       Robert Fitzgerald (admitted *pro hac vice*)
       Roy Leaf (admitted *pro hac vice*)
       155 N. Wacker Dr.
       Chicago, Illinois 60606-1720
       Telephone: (312) 407-0700
       Fax: (312) 407-0411

*Counsel for Debtors and Debtors in Possession*

## EXHIBIT A

**Third Amended Joint Chapter 11 Plan of Reorganization of Certain Affiliated Debtors of EMAS CHIYODA Subsea Limited**

**<u>EXHIBIT B</u>**

**Liquidation Analysis**

**<u>EXHIBIT C</u>**

**Debtors' Corporate Structure Chart**

## **<u>EXHIBIT D</u>**

**Disclosure Statement Approval Order**